## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA; STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, AND WASHINGTON; THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA; THE DISTRICT OF COLUMBIA; GUAM, PUERTO RICO, AND THE U.S. VIRGIN ISLANDS, <br><br> *ex rel.* LEONARDO S. SORGI, <br><br> Plaintiffs, <br><br> v. <br><br> JAZZ PHARMACEUTICALS PLC, JAZZ PHARMACEUTICALS, INC., and JAZZ PHARMACEUTICALS IRELAND LIMITED, <br><br> Defendants. | Civil Action No. 21-_____ <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3733 AND ANALOGUE STATE STATUTES** <br><br> ***QUI TAM* ACTION FILED *IN CAMERA* AND UNDER SEAL AS REQUIRED BY 31 U.S.C. § 3730(b)(2)** <br><br> **DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** <br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

PARTIES ............................................................................................................... 5

JURISDICTION AND VENUE ............................................................................ 6

BACKGROUND ................................................................................................... 7

    A.    Federal and State-Funded Healthcare Programs ...................................... 7

        1.    Medicare .......................................................................................... 7

        2.    Medicaid ........................................................................................... 8

        3.    Other Government-Funded Health Programs ................................. 9

    B.    Regulatory Framework for the Approval of Generic Drugs ...................... 9

    C.    Applicable Principles of U.S. Patent Law ............................................... 11

ALLEGATIONS CONCERNING DEFENDANTS' FALSE CLAIMS ............................. 13

    A.    Defendants Procurement of the Xyrem Patents by Fraudulently Withholding Critical Prior Art from the Patent Office .............................. 13

    B.    Defendants' Affirmative Acts in Furtherance of the Fraud to Maintain an Illegal Monopoly Despite Knowing that its Patents are Invalid and Unenforceable ...................................................................... 18

    C.    Defendants' Submission of False or Fraudulent Claims to Government Healthcare Programs ............................................................ 20

        1.    Materiality ...................................................................................... 24

        2.    Scienter .......................................................................................... 27

CAUSES OF ACTION ......................................................................................... 28

PRAYER FOR RELIEF ...................................................................................... 79

Plaintiff-Relator Leonardo Sorgi ("Relator"), through his attorneys on behalf of the United States of America; the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and Washington; the Commonwealths of Massachusetts and Virginia; the District of Columbia; and Guam, Puerto Rico, and The U.S. Virgin Islands (the foregoing states, commonwealths, district, and territories collectively, "the Plaintiff States"), for his Complaint against defendants Jazz Pharmaceuticals plc, Jazz Pharmaceuticals, Inc., and Jazz Pharmaceuticals Ireland Limited (collectively, "Jazz" or "Defendants"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## INTRODUCTION

1.      This case arises under the *qui tam* provisions of the federal False Claims Act ("FCA"0F), 31 U.S.C. §§ 3729–3733, and its state counterparts, which create civil liability when a defendant makes, or causes to be made, a false or fraudulent claim for payment to the government. The FCA is the government's primary civil tool to redress fraud on the public, and permits knowledgeable whistleblowers, such as Relator, to sue on the government's behalf. Like many FCA cases, this one is about overpriced prescription drugs.

2.      Relator also asserts claims under the California Insurance Frauds Prevention Act ("IFPA"), Cal. Ins. Code §§ 1871-1879.8, because Defendants have submitted or caused the submission of a "false or fraudulent claim for payment of a health care benefit" in violation of Cal. Penal Code § 550(a)(6) and Cal. Ins. Code § 1871.7.

3.      The cost of prescription drugs is one of the most intractable problems facing the American healthcare system. While pharmaceutical manufacturers have advanced myriad rationalizations for soaring costs, it is beyond debate that one of the fundamental reasons why drug prices stay high is that brand-name manufacturers use patents to prevent competitors from entering the market and continuously charge inflated monopoly prices until the patents expire.

4.      Critically, the point of the patent system is not to grant inventors a perpetual monopoly; it is to allow them to benefit from their discoveries for a set period, while encouraging others to wait in the wings until competition is permitted. When drug patents expire, generic drug companies can begin to offer the same medications at much lower prices. The onset of competition from generic manufacturers also typically brings down the price of the brand-name drug as well.

5.      The powerful incentives to maintain monopoly pricing have caused many brand-name manufacturers to attempt to "evergreen" their patents by seeking new patents on brand-name drugs as the old ones expire. These new patents frequently are of questionable validity. Many seek to patent features or uses of the drug that are obvious in light of prior art, or otherwise not inventive or useful.

6.      Sometimes, manufacturers attempting to extend their patent monopoly cross legal and ethical lines by engaging in deceptive conduct—such as by concealing or failing to disclose information that would cause the Patent Office to reject an application. When manufacturers dishonestly maintain their monopoly, they fraudulently impose massive costs on the U.S. healthcare system, which continues to pay inflated monopoly prices.

7.      This is such a case. Defendants manufacture, sell, and distribute Xyrem, which doctors widely prescribe for the treatment of narcolepsy and other sleep disorders.[1]

---

[1] The active ingredient in Xyrem is sodium oxybate, which is the sodium salt of gamma-hydroxybutyrate, otherwise known as "GHB."

The original patent on the chemical compound has long ago expired, but Defendants have maintained an unlawful drug monopoly by abusing the patent system through fraud, as described below.

8.      In the United States, a one-month prescription of Xyrem typically costs over $16,000. This represents a tenfold increase in the price of the medicine since it first received approval in 2002 by the United States Food and Drug Administration ("FDA").

9.      Defendants make over $1.6 billion each year selling Xyrem, which is covered by Medicare, Medicaid, and various other publicly-funded government health programs. According to the Centers for Medicare & Medicaid Services ("CMS"), Defendants received $255,629,021 from Medicare and $105,201,742 from Medicaid for Xyrem in 2019 alone. Upon information and belief, the amount of annual government payments or reimbursements for Xyrem has continued to increase since then, based on the high rate of growth in Medicare and Medicaid spending for Xyrem since 2015.

10.      Defendants knew that at least nine generic manufacturers were ready, willing, and able to introduce generic competition to Xyrem. Such generic competition would have reduced the price of sodium oxybate by at least 85%, and Defendants would have reasonably expected to lose 90% or more of Xyrem's market share.

11.      To protect the outsized profits stemming from their monopoly on Xyrem, Defendants fraudulently procured a series of new use-patents by withholding critical prior art, which—if properly disclosed to the Patent Office—would have precluded the issuance of such patents. As detailed herein, Defendants have repeatedly asserted or relied upon these fraudulently obtained, to preclude generic competitors from entering the market.

12.      As a result, Defendants have been able to charge artificially inflated prices for Xyrem and to charge for Xyrem when prescriptions would otherwise have been filled with a generic alternative.

13.     Even though Defendants knew the fraudulent patents would eventually be invalidated, the delay caused by Defendants' fraudulent course of conduct in manipulating the regulatory structure for generic approval (described below) has allowed Defendants to wrongfully shield hundreds of millions of dollars in Xyrem revenue, much of it paid by federal and state government funds.

14.     These tremendous public expenditures are attributable to Xyrem's fraudulently inflated price, which tainted every claim for payment or reimbursement for Xyrem.

15.     By systematically overcharging the United States and the Plaintiff States for Xyrem, Defendants violated the federal FCA, and various analogue statutes of the respective Plaintiff States. And each sale or claim for reimbursement for Xyrem constituted a separate actionable violation of these laws.

16.     As set forth below, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by the United States Government and each of the Plaintiff States in connection with the sale of Xyrem (each, a "False Claim"). These False Claims include, without limitation: (a) claims for Medicare and Medicaid reimbursement for Xyrem prescriptions; and (b) claims for payment relating to government purchases of Xyrem under certain government healthcare programs, such as the Veterans Health Administration. The systematic overcharging also causes federal and state managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicare Advantage and Medicaid programs.

17.     The Federal FCA and the State FCAs provide a mechanism for the federal and state governments to protect their healthcare funds from such unlawful predation. Relator brings this *qui tam* action to do so.

## PARTIES

18.    Plaintiff-Relator Leonardo S. Sorgi ("Relator"), is a patent attorney whose practice focuses on investigating invalid pharmaceutical patents that brand manufacturers use to protect their drugs from price competition. He also is the president and founder of Lahti Analytica, Inc., a company that provides business and consulting services to help clients develop, protect, and maximize the value of their intellectual property. Through his independent investigation, Relator has uncovered the information supporting the claims set forth herein. Relator's independent research and investigation has generated information that is independent of, and materially adds to, any publicly-disclosed allegations and transactions. Relator also has direct knowledge of the information on which the allegations are based within the meaning of the IFPA.

19.    Relator seeks to recover all available damages, civil penalties, and other relief for the federal and state-law violations alleged herein. In particular, Relator sues to recover on behalf of the United States Government and its various agencies administering government-funded healthcare programs, including, without limitation, Medicare; Medicaid; CHIP; the Indian Health Service; the Federal Bureau of Prisons' Health Services Division; the Veterans Health Administration; the Military Health System; the Defense Health Agency / TRICARE; and the Coast Guard's Office of Health Services. Relator also sues to recover on behalf of the Plaintiff States and their respective agencies administering state programs for prescription drug coverage, including, without limitation, Medicaid contributions. Finally, Relator sues on behalf of the State of California under the IFPA for the submission of false or fraudulent claims for the payment of health care benefits, including those under contracts of insurance.

20.    Defendant Jazz Pharmaceuticals plc is an Ireland public limited company with principal executive offices located in Dublin, Ireland; Jazz Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware having a

principal place of business in Palo Alto, California; and Jazz Pharmaceuticals Ireland Limited is a corporation organized and existing under the laws of Ireland having a principal place of business in Dublin, Ireland (collectively, "Jazz" or the "Defendants). At all relevant times, Jazz manufactured and distributed medicine for people with sleep disorders, including Xyrem.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. §§ 3730(b)(1) and 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. In addition, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court over the state law claims.

22.     Although no longer a jurisdictional requirement, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Moreover, whether or not such a disclosure had occurred, Relator would qualify as an "original source," within the meaning of 31 U.S.C. § 3730(e)(4)(B) and all of the applicable state analogue statutes, of the information in this Complaint, even if there had been any previous public disclosure of any aspect of the fraud alleged herein. Relator has direct and independent knowledge of the information on which the allegations herein are based that would materially add to such allegations or transactions. Among other information, Relator has provided facts demonstrating that Defendants intentionally failed to disclose prior art to the Patent Office that would have precluded them from obtaining the very patents they currently rely on to maintain their monopoly on the sale of Xyrem in the United States. Relator voluntarily provided the information to the federal government and the Plaintiff States before filing this action and before any public disclosure of the allegations and transactions in this Complaint material to the false claims alleged herein.

23.     This Court has personal jurisdiction over each of the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, each of the Defendants entities maintain minimum contacts with the United States, can be found in and transact business in this District, and caused false claims to be submitted in this District.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District. At all times relevant to this Complaint, each of the Defendants regularly conducted substantial business within this District and made significant sales within this District. Moreover, numerous acts violating 31 U.S.C. §§ 3729–3733 occurred in this District.

## BACKGROUND

### A.     Federal and State-Funded Healthcare Programs

25.     Government-funded healthcare programs cover medical services and prescription medications for one-third of the United States population.

#### 1.     Medicare

26.     Medicare is a federally-funded health insurance program primarily benefitting the elderly. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted. The Medicare program is administered by CMS.

27.     The Medicare program has four parts. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other healthcare providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider. Medicare Part C covers certain

managed care plans. Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

28.    Medicare provides benefits for patients being treated with Xyrem.

29.    Medicare Part D prices are particularly susceptible to unlawful inflation compared with other government programs because there is no set ceiling price. Instead, Medicare Part D sponsors will typically negotiate prices that are directly affected by market prices that are inflated through the exclusion of competitors. The price for drugs paid by Medicare Part D are typically much higher than the price paid by the government for other programs and generally range from 130% to over 150% of the listed price on the Federal Supply Schedule. In negotiating and setting prices, Medicare sponsors will usually factor in the drug's price listed on the Federal Supply Schedule.

30.    Many Medicare Part D prescription drug plans also require Step Therapy as a utilization management restriction that requires covered patients to first try less expensive alternatives (which would include generic drugs or cheaper biosimilars) before the plan will cover more expensive drugs. By unlawfully excluding competitors from introducing less-expensive generics through the assertion of the fraudulently-obtained patents in this case, Defendants have caused the filling of prescriptions for Xyrem that would have been filled with less-expensive generics, had they been available.

### 2.    Medicaid

31.    Medicaid is jointly administered by the United States and each state.

32.    Individual state Medicaid programs are administered by each state, subject to oversight by the United States in accordance with statutes and with

regulations promulgated by the Secretary of the DHHS. Pursuant to these statutes and regulations, the United States provides financial assistance to each of the state Medicaid programs by providing each state with financing equal to at least 50% of the costs incurred by the state Medicaid programs. In some instances, the United States pays for up to 75% of program costs incurred, including the costs incurred for reimbursing providers for dispensing prescription drug products (such as Xyrem) to Medicaid beneficiaries.

33.    Each state Medicaid program obtains federal financial assistance by submitting quarterly claims to the United States for costs incurred administering the state Medicaid programs.

### 3.    Other Government-Funded Health Programs

34.    Other major government-funded health programs—including the Children's Health Insurance Program ("CHIP"); the Indian Health Service; the Federal Bureau of Prisons' Health Services Division; the Veterans Health Administration; the Military Health System; the Defense Health Agency / TRICARE; the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"); and the Coast Guard's Office of Health Services—also purchase significant amounts of Xyrem for their covered patients.

### B.    Regulatory Framework for the Approval of Generic Drugs

35.    Under the Food, Drug, and Cosmetic Act ("FDCA"), a manufacturer must obtain FDA approval to sell a new drug by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301–392. An NDA must include submission of specific data concerning the safety and efficacy of the drug, and it must also identify any patent that could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the approved brand. *See* 21 U.S.C. § 355(a), (b).

36.     When the FDA approves an NDA, it publishes the patents identified by the brand manufacturer in a database of "Approved Drug Products with Therapeutic Equivalence Evaluations," which is commonly known as the "Orange Book." The Orange Book is an official publication of the FDA. Patents issued after NDA approval may be listed in the Orange Book within thirty days of issuance. 21 U.S.C. § 355(b)(1), (c)(2).

37.     By listing a patent in the Orange Book, a pharmaceutical company is representing, in an official government publication, that the patent is both valid and enforceable. The FDA relies completely on the manufacturer's truthfulness about patent validity and applicability when listing patents in the Orange Book. That is because the agency does not have the resources or authority to independently verify the scope and validity of each manufacturer's patents. In listing patents in the Orange Book, the FDA merely performs a ministerial act. Therefore, pharmaceutical companies have a duty to list only those patents which they believe in, good faith, can be validly asserted to restrict the entry of generics onto the market.

38.     The Hatch-Waxman Amendments to the FDCA, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. A generic manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"), which relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA.

39.     As part of the application process, a generic manufacturer must certify that either no patent for the brand name drug has been filed with the FDA (a "Paragraph I certification"); that the patent for the brand drug has expired (a "Paragraph II certification"); that the patent for the brand name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III certification"); or that the patent for the brand drug

is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

40.    Because ANDAs with Paragraph I, II, or III certifications face no potential patent challenge, FDA approval of these ANDAs is relatively expeditious. When generic manufacturers file Paragraph IV certifications, however, brand manufacturers are able to trigger extensive regulatory delays that will block FDA approval of generic entry — potentially for many years.

41.    When a generic manufacturer files a Paragraph IV certification, it must promptly provide notice to the brand manufacturer. Filing an ANDA with a Paragraph IV certification gives rise to a cause of action for patent infringement regardless of the merits of the action. If the brand manufacturer initiates a patent infringement action against the generic filer within 45 days of receiving notification, the FDA will not grant final approval to the ANDA until the earlier of: (a) the passage of 30 months from the notification date, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.

42.    Therefore, as a practical matter, the filing of a patent infringement action provides a brand manufacturer with the equivalent of an automatic 30-month injunction that prevents competition from the generic manufacturer—irrespective of the underlying merits in the infringement action.

C.    **Applicable Principles of U.S. Patent Law**

43.    Under applicable patent law, an application for a patent will be rejected by the Patent Office if the invention was "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102. Even if the invention was not disclosed in detail, a claim is unpatentable if the prior art is such that the subject matter, as a

whole, would have been obvious to a person having ordinary skill in the art. 35 U.S.C.
§ 103.

44.    The term "prior art" broadly encompasses all publicly available
information that might be relevant to a patent's claims of originality. If the Patent
Office uncovers prior art that satisfies sections 102 or 103, it establishes a *prima facie*
case of obviousness. To overcome a *prima facie* case of obviousness, the patent applicant
has a number of options, including: (i) narrowing the invention to distinguish over the
prior art; (ii) arguing the prior art does not render the claim obvious; or (iii) submitting
objective evidence of secondary considerations, including commercial success, long-felt
but unsolved need, and failure of others. A person or entity can challenge the validity of
an issued patent by filing a petition for *inter partes* review ("IPR") proceedings before
the Patent Trial and Appeal Bureau ("PTAB"). 35 U.S.C. § 311.

45.    Patent applicants have an affirmative duty of candor and good faith,
which includes the duty to disclose all material prior art known to the applicant at the
time of the application. 37 C.F.R. § 1.56 (""Each individual associated with the filing
and prosecution of a patent application has a duty of candor and good faith in dealing
with the Office, which includes a duty to disclose to the Office all information known to
that individual to be material to patentability as defined in this section."). Failure to
disclose material prior art to the Patent Office can render a patent unenforceable. *See,
e.g.*, *C.R. Bard, Inc. v. M3 Sys.*, 157 F.3d 1340, 1367 (Fed. Cir. 1998) ("Fraud in
obtaining a United States patent is a classical ground of invalidity or unenforceability
of the patent.").

## ALLEGATIONS CONCERNING DEFENDANTS' FALSE CLAIMS

A.     **Defendants' Procurement of the Xyrem Patents by Fraudulently Withholding Critical Prior Art from the Patent Office**

46.     Xyrem (sodium oxybate or GHB) is a central nervous system (CNS) depressant medication that is generally indicated for treatment of narcolepsy and cataplexy. Valproate, also known as valproic acid or divalproex, and sold in a sodium form under the trade name Depakote, is another CNS depressant medication that is used primarily for the treatment of bipolar disorder, seizures, and migraine headaches. When Xyrem was initially approved by the FDA, the product label cautioned against concurrent use of Xyrem with other CNS depressants like Valproate, for safety reasons. Despite this, persons of ordinary skill in the art understood that, when it is therapeutically necessary for a patient to take two drugs at the same time, one standard and routine strategy for doing so is to reduce the dosage of one or both drugs.[2] In fact, the FDA itself recommended doing this.[3]

47.     The Defendants previously listed over twenty patents in the Orange Book covering Xyrem. Although Jazz asserted many of those patents in litigation against generics, they all expired or were invalidated by January 2021, except for five patents that will not expire until 2033.[4] Based on these patents, Jazz negotiated settlements

---

[2] *See, e.g., Stockley's Drug Interactions,* K. Baxter Ed., Eighth Edition (2008 Pharmaceutical Press).

[3] *See, e.g.,* FDA's Center for Drug Evaluation and Research, Guidance for Industry: Drug Interaction Studies—Study Design, Data Analysis, Implications for Dosing, and Labeling Recommendations (Feb. 2012) ("FDA Guidance") at 2-3.

[4] Xyrem is also protected by U.S. Patent No. 8,731,936, which is directed to a risk evaluation and management strategy ("REMS") distribution system. Some, but not all of the claims, in the '936 patent have been invalidated. The '936 patent did not create a material obstacle to entry of a generic competitor to Xyrem because (i) Jazz has already represented that it lacks sufficient information to assert infringement against at least one generic manufacturer (Roxane); (ii) the claims that have not yet been invalidated for the '963 patent require limitations for cash payers that were not infringed by at least one generic's (Roxane) approved REMS; (iii) the '936 patent is invalid for being directed to ineligible subject matter under 35 U.S.C. § 101, and at least one generic

(continued...)

with generics manufacturers to allow them to enter the market as late as 2026 (and, in some limited circumstances, 2023).

48.    The patents that will not expire until 2033 belong to a family of patents including U.S. Patent Nos. 8,772,306; 9,050,302; 9,486,426; 10,213,400 and 10,864,181.[5] Each of these patents is directed to co-administering Xyrem with other CNS depressants like Valproate, in a manner that would be safe, but still therapeutically effective, by simply reducing the dosage of Xyrem.

49.    The '306 patent was the first patent in the family to issue, and it was filed on March 15, 2013. The patent was granted by the Patent Office because the Examiner believed that the available prior art taught away from combining GHB (*i.e.*, Xyrem) and Valproate. The Patent Office stated, "[t]he prior art of record teaches away from the claimed invention [because it teaches] that [Valproate] can create a therapeutic problem using GHB."[6]

50.    But this conclusion was flatly wrong: Jazz misled the Patent Office into believing that prior art taught away from combining GHB and Valproate. Indeed, long before Jazz filed for the '306 patent, there were already several sources of prior art teaching the safe and effective co-administration of GHB and Valproate, and Jazz knew about them. Had that prior art been properly disclosed to the Patent Office, that would have precluded Defendants from obtaining the '306 patent, or any others in that patent family.

---

(Roxane) has asserted that argument; and (iv) the '936 patent would not have prevented generic competition because at least one of the generic's REMS does not include a central pharmacy or central database, as required by claim 28 of the patent.

[5] Jazz only asserted three of these patents in litigation against generics, but for the reasons discussed herein, all five patents are equally invalid and were equally procured by fraud.

[6] *See* U.S. Patent Application No. 13/872,997, Notice of Allowance, Dec. 12, 2013 at 2.

51.    For example, long before filing the '306 patent and the other patents in its patent family, the FDA's Adverse Events Reporting System ("FAERS") database[7] already contained at least 30 documented instances showing the prior co-administration of GHB and Valproate between 2003 and 2012 in a safe and effective manner. Indeed, these incidence reports showed everything necessary to render the '306 patent obvious, including: (1) GHB and Valproate were regularly prescribed together and co-administered; (2) the prescriptions for taking GHB and valproate together were ongoing, suggesting safe and effective usage; and (3) the dosage of GHB was commonly reduced from the recommended dosages when co-administered with Valproate.

52.    The adverse event reports also demonstrate two other important facts:

    a.    First, Jazz clearly knew about these reports. In fact, the reports often specified the date they were sent directly to Jazz, and the FDA requires pharmaceutical manufacturers to record and investigate instances when the manufacturer receives reports of adverse events. Defendants also collected data on adverse events related to Xyrem from pharmacoviligance reports to the company, as well as information learned by the central pharmacy used by Defendants in connection with the established controlled distribution system for Xyrem.

    b.    Second, many of the reported adverse events resulted from something *other than* co-administration of GHB and Valproate—such as broken wrists, or as a result from an overdose of a third drug such as oxycontin, meaning that the co-administration of GHB and Valproate was not in itself problematic, particularly when the dosage of GHB had been reduced.

53.    Thus, the reports and the database were clearly material to the patentability of the '306 patent. The Patent Office granted the '306 patent on the

_____

[7] This database was made accessible by way of quarterly releases beginning in 2004, including electronic files that could be accessed, manipulated and downloaded into searchable programs, and was available online beginning in September 2012..

understanding that no available prior art taught the safe and effective co-administration of Xyrem with other CNS depressants like Valproate. But that is precisely the *opposite* of what was taught by the adverse event reports going back years before Jazz filed for the '306 patent.

54.    In addition to the adverse events reports, on December 17, 2012, an FDA Safety Communication was published, specifically instructing physicians to reduce the normal dose of Xyrem when prescribing it in conjunction with CNS depressants like Valproate. In other words, FDA knew that doctors had been co-administering Xyrem with other CNS depressant like Valproate, and told them to lower the dosage when doing so.

55.    Around the same time, the FDA also directed Jazz to update its product label to indicate that Xyrem could safely be co-administered with CNS depressants like Valproate at lower doses. The updated 2012 label states, in relevant part, that:

> Xyrem is a central nervous system (CNS) depressant. Alcohol and sedative hypnotics are contraindicated in patients who are using Xyrem. The concurrent use of Xyrem with other CNS depressants, including but not limited to opioid analgesics, benzodiazepines, sedating antidepressants or antipsychotics, general anesthetics, muscle relaxants, and/or illicit CNS depressants, may increase the risk of respiratory depression, hypotension, profound sedation, syncope, and death. *If use of these CNS depressants in combination with Xyrem is required, dose reduction or discontinuation of one or more CNS depressants (including Xyrem) should be considered.*

(emphasis added).[8]

56.    Jazz clearly knew about the FDA's 2012 Communication and its revised 2012 label because both directly concerned Jazz's drug, Xyrem. Further, an instruction by the FDA, on the one hand, and an instruction in a package insert, on the other hand, that Xyrem and CNS depressants like Valproate could be taken together, were each clearly material to the patentability of the '306 patent.

---

[8] By contrast, the previous label had expressly stated that Xylem "should not be used in combination with sedative hypnotics or other CNS depressants."

57.    Thus, while the Patent Office's reasons to allow the patents indicated that the prior art taught away from co-administering these drugs, the reality was that this is precisely what the FDA communication and revised label expressly teach.

58.    Simply put, there was nothing novel about the idea of prescribing Xyrem together with other CNS depressants like Valproate when Jazz filed its new patent application on that basis on March 15, 2013.

59.    Instead of disclosing these multiple instances of prior art—which would have precluded the issuance of any new patents on that basis—Defendants knowingly and purposefully omitted this material information from the Patent Office during examination of the '306 patent.

60.    Jazz's fraud was not limited to the '306 patent alone. Rather, Jazz's fraud infected each of the other patents in the family. All five patents in the family are substantively the same and generally directed to co-administering Xyrem with other CNS depressants like Valproate, by simply reducing the dosage of Xyrem. The Patent Office initially observed that all of the patents after the '306 patent may suffer from "double patenting," which is a common observation made by the Patent Office against multiple patents covering essentially the same invention. To overcome the Patent Office's double patenting concerns, and permit the patents to be granted, Defendants filed terminal disclaimers, which essentially reflect Defendants' acknowledgment that all five patents will expire at the same time. After that, in each case, the patents were granted, and the Patent Office essentially relied upon the prior examination of the '306 patent.[9]

---

[9] During the examination of two of the patents (the '400 and '181 patents) Jazz did affirmatively disclose the 2012 Xyrem label in September 2018 and June 2019, respectively. However, these disclosures were made after the other three patents issued, and Jazz never asserted the '400 and '181 patents in litigation against the generics. Further, Jazz's fraud on the '306 patent—principally through withholding the adverse event reports—infected the Patent Office's review of these final two patents.

61.     Defendants thus knowingly concealed the existence of material facts that otherwise would have precluded it from obtaining any new patents claiming the purportedly novel idea that Xyrem could safely be co-administered with other CNS depressants at reduced dosages. Consequently, the patents that Defendants previously relied upon to maintain their monopoly on sales of Xyrem until 2026 are plainly invalid and unenforceable.

**B.     Defendants' Affirmative Acts in Furtherance of the Fraud to Maintain an Illegal Monopoly Despite Knowing that its Patents are Invalid and Unenforceable**

62.     Between 2014 and 2017, nine different generic manufacturers submitted Abbreviated New Drug Applications ("ANDAs") with the FDA, seeking permission to produce generic versions of Xyrem. Some of these generics received tentative FDA approval as early as January 2017.

63.     Jazz filed patent infringement suits against each of these manufacturers and then settled the cases in a manner that would allow it to maintain its monopoly without ever having to litigate the validity of the Xyrem patents.

64.     In particular, Jazz asserted one or more patents from the '306 patent family against prospective generics that each filed an ANDA seeking license to distribute a generic version of Xyrem. This included the following lawsuits: (i) *Jazz Pharmaceuticals, Inc. v. Ranbaxy Laboratories Ltd.*, Case No. 2:14-cv-06151 (D.N.J); (ii) *Jazz Pharmaceuticals, Inc. v. Par Pharmaceutical, Inc.*, Case Nos. 2:14-cv-06150 and 2:15-cv-07580 (D.N.J); (iii) *Jazz Pharmaceuticals, Inc. v. Watson Laboratories, Inc.*, Case Nos. 2:14-cv-07757 and 2:16-cv-01505 (D.N.J); (iv) *Jazz Pharmaceuticals, Inc. v. Amneal Pharmaceuticals, LLC.*, Case Nos. 2:15-cv-01043, 2:15:-cv-06562, and 2:17-cv-01440 (D.N.J); (v) *Jazz Pharmaceuticals, Inc. v. Roxane Laboratories, Inc.*, Case Nos. 2:15-cv-01360 and 2:16-cv-00469 (D.N.J); (vi) *Jazz Pharmaceuticals, Inc. v. Wockhardt Bio AG*, Case Nos. 2:15-cv-05619 and 2:16-cv-00099 (D.N.J); (vii) *Jazz Pharmaceuticals,*

*Inc. v. Lupin Ltd.*, Case Nos. 2:15-cv-06548 and 2:18-cv-08267 (D.N.J); (viii) *Jazz Pharmaceuticals, Inc. v. Wockhardt Bio AG*, Case Nos. 2:15-cv-05619 and 2:16-cv-00099 (D.N.J); (ix) *Jazz Pharmaceuticals, Inc. v. Ascent Pharmaceuticals, Inc.*, Case No. 2:17-cv-05487 (D.N.J.); (x) *Jazz Pharmaceuticals, Inc. v. Mallinckrodt PLC*, Case No. 2:18-cv-00029 (D.N.J); and (xi) *Jazz Pharmaceuticals, Inc. v. Sun Pharmaceutical Industries, Ltd.*, 2:15-cv-08229 (D.N.J.).[10]

65. Upon information and belief, the settlement agreements included an unlawful pay-off to the generic manufacturers that will allow Jazz to maintain an effective monopoly on Xyrem for another five years into 2026 — despite knowing that its patents are invalid.[11]

_____

[10] The validity of the '306 patent has also been the subject of various challenges in *inter partes* review ("IPR") proceedings commenced by the generics before the Patent Trials and Appeals Bureau (the "PTAB," which is an expedited administrative court for patent infringement litigation). *See, e.g., Par Pharmaceutical, Inc. v. Jazz Pharmaceutical, Inc.*, IPR2016-00002 ("Par IPR"); *Ranbaxy, Inc. v. Jazz Pharmaceutical, Inc.*, IPR2016-00024 ("Ranbaxy IPR"); and *Amneal Pharmaceuticals LLC v. Jazz Pharmaceutical, Inc.*, IPR2016-00546 ("Amneal IPR"). During these IPR proceedings, the generics relied upon different prior art that did not expressly teach the safe and effective co-administration of the Xyrem and Valproate. By contrast, the adverse event reports, combined with the FDA communication and 2012 label, expressly teach that GHB and Valproate can be safely and effectively co-administered along with a reduction of GHB dosage. Thus, the prior art identified in this Complaint is not redundant of those reviewed in the IPRs.

Moreover, in litigating before the PTAB, Jazz made affirmative statements consistent with its earlier fraud on the USPTO: again, Jazz failed to disclose the 2012 label and instead cited the 2005 label. Specifically, in defending against a 2015 invalidity challenge to U.S. Patent No. 8,772,306 before the PTAB, Jazz cited the 2005 label, arguing that "[t]he 2005 Xyrem [label] ... expressly taught ... away from co-administering ... [Xyrem] and valproate and, therefore, taught ... away from" the claimed invention. *Par Pharmaceuticals, Inc. v. Jazz Pharmaceuticals Ireland Ltd.*, Case IPR 2016-00002, Patent Owner Preliminary Response, Paper No. 10 (January 15, 2016) at pp. 30, 32 (available by searching for 8772306 at https://ptab.uspto.gov/#/login). These arguments were wholly inconsistent with the 2012 label, which explicitly addressed the co-administration of these medications at lower doses.

[11] SEC disclosures about the settlements indicate that Jazz agreed to permit full generic competition in early 2026. Additionally, it appears that subject to Jazz's control,

(continued...)

66.     Needless to say, Jazz will not be able to sustain the exorbitant price that it charges for Xyrem once generic manufacturers enter the market.[12] Meanwhile, however, by staving off real competition until 2026, Jazz stands to make at least another $8 billion from the artificial price inflation on its best-selling drug.

67.     But-for Defendants' fraudulent actions, generic competitors should and would have been able to enter the market by January 2021, at the latest—which would have significantly reduced the cost of sodium oxybate and the number of on-brand Xyrem prescriptions purchased or reimbursed by government healthcare funds.

C.     **Defendants' Submission of False or Fraudulent Claims to Government Healthcare Programs**

68.     When an upstream fraud on the government taints claims for payment later submitted to the government, the claims are "false or fraudulent" within the meaning of the FCA.

69.     For example, if a government contractor obtains a contract by fraud, claims for payment later submitted under that contract are actionable under the FCA. Or if a manufacturer obtains FDA approval for a new drug by defrauding the FDA, then claims for payment for that drug are tainted by fraud and actionable under the FCA.

70.     It is also well-established that when drug manufacturers manipulate drug prices to the government's detriment, the resulting claims for payment are false or fraudulent.

71.     Here, Defendants maintained their patent monopoly by defrauding the Patent Office; therefore, each and every claim for payment submitted to the United

---

authorized generic sales by four manufacturers subject to royalty payments and revenue sharing will be allowed starting in 2023.

[12] Studies have shown that the drugs prices typically fall by 65% to 90% once a generic version of the medication enters the marketplace. *See, e.g.*, IMS Institute for Healthcare Informatics, *Price Declines after Branded Medicines Lose Exclusivity in the U.S.* at 2 (2016), https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/price-declines-after-branded-medicines-lose-exclusivity-in-the-us.pdf.

States and the Plaintiff States during the unlawfully extended monopoly period is tainted by that upstream fraud, and therefore actionable under the FCA and its state-law counterparts.

72.    The link between the fraud on the Patent Office and false claims to the government is clear and direct. Indeed, the entire point of Defendants' fraud was to extend the patent monopoly on Xyrem, so that they could continue to charge inflated prices to all payors, including government healthcare programs, and so Defendants could ensure that all of the payments for the medication—including all of the government payments—flowed to Defendants, and not generic competitors.

73.    The unlawful exclusion of generic competitors is especially damaging to the government. Many government programs require patients to use or consider using generic alternatives before using more expensive name-brand drugs. Thus, each and every claim for payment or reimbursement for Xyrem that would have been substituted for a less expensive generic equivalent also constituted a False Claim.

74.    Independently, Defendants directly defrauded government paying agencies by expressly and implicitly certifying to government payors that the price they were charging the government for Xyrem was "fair and reasonable," or at least not tainted by fraud, when they knew that the price was actually the product of an unlawfully extended monopoly.

75.    For a drug manufacturer to sell pharmaceutical products to the federal government under certain government programs—either directly through sales to a government agency, or indirectly by receiving reimbursement for sales through Medicaid—the manufacturer must enter into several agreements with the federal government in which the manufacturer reports prices and business practices that establish the purchase price or reimbursement amounts are "fair and reasonable" under federal acquisition regulations.

76.    For Defendants to market Xyrem to federal agencies or otherwise qualify Xyrem for reimbursement under certain government programs, Defendants must list Xyrem's prices on the Federal Supply Schedule ("FSS"), a program run by the General Services Administration ("GSA"). To do so, Defendants would have been required to sign a standard Master Agreement ("MA") and a Pharmaceutical Price Agreement ("PPA"). *See* 38 U.S.C. § 8126(a). The PPA must be renewed annually and include the non-federal average manufacturer price ("AMP") for the prior year. Moreover, drug manufacturers are required to update their AMP information to CMS every calendar quarter. *See* 42 C.F.R. § 414.804(a)(5). The AMP is used to calculate the Federal Ceiling Price ("FCP"), which is 76 percent of the AMP plus a discount pegged to the cost of living index. As part of this process, Defendants must periodically provide the federal government with Xyrem's commercial list price, the lowest price charged to any commercial customer (the "Most Favored Customer"), and the name and pricing information for a "Tracking Customer," which is the "customer or class of customers whose pricing is tracked against the awarded FSS pricing for the purposes of ensuring that prices remain *fair and reasonable* throughout the life of the contract" (emphasis added).*See* GSA Drugs, Pharmaceuticals & Hematology Related Products Solicitation, 02 – Vendor Response Document, p. 40.

77.    As part of the GSA's assessment of Xyrem pricing, Defendants were required to supply a written justification for offered pricing, a mechanism for future potential pricing adjustments, and proof that the price is fair and reasonable. *See* About GSA Schedules, available at https://www.gsa.gov/buying-selling/purchasing-programs/gsa-schedules/about-gsa-schedules.

78.    Drug manufacturers such as Defendants have an express obligation to provide truthful information about AMP pricing to the government, and such manufacturers may be subject to substantial penalties if they provide inaccurate AMP information. For example, the FSS Solicitation Document relating to drugs,

pharmaceuticals & hematology related products provides that: "[a]ccuracy of information and computation of prices is the responsibility of the Contractor . . . . Inclusion of incorrect information will cause the Contractor to resubmit/correct and redistribute the Federal Supply Schedule Price List, and may constitute sufficient cause for Cancellation . . . and application of any other remedies as provided by law— including monetary recovery." GSA Drugs, Pharmaceuticals & Hematology Related Products Solicitation, 01 - Solicitation Document, pp. 39–40.

79.     Moreover, to receive payment or reimbursement under Medicaid for Xyrem, Defendants must participate in the Medicaid Drug Rebate Program ("MDRP"). Under the MDRP, the manufacturer must submit product and pricing data for all of its drugs that are eligible for coverage under Medicaid to CMS *via* the Drug Data Reporting for Medicaid ("DDR") system. Under the agreement, the manufacturer must supply the AMP and the number of units sold to DHHS. Drug manufacturers are required to provide truthful information and are subject to substantial civil penalties if they provide false information to the government. *See* 42 U.S.C. § 1396r-8(b)(3)(C)(ii). When providing the AMP to CMS, Defendants implicitly certify that the average manufacturer price reported has not been unlawfully inflated through the exclusion of competitors.

80.     Defendants are also required to participate in the Section 340B Drug Pricing Program, administered by the Office of Pharmacy Affairs in the DHHS. Under this program, Defendants are required to provide drugs to eligible healthcare organizations and certain other entities at reduced prices based on pricing data supplied to the federal government, including with respect to the foregoing information provided to the DHHS and the GSA through the DDR and FSS, respectively.

81.     Defendants violated their obligations under these programs because the prices they negotiated with the government for Xyrem were based on illegally-obtained patent protection, and thus manifestly were not "fair and reasonable." Even if all of the

data Defendants provided to the government were literally accurate, Defendants misleadingly omitted the critical fact that their pricing was the product of an unlawfully extended patent monopoly, *i.e.*, a fraud on the government. That omission goes directly to whether the prices the government paid for Xyrem were fair and reasonable.

82.     Defendants, their employees and agents, individually and in concert, knowingly submitted or caused to be submitted False Claims to the United States Government and the Plaintiff States to secure payments for illegally inflated prices for sodium oxybate.

83.     The United States Government and the Plaintiff States were unaware of Defendants' fraudulent scheme, misrepresentations to the Patent Office, and wrongful listing of the patents in the '306 patent family in the Orange Book at the time they paid False Claims.

### 1.    Materiality

84.     Defendants' misrepresentations were material to the Patent Office's decision to grant the patents in the '306 patent family, the PTAB's holding for Defendants in IPRs, *and* the government's subsequent payment decisions.

85.     With respect to the Patent Office's determination, it is well-established that an application seeking a patent that is obvious over prior art should be rejected. These principles were well-known by practitioners in the field, particularly Defendants. But for Defendants' misrepresentations to the Patent Office, the Patent Office would never have issued the patents in the '306 patent family.

86.     Defendants' fraud was also material to the government's payment decisions.

87.     The price of a good that the government pays for is *per se* material to the government's payment decision. Had the price been less, the government would have paid less.

88.     In this case, the government would have paid *a lot* less. The United States and the Plaintiff States have spent and continue to spend hundreds of millions of dollars on Xyrem every year. As noted by the FDA, studies have demonstrated that the entry of generics lower prices for the drug by 85% and quickly capture 90% of the market. Defendants prevented this from happening with Xyrem by applying for and obtaining the patents in the '306 patent family. But for these illegally acquired patents, generic competitors could have entered the market for sodium oxybate, competing with Xyrem at least as early as January 2021, when the patent monopoly lawfully should have expired.

89.     But for Defendants' fraudulent conduct, at least one or more of the nine Xyrem ANDA filers would have already introduced generic alternatives to Xyrem sufficient to have satisfied demand for the drug. But for Defendants' unlawful conduct, competition would have lowered prices for sodium oxybate by 85% or more, and lower-priced generics would have filled 90% of Xyrem prescriptions. Instead, Defendants have used their fraudulently-acquired patent to prevent generic competitors from marketing and selling lower-priced alternatives.

90.     The government has repeatedly confirmed, by word and deed, that drug price manipulation is material to its payment decisions.

91.     The government objects to the abuse of patents to exclude generic competitors. *See, e.g., Fed. Trade Com'n v. AbbVie Inc.*, 329 F. Supp. 3d 98 (E.D. Pa. 2018), *aff'd in part, rev'd in part & remanded sub nom. Fed. Trade Com'n v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020).

92.     Government law enforcement views overcharging the government through anticompetitive conduct to be material and serious violation.[13]

---

[13] For example, a Department of Justice press release dated November 14, 2018 in connection with guilty pleas by foreign companies for bid-rigging states: "'The FBI remains committed to holding corporations—both foreign and domestic—accountable

(continued...)

93.    In purchasing drugs or reimbursing prescriptions as an end-payor for certain government healthcare programs, the United States Government and the Plaintiff States require manufacturers to report accurate prices to them for purposes of calculating the "fair and reasonable" price that the government will pay. Those calculations necessarily assume that the inputs given to the government are not tainted by upstream fraud that would inflate the price and cause the government to pay more than it otherwise would have.

94.    The sole purpose of Defendants' fraud was to cause all payors—including the government healthcare programs that spend about $400 million annually on this drug—to continue paying unlawful monopoly prices to Defendants, instead of fair prices determined by market competition. The inevitable and intended result was the gouging of the government and the unlawful enrichment of Defendants.

95.    The government is ineligible to challenge the validity of patents in a post-issuance review before the PTAB. *See Return Mail, Inc. v. United States Postal Serv.*, 2019 WL 2412904, at *11 (U.S. June 10, 2019). Therefore, recovering through the FCA for overcharges paid by the government for drugs whose prices have been unlawfully inflated as a result of fraudulently-obtained pharmaceutical patents is an important way for the government to protect healthcare funds from massive waste and fraud.

---

for anticompetitive conduct and fraudulent practices toward the United States,' said FBI Executive Assistant Director Amy Hess."

As another example, on May 10, 2019, 43 states and Puerto Rico filed suit against over a dozen pharmaceutical manufacturers and their executives for artificially inflating the price of generic drugs through anticompetitive conduct. *See State of Connecticut v. Teva Pharms. USA, Inc.*, No. 3:19-cv-00710-MPS (D. Conn. filed May 10, 2019).

As another example, the United States filed a criminal Information on May 30, 2019 against Heritage Pharmaceuticals Inc., in the Eastern District of Pennsylvania, 2:19-cr-00316-RBS, alleging that Heritage fixed the prices for a diabetes drug by suppressing and eliminating competition. In connection with the price-fixing allegations, Heritage agreed to pay over $7 million to settle the government's claims under the FCA.

### 2.    Scienter

96.    The FCA requires that the defendant have either actual knowledge of information (*e.g.*, that a claim is false) or acts with either deliberate ignorance or reckless disregard to the truth or falsity of the information.

97.    Defendants acted with the requisite scienter when they misrepresented the patentability of the patents in the '306 patent family. They actually knew or were reckless to the fact that the patents in the '306 patent family were invalid. Despite knowing these material facts, Defendants failed to disclose them to the Patent Office.

98.    Defendants knew that the United States and the Plaintiff States would be purchasers and third-party payers for Xyrem through direct or indirect sales of Xyrem or the payment of claims for prescription drug reimbursement submitted by providers under government programs. Thus, they knew that their fraud on the Patent Office would cause false claims to be submitted to the United States and the Plaintiff States.

99.    Defendants also had the requisite scienter when they submitted price information and subsequent claims for payment to the government. At all times, Defendants either actually knew, were deliberately indifferent to, or recklessly disregarded the fact that they had unlawfully extended their patent monopoly to inflate the price of Xyrem. Thus, Defendants knew that the pricing information they submitted to the government would not result in a price that was "fair and reasonable," and they knew that the claims they were submitting (or causing others to submit) were false or fraudulent because they were for inflated prices. Defendants also knew that the claims they submitted or caused to be submitted for the payment or reimbursement of Xyrem were false or fraudulent because they sought payment for Xyrem prescriptions that would have been filled by a less expensive generic but for Defendants' unlawful exclusion of competitors.

100.    In sum, this case does not involve a garden-variety attempt by a manufacturer to extend a patent monopoly. Defendants clearly and brazenly crossed

legal and ethical lines while extending the patent monopoly for Xyrem. They withheld critical information from the Patent Office, and then exploited the wrongful extension of the patent monopoly.

## CAUSES OF ACTION

### Count 1
### False Claims Act
### 31 U.S.C. §§ 3729–3733

101.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

102.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729–3733, as amended.

103.    Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment of Xyrem.

104.    Defendants also knowingly used false records and statements material to false claims for payment for Xyrem.

105.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the United States. Relator has no control over, or dealings with, such entities, and has no access to the records in their possession.

106.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the Government would not have paid but for Defendants' illegal conduct.

107.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

108.    Additionally, the United States is entitled to a civil penalty of $23,331 for each and every violation alleged herein, and additional civil penalties under the applicable provisions of each analogue state statute.

## Count 2
## California False Claims Act
## Cal. Gov't Code §§ 12650–12656

109.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

110.    This is a claim for treble damages and penalties under the California False Claims Act.

111.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

112.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

113.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

114.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of California—through any state funded program, including, without limitation, Medi-Cal—for Xyrem.

115.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of California. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

116.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of California. Relator has no control over or dealings with such entities and has no access to the records in their possession.

117.     The State of California, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of California would not have paid but for Defendants' illegal conduct.

118.     By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

119.     Additionally, the State of California is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

120.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of California pursuant to Cal. Gov't Code § 12652(c)(1).

**Count 3**
**Colorado Medicaid False Claims Act**
**Colo. Rev. Stat. §§ 25.5-4-303.5 to -310**

121.     Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

122.     This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

123.     Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

124.     Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

125.     Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

126.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Colorado—through any state funded program, including, without limitation, Health First Colorado—for Xyrem.

127.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Colorado. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

128.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Colorado. Relator has no control over or dealings with such entities and has no access to the records in their possession.

129.    The State of Colorado, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Connecticut would not have paid but for Defendants' illegal conduct.

130.    By reason of Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

131.    Additionally, the State of Colorado is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

132.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Colorado pursuant to Colo. Rev. Stat § 25.5-4-306(2).

133.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

**Count 4**
**Connecticut False Claims Act**
**Conn. Gen. Stat. §§ 4-274 to -289**

134.    This is a claim for treble damages and penalties under the Connecticut False Claims Act.

135.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

136.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

137.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

138.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Connecticut—through any state funded program, including, without limitation, Medicaid—for Xyrem.

139.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Connecticut.

140.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Connecticut. Relator has no control over or dealings with such entities and has no access to the records in their possession.

141.    The State of Connecticut, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Connecticut would not have paid but for Defendants' illegal conduct.

142.    By reason of Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

143.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Connecticut pursuant to Conn. Gen. Stat. § 4-277.

**Count 5**
**Delaware False Claims and Reporting Act**
**Del. Code Ann. tit. 6, §§ 1201–1211**

144.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

145.    This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

146.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

147.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

148.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

149.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Delaware—through any state funded program, including, without limitation, Medicaid—for Xyrem.

150.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Delaware. Defendants

also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

151.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Delaware. Relator has no control over or dealings with such entities and has no access to the records in their possession.

152.    The State of Delaware, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Delaware would not have paid but for Defendants' illegal conduct.

153.    By reason of Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

154.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Delaware pursuant to Del. Code Ann. tit. 6, § 1203(b).

### Count 6
### Florida False Claims Act
### Fla. Stat. §§ 68.081 to .09

155.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

156.    This is a claim for treble damages and penalties under the Florida False Claims Act.

157.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

158.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

159.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

160.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Florida—through any state funded program, including, without limitation, Medicaid—for Xyrem.

161.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Florida. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

162.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Florida. Relator has no control over or dealings with such entities and has no access to the records in their possession.

163.    The State of Florida, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Florida would not have paid but for Defendants' illegal conduct.

164.    By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

165.    Additionally, the State of Florida is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

166.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Florida pursuant to Fla. Stat. § 68.083.

**Count 7**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. §§ 49-4-168 to -168.6**

167.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

168.    This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

169.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

170.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

171.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

172.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Georgia—through any state funded program, including, without limitation, Medicaid—for Xyrem.

173.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Georgia. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

174.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Georgia. Relator has no control over or dealings with such entities and has no access to the records in their possession.

175.    The State of Georgia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Georgia would not have paid but for Defendants' illegal conduct.

176.    By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

177.    Additionally, the State of Georgia is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

178.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Georgia pursuant to Ga. Code Ann. §49-4-168.

## Count 8
## Hawaii False Claims Act
## Haw. Rev. Stat. §§ 661-21 to -31

179.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

180.    This is a claim for treble damages and penalties under Hawaii False Claims Act.

181.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

182.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

183.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

184.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Hawaii—through any state funded program, including, without limitation, Med-QUEST—for Xyrem.

185.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Hawaii. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

186.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Hawaii. Relator has no control over or dealings with such entities and has no access to the records in their possession.

187.    The State of Hawaii, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Hawaii would not have paid but for Defendants' illegal conduct.

188.    By reason of Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

189.    Additionally, the State of Hawaii is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

190.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Hawaii pursuant to Haw. Rev. Stat. § 661-25.

### Count 9
### Illinois False Claims Act
### 740 Ill. Comp. Stat. 175/1–175/8

191.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

192.    This is a claim for treble damages and penalties under the Illinois False Claims Act.

193.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

194.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

195.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

196.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Illinois—through any state funded program, including, without limitation, Medicaid—for Xyrem.

197.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Illinois. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

198.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Illinois. Relator has no control over or dealings with such entities and has no access to the records in their possession.

199.    The State of Illinois, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Illinois would not have paid but for Defendants' illegal conduct.

200.    By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

201.    Additionally, the State of Illinois is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

202.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Illinois pursuant to 740 Ill. Comp. Stat. 175/4(b).

### Count 10
### Indiana False Claims and Whistleblower Protection Act
### Ind. Code §§ 5-11-5.5-1 to -18

203.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

204.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

205.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

206.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

207.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for · payment and approval for prescriptions for Xyrem.

208.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Indiana—through any state funded program, including, without limitation, Medicaid—for Xyrem.

209.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Indiana. Defendants

also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

210.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Indiana. Relator has no control over or dealings with such entities and has no access to the records in their possession.

211.    The State of Indiana, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Indiana would not have paid but for Defendants' illegal conduct.

212.    By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

213.    Additionally, the State of Indiana is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

214.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Indiana pursuant to Ind. Code § 5-11-5.5-4.

### Count 11
### Iowa False Claims Act
### Iowa Code §§ 685.1 to .7

215.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

216.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

217.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

218.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

219.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

220.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Iowa—through any state funded program, including, without limitation, Medicaid—for Xyrem.

221.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Iowa. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

222.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Iowa. Relator has no control over or dealings with such entities and has no access to the records in their possession.

223.    The State of Iowa, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Iowa would not have paid but for Defendants' illegal conduct.

224.    By reason of Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

225.    Additionally, the State of Iowa is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

226.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Iowa pursuant to Iowa Code § 685.3(2).

## Count 12
### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. Ann. §§ 46:437.1 to 439.4

227.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

228.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

229.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

230.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

231.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

232.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Louisiana—through any state funded program, including, without limitation, Medicaid—for Xyrem.

233.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Louisiana. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

234.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous

separate entities across the State of Louisiana. Relator has no control over or dealings with such entities and has no access to the records in their possession.

235.    The State of Louisiana, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Louisiana would not have paid but for Defendants' illegal conduct.

236.    By reason of Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

237.    Additionally, the State of Louisiana is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

238.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Louisiana pursuant to La. Rev. Stat. Ann. § 46:439.1.

**Count 13**
**<u>Maryland False Health Claims Act</u>**
**<u>Md. Code Ann., Health-Gen. §§ 2-601 to -611</u>**

239.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

240.    This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

241.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

242.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

243.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b)

make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

244.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Maryland—through any state funded program, including, without limitation, Medicaid—for Xyrem.

245.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Maryland. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

246.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Maryland. Relator has no control over or dealings with such entities and has no access to the records in their possession.

247.    The State of Maryland, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Maryland would not have paid but for Defendants' illegal conduct.

248.    By reason of Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

249.    Additionally, the State of Maryland is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

250.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Maryland pursuant to Md. Code Ann., Health-Gen. § 2-604(a)(1).

## Count 14
## Massachusetts False Claims Act
## Mass. Gen. Laws ch. 12, §§ 5A–5O

251.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

252.    This is a claim for treble damages and penalties under the Massachusetts False Claims Act.

253.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

254.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

255.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

256.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the Commonwealth of Massachusetts—through any state funded program, including, without limitation, Medicaid—for Xyrem.

257.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Commonwealth of Massachusetts. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

258.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous

separate entities across the Commonwealth of Massachusetts. Relator has no control over or dealings with such entities and has no access to the records in their possession.

259.    The Commonwealth of Massachusetts, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the Commonwealth of Massachusetts would not have paid but for Defendants' illegal conduct.

260.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

261.    Additionally, the Commonwealth of Massachusetts is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

262.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Massachusetts pursuant to Mass. Gen. Laws. ch. 12, § 5C(2).

### Count 15
### Michigan Medicaid False Claims Act
### Mich. Comp. Laws §§ 400.601–.615

263.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

264.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

265.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

266.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

267.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

268.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Michigan—through any state funded program, including, without limitation, Medicaid—for Xyrem.

269.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Michigan. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

270.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Michigan. Relator has no control over or dealings with such entities and has no access to the records in their possession.

271.    The State of Michigan, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Michigan would not have paid but for Defendants' illegal conduct.

272.    By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

273.    Additionally, the State of Michigan is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

274.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Michigan pursuant to Mich. Comp. Laws § 400.610a.

## Count 16
## Minnesota False Claims Act
## Minn. Stat. §§ 15C.01–.16

275.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

276.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

277.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

278.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

279.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

280.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Minnesota—through any state funded program, including, without limitation, Medicaid—for Xyrem.

281.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Minnesota. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

282.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Minnesota. Relator has no control over or dealings with such entities and has no access to the records in their possession.

283.    The State of Minnesota, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Minnesota would not have paid but for Defendants' illegal conduct.

284.    By reason of Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

285.    Additionally, the State of Minnesota is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

286.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Minnesota pursuant to Minn. Stat. § 15C.05.

### Count 17
### Montana False Claims Act
### Mont. Code Ann. §§ 17-8-401 to -413

287.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

288.    This is a claim for treble damages and penalties under the Montana False Claims Act.

289.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

290.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

291.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

292.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Montana—through any state funded program, including, without limitation, Medicaid—for Xyrem.

293.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Montana.

294.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Montana. Relator has no control over or dealings with such entities and has no access to the records in their possession.

295.    The State of Montana, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Montana would not have paid but for Defendants' illegal conduct.

296.    By reason of Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

297.    Additionally, the State of Montana is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

298.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Montana pursuant to Mont. Code Ann. § 17-8-406.

### Count 18
### Nevada Submission of False Claims to State or Local Government
### Nev. Rev. Stat. §§ 357.010–.250

299.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

300.    This is a claim for treble damages and penalties under the Nevada statute relating to the Submission of False Claims to State or Local Government, Nev. Rev. Stat. §§ 357.010–.250

301.     Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

302.     Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

303.     Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

304.     Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Nevada—through any state funded program, including, without limitation, Medicaid—for Xyrem.

305.     Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Nevada. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

306.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Nevada. Relator has no control over or dealings with such entities and has no access to the records in their possession.

307.     The State of Nevada, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Nevada would not have paid but for Defendants' illegal conduct.

308.     By reason of Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

309.    Additionally, the State of Nevada is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

310.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Nevada pursuant to Nev. Rev. Stat. § 357.080.

## Count 19
### New Hampshire False Claims Act
### N.H. Rev. Stat. Ann. §§ 167:61-a to 167:61-e

311.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

312.    This is a claim for treble damages and penalties under the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. §§ 167:61-a to 167:61-e.

313.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

314.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

315.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

316.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of New Hampshire—through any state funded program, including, without limitation, Medicaid—for Xyrem.

317.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New Hampshire.

Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

318.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of New Hampshire. Relator has no control over or dealings with such entities and has no access to the records in their possession.

319.    The State of New Hampshire, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of New Hampshire would not have paid but for Defendants' illegal conduct.

320.    By reason of Defendants' acts, the State of New Hampshire has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

321.    Additionally, the State of New Hampshire is entitled to a statutory penalty of not less than $5,000 and not more than $10,000 for each and every violation alleged herein, to be determined by the Court in accordance with the relevant statutes.

322.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Hampshire pursuant to N.H. Rev. Stat. Ann. §§ 167:61-c(II).

### Count 20
### New Jersey False Claims Act
### N.J. Stat. Ann. §§ 2A:32C-1 to -18

323.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

324.    This is a claim for treble damages and penalties under the New Jersey False Claims Act.

325.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

326.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

327.   Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

328.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of New Jersey—through any state funded program, including, without limitation, Medicaid—for Xyrem.

329.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New Jersey. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

330.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of New Jersey. Relator has no control over or dealings with such entities and has no access to the records in their possession.

331.   The State of New Jersey, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of New Jersey would not have paid but for Defendants' illegal conduct.

332.   By reason of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

333.   Additionally, the State of New Jersey is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

334.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Jersey pursuant to N.J. Stat. Ann. § 2A:32C-5.

**Count 21**
**New Mexico Medicaid False Claims**
**N.M. Stat. Ann. §§ 27-14-1 to -15**

335.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

336.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

337.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

338.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

339.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

340.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of New Mexico—through any state funded program, including, without limitation, Medicaid—for Xyrem.

341.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New Mexico. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

342.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous

separate entities across the State of New Mexico. Relator has no control over or dealings with such entities and has no access to the records in their possession.

343.    The State of New Mexico, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of New Mexico would not have paid but for Defendants' illegal conduct.

344.    By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

345.    Additionally, the State of New Mexico is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

346.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Mexico pursuant to N.M. Stat. Ann. § 27-14-8.

**Count 22**
**New Mexico Fraud Against Taxpayers Act**
**N.M. Stat. Ann. §§ 44-9-1 to -14**

347.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

348.    This is a claim for treble damages and penalties under the New Mexico Fraud Against Taxpayers Act.

349.    Through the acts described herein, Defendants knowingly, intentionally, and willfully violated the New Mexico Fraud Against Taxpayers Act.

350.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Mexico pursuant to N.M. Stat. Ann. § 44-9-5.

## Count 23
## New York False Claims Act
## N.Y. State Fin. Law §§ 187–194

351.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

352.    This is a claim for treble damages and penalties under the New York False Claims Act.

353.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

354.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

355.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

356.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of New York—through any state funded program, including, without limitation, Medicaid—for Xyrem.

357.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New York. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

358.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of New York. Relator has no control over or dealings with such entities and has no access to the records in their possession.

359.    The State of New York, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of New York would not have paid but for Defendants' illegal conduct.

360.    By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

361.    Additionally, the State of New York is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

362.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New York pursuant to N.Y. State Fin. Law § 190(2).

### Count 24
### North Carolina False Claims Act
### N.C. Gen. Stat. §§ 1-605 to -618

363.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

364.    This is a claim for treble damages and penalties under the North Carolina False Claims Act.

365.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

366.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

367.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

368.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of North Carolina—through any state funded program, including, without limitation, Medicaid—for Xyrem.

369.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of North Carolina.

370.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of North Carolina. Relator has no control over or dealings with such entities and has no access to the records in their possession.

371.   The State North Carolina, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of North Carolina would not have paid but for Defendants' illegal conduct.

372.   By reason of Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

373.   Additionally, the State of North Carolina is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

374.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 1-608(b).

### Count 25
### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63, §§ 5053–5053.7

375.   Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

376.   This is a claim for treble damages and penalties under the Oklahoma False Claims Act.

377.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

378.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

379.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

380.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Oklahoma—through any state funded program, including, without limitation, Medicaid—for Xyrem.

381.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Oklahoma.

382.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Oklahoma. Relator has no control over or dealings with such entities and has no access to the records in their possession.

383.    The State of Oklahoma, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Oklahoma would not have paid but for Defendants' illegal conduct.

384.    By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

385.    Additionally, the State of Oklahoma is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

386.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Oklahoma pursuant to Okla. Stat. tit. 63, § 5053.3.

**Count 26**
**Rhode Island False Claims Act**
**R.I. Gen. Laws §§ 9-1.1-1 to -9**

387.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

388.    This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

389.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

390.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

391.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

392.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Rhode Island—through any state funded program, including, without limitation, Medicaid—for Xyrem. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

393.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Rhode Island.

394.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Rhode Island. Relator has no control over or dealings with such entities and has no access to the records in their possession.

395.    The State of Rhode Island, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Rhode Island would not have paid but for Defendants' illegal conduct.

396.    By reason of Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

397.    Additionally, the State of Rhode Island is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

398.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Rhode Island pursuant to R.I. Gen. Laws § 9-1.1-4(b).

### Count 27
### Tennessee Medicaid False Claims Act
### Tenn. Code Ann. §§ 71-5-181 to -185

399.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

400.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

401.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

402.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

403.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

404.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Tennessee—through any state funded program, including, without limitation, Medicaid—for Xyrem.

405.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Tennessee. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

406.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Tennessee. Relator has no control over or dealings with such entities and has no access to the records in their possession.

407.    The State of Tennessee, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Tennessee would not have paid but for Defendants' illegal conduct.

408.    By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

409.    Additionally, the State of Tennessee is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

410.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Tennessee pursuant to Tenn. Code Ann. § 71-5-183(b).

**Count 28**
**Texas Medicaid Fraud Prevention Law**
**Tex. Hum. Res. Code Ann. §§ 36.001–.132**

411.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

412.    This is a claim for double damages and penalties under the Texas Medicaid Fraud Prevention Law.

413.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

414.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

415.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

416.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Texas—through any state funded program, including, without limitation, Medicaid—for Xyrem.

417.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Texas. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

418.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous

separate entities across the State of Texas. Relator has no control over or dealings with such entities and has no access to the records in their possession.

419.    The State of Texas, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Texas would not have paid but for Defendants' illegal conduct.

420.    By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

421.    Additionally, the State of Texas is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

422.    Relator has standing as a qui tam relator to bring this cause of action on behalf of the State of Texas pursuant to Tex. Hum. Res. Code Ann. § 36.101.

## Count 29
## Vermont False Claims Act
## Vt. Stat. Ann. tit. 32, §§ 630–642

423.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

424.    This is a claim for treble damages and penalties under the Vermont False Claims Act.

425.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

426.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

427.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b)

make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

428.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Vermont—through any state funded program, including, without limitation, Medicaid—for Xyrem.

429.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Vermont.

430.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Vermont. Relator has no control over or dealings with such entities and has no access to the records in their possession.

431.    The State of Vermont, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Vermont would not have paid but for Defendants' illegal conduct.

432.    By reason of Defendants' acts, the State of Vermont has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

433.    Additionally, the State of Vermont is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

434.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Vermont pursuant to Vt. Stat. Ann. tit. 32, § 632(b)(1).

### Count 30
### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §§ 8.01-216.1 to .19

435.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

436.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

437.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

438.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

439.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

440.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the Commonwealth of Virginia—through any state funded program, including, without limitation, Medicaid—for Xyrem.

441.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Commonwealth of Virginia. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

442.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the Commonwealth of Virginia. Relator has no control over or dealings with such entities and has no access to the records in their possession.

443.    The Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the Commonwealth of Virginia would not have paid but for Defendants' illegal conduct.

444.    By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

445.    Additionally, the Commonwealth of Virginia is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

446.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Virginia pursuant to Va. Code Ann. § 8.01-216.5(a).

**Count 31**
**Washington State Medicaid Fraud False Claims Act**
**Wash. Rev. Code §§ 74.66.005–.130**

447.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

448.    This is a claim for treble damages and penalties under the Washington State Medicaid Fraud False Claims Act.

449.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

450.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

451.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

452.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Washington—through any state funded program, including, without limitation, Medicaid—for Xyrem.

453.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Washington. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

454.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Washington. Relator has no control over or dealings with such entities and has no access to the records in their possession.

455.    The State of Washington, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Washington would not have paid but for Defendants' illegal conduct.

456.    By reason of Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

457.    Additionally, the State of Washington is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

458.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Washington pursuant to Wash. Rev. Code § 74.66.050.

### Count 32
### The District of Columbia False Claims Law
### D.C. Code §§ 2-381.01 to .09

459.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

460.    This is a claim for treble damages and penalties under the District of Columbia False Claims Law.

- 70 -

461.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

462.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

463.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

464.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the District of Columbia—through any state funded program, including, without limitation, Medicaid—for Xyrem.

465.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the District of Columbia. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

466.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the District of Columbia. Relator has no control over or dealings with such entities and has no access to the records in their possession.

467.    The District of Columbia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that District of Columbia would not have paid but for Defendants' illegal conduct.

468.    By reason of Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

469.    Additionally, the District of Columbia is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

470.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the District of Columbia pursuant to D.C. Code § 2-308.15(b)(1).

**Count 33**
**Guam False Claims and Whistleblower Act**
**5 G.C.A. §§ 37101, et seq.**

471.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

472.    This is a claim for treble damages and penalties under the Guam False Claims and Whistleblower Act, 5 G.C.A. § 37101, et seq.

473.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

474.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

475.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

476.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid through any government-funded program for Xyrem.

477.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Guam Department of Public Health and Social Services and/or other agencies and departments of the government of Guam.

478.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the Island of Guam. Relator has no control over or dealings with such entities and has no access to the records in their possession.

479.    The government of Guam, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims it would not have paid, but-for Defendants' illegal conduct.

480.    By reason of Defendants' acts, the government of Guam has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

481.    Additionally, the government of Guam is entitled to a statutory penalty of not less than $5,000 and not more than $10,000 for each and every violation alleged herein, to be determined by the Court in accordance with the relevant statutes.

482.    Relator has standing as a qui tam relator to bring this cause of action on behalf of the government of Guam, pursuant to 5 G.C.A. § 37202.

### Count 34
### False Claims to Government of Puerto Rico Programs, Contracts, and Services Act
### 32 L.P.R.A. §§ 2931, et seq.

483.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

484.    This is a claim for treble damages and penalties under the False Claims to Government of Puerto Rico Programs, Contracts, and Services Act 32 L.P.R.A. §§ 2931, et seq.

485.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

486.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

487.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

488.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid through any government-funded program for Xyrem.

489.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the government of Puerto Rico. Defendants also caused managed care organizations to claim false and artificially increased per-capita amounts for enrollees in their capitated Medicaid programs.

490.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across Puerto Rico. Relator has no control over or dealings with such entities and has no access to the records in their possession.

491.    The government of Puerto Rico, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims it would not have paid, but-for Defendants' illegal conduct.

492.    By reason of Defendants' acts, the government of Puerto Rico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

493.    Additionally, the government of Puerto Rico is entitled to a statutory penalty of not less than $11,181 and not more than $ $22,363 for each and every violation alleged herein, to be determined by the Court in accordance with the relevant statutes.

494.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the government of Puerto Rico, pursuant to 32 L.P.R.A. § 2934a(2).

### Count 35
### The Virgin Islands False Claims Act
### 33 V.I.C. §§ 3501, et seq.

495.    Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

496.    This is a claim for treble damages and penalties under the Virgin Islands False Claims Act, 33 V.I.C. §§ 3501, *et seq.*

497.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Xyrem.

498.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

499.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use false records and statements material to false or fraudulent claims for payment and approval for prescriptions for Xyrem.

500.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid through any government-funded program for Xyrem.

501. Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the government of the Virgin Islands.

502. Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the Virgin Islands. Relator has no control over or dealings with such entities and has no access to the records in their possession.

503. The government of the Virgin Islands, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims it would not have paid, but-for Defendants' illegal conduct.

504. By reason of Defendants' acts, the government of the Virgin Islands has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

505. Additionally, the government of the Virgin Islands is entitled to a statutory penalty of not less than $5,000 and not more than $10,000 for each and every violation alleged herein, to be determined by the Court in accordance with the relevant statutes.

506. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the government of Puerto Rico, pursuant to 33 V.I.C. § 3504(b).

### Count 36
### The California Insurance Fraud Prevention Act
### Cal. Ins. Code §§ 1871-1879.8.

507. Relator re-alleges and incorporates by reference all foregoing allegations as though fully set forth herein.

508. This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code §§ 1871-1879.8. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of California, pursuant to Cal. Ins. Code § 1871.7(e)(1).

509.   Through the acts described above, Defendants knowingly, intentionally, and willfully submitted or caused the submission of a "false or fraudulent claim for payment of a health care benefit" for Xyrem in violation of Cal. Penal Code § 550(a)(6) and the IFPA, Cal. Ins. Code § 1871.7.

510.   Defendants initiated the fraudulent scheme alleged herein to allow them to continue selling Xyrem at supracompetitive prices after the expiration of the Defendants' initial patents covering Xyrem expired.

511.   Defendants' fraudulent scheme erected significant barriers to the introduction of generic alternatives to Xyrem and constituted a willful attempt to exclude competition in the relevant market. Defendants' wrongful conduct has enabled Defendants to charge insurers illegally-inflated prices for Xyrem. Defendants' wrongful conduct has also enabled Defendants to charge or cause others to charge insurers for Xyrem, when the prescriptions would have otherwise been filled by much lower-cost generic alternatives.

512.   Xyrem is covered by insurers in California. Each and every claim submitted to an insurer in California for payment or reimbursement for Xyrem is a false claim in violation of California Insurance Code § 1871.7 and California Penal Code § 550(b)(3), because Defendants knowingly and intentionally caused each claim to be submitted for an artificially high price that Defendants charged as a result of their fraudulently-obtained patents. Defendants also knowingly concealed the occurrence of events that affected the amount of benefit or payment to which persons are entitled under an insurance contract.

513.   Defendants knew that they would be submitting claims and causing or inducing others to submit claims to insurers based on Defendants' illegally-inflated pricing for Xyrem. Defendants were also well-aware of the statutory structures that govern the methods by which their reported pricing to government agencies and private

price compendia would materially affect payment and reimbursement decisions of insurers throughout California.

514.    Defendants, their employees and agents, individually and in concert, conspired to cause the submission of false claims under insurance contracts for illegally-inflated prices for Xyrem. Through the acts described above, Defendants knowingly, intentionally, and willfully have also conspired or assisted one another to "conceal, or knowingly fail to disclose" the occurrence of or an event that affected "the amount of any benefit or payment" to which any person is entitled under an insurance contract in violation of Cal. Penal Code § 550(b)(3), which is incorporated in Cal. Ins. Code § 1871.7.

515.    Relator cannot at this time identify all the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities or persons across the State of California. Relator has no control over or dealings with such entities and has no access to the records in their possession.

516.    The State of California and insurers within California that paid the false claims alleged herein were unaware of the falsity of the records, statements and claims made or caused to be made by Defendants. They have paid and continue to pay such false claims, and they would not have done so but for Defendants' illegal conduct.

517.    As a result of the above-described conduct, Plaintiff is entitled to preliminary and equitable relief, penalties and assessments, and all other relief provided for in Cal. Ins. Code § 1871.7.

518.    The State of California and insurers were unaware of Defendants' fraudulent scheme, misrepresentations to the Patent Office, and fraudulent acquisition of the patents at the time they paid false claims for Xyrem.

519.    California is entitled to a statutory penalty of not less than $5,000 and not more than $10,000 for each and every violation alleged herein, to be determined by the Court in accordance with the relevant statutes.

## PRAYER FOR RELIEF

WHEREFORE, *qui tam* Relator Leonardo Sorgi prays for judgment against

Defendants, as follows:

A.  that Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729–33; all applicable provisions of the analogue state statutes in the Plaintiff States; and the California IFPA.

B.  that the Court enter judgment against Defendants in an amount equal to three times the amount of damages sustained by the United States and the Plaintiff States named herein, as a result of Defendants' actions, as well as a civil penalty of $23,331 for each violation of 31 U.S.C. § 3729, and additional civil penalties under the applicable provisions of each analogue state statute in the Plaintiff States and the California IFPA;

C.  that Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the federal False Claims Act, and in accordance with the maximum amount permitted by the *qui tam* provisions of each analogue state statute in the Plaintiff States and under the California IFPA;

D.  that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

E.  any other such relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and any applicable state statutes, Relator hereby demands a trial by jury.

Dated: May 26, 2021

Ana Isabel Muñoz
(Mass. Bar No. 569233)
**ZALKIND DUNCAN &**
**BERNSTEIN LLP**
65A Atlantic Ave.
Boston, MA 02110
Telephone: (617) 742-6020
AMunoz@ZalkindLaw.com

**POLLOCK COHEN LLP**
Adam Pollock (*pro hac vice* to be filed)
Agatha M. Cole (*pro hac vice* to be filed)
Raphael Janove (*pro hac vice* to be filed)
60 Broad Street, 24th Floor
New York, NY 10004
Telephone: (212) 337-5361
Adam@PollockCohen.com
Agatha@PollockCohen.com
Rafi@PollockCohen.com

**HERRERA KENNEDY LLP**
Nicomedes Sy Herrera
(*pro hac vice* to be filed)
Shawn M. Kennedy
(*pro hac vice* to be filed)
Bret D. Hembd (*pro hac vice* to be filed)
Laura E. Seidl (*pro hac vice* to be filed)
1300 Clay Street, Suite 600
Oakland, California 94612
Telephone: (510) 422-4700
NHerrera@HerreraKennedy.com
SKennedy@HerreraKennedy.com
BHembd@HerreraKennedy.com
LSeidl@HerreraKennedy.com

*Attorneys for Plaintiff-Relator,
Leonardo Sorgi*