# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA; STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, AND WASHINGTON; THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA; THE DISTRICT OF COLUMBIA; GUAM, PUERTO RICO, AND THE U.S. VIRGIN ISLANDS,<br><br>*ex rel*. LEONARDO S. SORGI,<br><br>        Plaintiffs,<br><br>v.<br><br>JAZZ PHARMACEUTICALS PLC, JAZZ PHARMACEUTICALS, INC., and JAZZ PHARMACEUTICALS IRELAND LIMITED,<br><br>        Defendants. | Civil Action No. 21-10891-PBS<br><br>Judge Patti B. Saris<br><br><br>**Leave to file overlength brief granted on Nov. 25, 2024** |

**DEFENDANTS' JAZZ PHARMACEUTICALS PLC, JAZZ PHARMACEUTICALS, INC. AND JAZZ PHARMACEUTICALS IRELAND LIMITED MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

I.    Jazz worked with FDA to address safety concerns regarding coadministration of Xyrem® with other CNS depressants. ....................................................... 3

II.   Jazz studied and sought to patent a method of safely coadministering Xyrem® with the CNS depressant valproate. ....................................................... 3

III.  The PTAB rejected a series of post-issuance challenges to the validity of the '306 patent. ....................................................... 5

IV.   In examinations of other patents in the '306 family, the Examiner considered the 2012 Label and the IPR materials and still allowed the patents. .................................. 6

V.    Following issuance of the '306 patent, Jazz continued to work with FDA on patient safety issues related to Xyrem®. ....................................................... 6

ARGUMENT ................................................................................................................ 7

I.    Legal Standards ................................................................................................ 7

II.   Relator Fails to Plead Essential Elements of His Claim. .................................. 8

      A.   Relator fails to adequately plead falsity ................................................ 9

           1.   Relator fails to adequately plead inequitable conduct. ................... 9

           2.   Relator fails to adequately plead that Jazz made false statements to the PTAB ... 13

           3.   Relator fails to adequately plead a fraudulent inducement theory of falsity. ....... 14

           4.   Relator fails to adequately plead his false certification theories of falsity. .......... 16

      B.   Relator fails to adequately plead materiality. ............................................. 20

      C.   Relator fails to adequately plead scienter. ................................................. 20

      D.   Relator fails to adequately allege the submission of false claims. .............................. 21

III.  Relator's Claims are Precluded by the Public Disclosure Bar. ......................... 22

IV.   Relator's State Law Claims Fail Because They Are Derivative of His Federal FCA Claims. ....................................................... 27

V.    Relator's Claims Must Be Dismissed Because the FCA *Qui Tam* Provisions are
      Unconstitutional. ........................................................................................................ 28

VI.   This Court Lacks Personal Jurisdiction Over the Irish Entities. ..................................... 29

      A.  This Court Lacks General Jurisdiction Over the Irish Entities. .................................. 29

      B.  This Court Lacks Specific Jurisdiction Over the Irish Entities. ................................. 29

CONCLUSION ............................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*U.S. ex rel. Allen v. Alere Home Monitoring, Inc.*,
    355 F. Supp. 3d 18 (D. Mass. 2019) ...................................................................10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................7, 19, 20

*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*,
    591 F.3d 1 (1st Cir. 2009) .....................................................................29

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...............................................................................7

*BNSF Ry. Co. v. Tyrrell*,
    581 U.S. 402 (2017) .............................................................................29

*U.S. ex rel. Booker v. Pfizer, Inc.*,
    847 F.3d 52 (1st Cir. 2017) ................................................................21, 22

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001) .............................................................................10

*Chen v. U.S. Sports Acad., Inc.*,
    956 F.3d 45 (1st Cir. 2020) ...................................................................30

*U.S. ex rel. Collins v. Molina Healthcare, Inc.*,
    2019 WL 11816475 (D. Mass. July 17, 2019) ...........................................17

*CXENSE Inc. v. Maroniene*,
    2017 WL 3131987 (D. Mass. 2017) ........................................................20

*U.S. ex rel. D'Agostino v. ev3, Inc.*,
    153 F. Supp. 3d 519 (D. Mass. 2015) ..................................................13, 24

*U.S. ex rel. D'Agostino v. ev3, Inc.*,
    845 F.3d 1 (1st Cir. 2016) ................................................................15, 20

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) .............................................................................29

*Universal Health Services, Inc. v U.S. ex rel. Escobar*,
    579 U.S. 176 (1989) ...................................................................... *passim*

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
    575 F.3d 1312 (Fed. Cir. 2009) .....................................................10, 11, 13

*Genentech, Inc. v. Sandoz Inc.*,
    55 F.4th 1368 (Fed. Cir. 2022) ..............................................................................13

*GMO Tr. ex rel. GMO Emerging Country Debt Fund v. ICAP plc*,
    2012 WL 5197545 (D. Mass. Oct. 18, 2012) .........................................................11

*Graham Cnty. Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson*,
    559 U.S. 280 (2010) ................................................................................................27

*Guilfoile v. Shields*,
    913 F.3d 178 (1st Cir. 2019) ...................................................................................21

*U.S. ex rel. Hagerty v. Cyberonics, Inc.*,
    95 F. Supp. 3d 240 (D. Mass. 2015), *aff'd*, 844 F.3d 26 (1st Cir. 2016) ..........24, 25

*U.S. ex rel. Hagerty v. Cyberonics, Inc.*,
    844 F.3d 26 (1st Cir. 2016) .......................................................................................8

*U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
    360 F.3d 220 (1st Cir. 2004), *abrogated on other grounds by Lestage v.*
    *Coloplast Corp.*, 982 F.3d 37 (1st Cir. 2020) ................................................. *passim*

*U.S. ex rel. Kelly v. Novartis Pharm. Corp.*,
    827 F.3d 5 (1st Cir. 2016) ..............................................................................8, 9, 21

*Lawton ex rel. U.S. v. Takeda Pharm. Co.*,
    842 F.3d 125 (1st Cir. 2016) ...................................................................................22

*Lexington Luminance LLC v. Osram Sylvania Inc.*,
    972 F. Supp. 2d 88 (D. Mass. 2013) .......................................................................12

*U.S. ex rel. Loughren v. Unum Grp.*,
    613 F.3d 300 (1st Cir. 2010) ...................................................................................13

*U.S. ex rel. Mackillop v. Grand Canyon Educ., Inc.*,
    626 F. Supp. 3d 418 (D. Mass. 2022) .....................................................................16

*United States ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943) ................................................................................................14

*U.S. ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.*,
    540 F. Supp. 3d 103 (D. Mass. 2021) ................................................................8, 18

*Maturi v. McLaughlin Rsch. Corp.*,
    413 F.3d 166 (1st Cir. 2005) ...................................................................................16

*New York v. Amgen Inc.*,
    652 F.3d 103 (1st Cir. 2011) ...................................................................................27

*U.S. ex rel. Osinek v. Kaiser Permanente*,
  2023 WL 4054914 (N.D. Cal. June 15, 2023) ........................................................16

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.*,
  695 F.3d 1285 (Fed. Cir. 2012).............................................................................9

*Panduit Corp. v. Dennison Mfg. Co.*,
  810 F.2d 1561 (Fed. Cir. 1987).............................................................................14

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  538 F. Supp. 2d 367 (D. Mass. 2008) ....................................................................23

*In re Plavix Mktg., Sales Prac. & Prods. Liab. Litig. (No. II)*,
  332 F. Supp. 3d 927 (D.N.J. 2017) ......................................................................14

*U.S. ex rel. Promega Corp. v. Hoffman-La Roche Inc.*,
  No. 03-1447-A (E.D. Va. Sept. 29, 2004) .............................................................16

*U.S. ex rel. Provuncher v. Angioscore, Inc.*,
  2012 WL 1514844 (D. Mass. May 1, 2012) ..........................................................14

*Regents of Univ. of Minn. v. LSI Corp.*,
  926 F.3d 1327 (Fed. Cir. 2019)............................................................................26

*U.S. ex rel. Rose v. Stephens Inst.*,
  909 F.3d 1012 (9th Cir. 2018) .............................................................................17

*Saint Regis Mohawk Tribe v. Mylan Pharm. Inc.*,
  896 F.3d 1322 (Fed. Cir. 2018)............................................................................26

*San Geronimo Caribe Proj., Inc. v. Acevedo-Vila*,
  687 F.3d 465 (1st Cir. 2012).................................................................................8

*Schatz v. Republican State Leadership Comm.*,
  669 F.3d 50 (1st Cir. 2012).................................................................................20

*U.S. ex rel. Siegel v. Novo Nordisk, Inc.*,
  2024 WL 3582417 (W.D. Wash. July 30, 2024) ....................................................16

*U.S. ex rel. Silbersher v. Janssen Biotech, Inc.*,
  576 F. Supp. 3d 212 (D.N.J. 2021) ....................................................................9, 26

*U.S. ex rel. Silbersher v. Valeant Pharm. International, Inc.*,
  89 F.4th 1154 (9th Cir. 2024) ..............................................................................26

*U.S. ex rel. Stonebrook v. Merck KGaA*,
  2024 WL 1142702 (D. Mass. Mar. 15, 2024)........................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..................................................................................................7

*United States v. Allergan, Inc.*,
  46 F.4th 991 (9th Cir. 2022) .................................................................................24

*United States v. Medtronic, Inc.*,
  189 F. Supp. 3d 259 (D. Mass. 2016) ...................................................................10

*Venmill Indus., Inc. v. ELM, Inc.*,
  100 F. Supp. 3d 59 (D. Mass. 2015) .....................................................................30

*Whitman & Co. v. Longview Partners (Guernsey) Ltd.*,
  2015 WL 4467064 (D. Mass. July 20, 2015) ........................................................11

*U.S. ex rel. Williams v. City of Brockton*,
  2020 WL 887706 (D. Mass. Feb. 24, 2020) ..........................................................14

*State ex rel. Wilson v. Bristol Myers Squibb, Inc.*,
  2013 WL 5373514 (Cal. Super. Ct. Sept. 23, 2013) ..............................................28

*U.S. ex rel. Winkelman v. CVS Caremark Corp.*,
  827 F.3d 201 (1st Cir. 2016) .................................................................................22

*U.S. ex rel. Zafirov v. Fla. Med. Assocs.*,
  2024 WL 4349242 (M.D. Fla. Sep. 30, 2024) .......................................................28

**Statutes**

31 U.S.C. § 3730(4)(B) ....................................................................................................27

31 U.S.C. § 3730(e)(4) .....................................................................................................22

31 U.S.C. § 3730(e)(4)(A)(ii) ..........................................................................................26

35 U.S.C. § 316(a)(1) .......................................................................................................26

38 U.S.C. § 8126(a) ..........................................................................................................18

42 U.S.C. § 1396r-8(b)(3)(C)(ii) ................................................................................17, 18

Cal. Ins. Code §§ 1871 et seq. ..........................................................................................28

**Other Authorities**

37 C.F.R. § 1.104(a)(1) .....................................................................................................12

48 C.F.R. § 8.401 *et seq.* ..................................................................................................19

Manual of Patent Examining Procedure § 2103 ..........................................................................12

## INTRODUCTION

Relator Leonardo Sorgi ("Relator"), a patent attorney whose practice "focuses on investigating invalid pharmaceutical patents that brand manufacturers use to protect their drugs from price competition," Dkt. 63 ¶ 19, filed this *qui tam* suit under the federal False Claims Act ("FCA") and state FCAs against Jazz Pharmaceuticals PLC, Jazz Pharmaceuticals Inc., and Jazz Pharmaceuticals Ireland Limited (collectively, "Jazz"). He alleges no personal knowledge of any facts related to Jazz's application for the patent at issue, yet in his Amended Complaint he asks this Court to do something unprecedented: declare through an FCA proceeding that a presumptively valid patent issued by the Patent and Trademark Office ("PTO") was obtained by fraud.

Even if this Court were inclined to second guess the decisions of the PTO and PTAB in this case, Relator's Amended Complaint must still be dismissed in whole or in part for six reasons. *First*, in his attempt to relitigate the decisions of the PTO and PTAB in an FCA proceeding, Relator fails to plead with particularity a scheme by Jazz to defraud the government, including the who, what, when, where, and how of the alleged fraud. Because his Amended Complaint lacks such particularized allegations, Relator does not state the falsity element of his claims.

*Second*, Relator fails to plead the other required elements of an FCA violation. He fails to plead how Jazz's alleged fraud on the PTO in 2014 **caused** the submission of false claims to the government in 2019 and beyond. He fails to plead that any of Jazz's conduct was **material** to the government's decisions to pay those claims. His threadbare factual allegations cannot establish **scienter**. And he fails to plead any facts providing reliable indicia that false claims were **submitted** to the government. Relator's FCA theories therefore fail as a matter of law.

*Third*, Relator relies on information that he alleges has been publicly disclosed and Relator is not an original source, so his claims are barred by the FCA's public disclosure bar. Unlike the

usual *qui tam* plaintiff—a whistleblower describing his personal experience with the defendant's supposed fraud, allowing him to expose hidden misconduct—Relator alleges no relationship with Jazz. Instead, he relies on materials he alleges were previously disclosed in Food and Drug Administration ("FDA") reports, patent-related proceedings, and news media articles to fill out his Amended Complaint.

*Fourth*, Relator's state law claims fail for the same reasons.

*Fifth*, Relator's initiation of this suit pursuant to the FCA's *qui tam* provisions is unconstitutional. Because *qui tam* relators exercise significant authority pursuant to the laws of the United States and occupy a continuing position established by law, they are Officers of the United States who must be appointed in conformity with the requirements of the Appointments Clause. Relator was not appointed at all, let alone in a manner consistent with the Clause.

*Sixth*, this Court lacks both general and specific personal jurisdiction over Jazz Pharmaceuticals PLC and Jazz Pharmaceuticals Ireland Limited (the "Irish Entities").

For all of these reasons, Relator's claims should be dismissed with prejudice.

## BACKGROUND

Xyrem® is a central nervous system ("CNS") depressant that was first approved by FDA in July 2002 for the treatment of cataplexy (sudden muscle weakness) in patients with narcolepsy (a rare, debilitating sleep disorder). Dkt. 63 ¶¶ 7, 47. Xyrem®'s active ingredient is sodium oxybate, which is the sodium salt of gamma-hydroxybutyrate ("GHB"). *Id*. There have long been concerns about the coadministration of Xyrem® with other CNS depressants due to its powerful sedative properties. This concern was reflected in the 2005 Xyrem® label, which warned against co-administering Xyrem® with other CNS depressants. *Id.* ¶ 47; *see* Request for Judicial Notice

("RJN"), Ex. 1 at 1.[1]

## I.    Jazz worked with FDA to address safety concerns regarding coadministration of Xyrem® with other CNS depressants.

In December 2012, Jazz worked with FDA, on an interim basis, to revise the Xyrem®

labeling to address potential safety issues resulting from coadministration of Xyrem® with other

CNS depressants, though not valproate specifically ("2012 Label"). Dkt. 63 ¶ 96-99. The revised

2012 Label added the following italicized language:

> The concurrent use of Xyrem with other CNS depressants, including but not limited
> to opioid analgesics, benzodiazepines, sedating antidepressants or antipsychotics,
> general anesthetics, muscle relaxants, and/or illicit CNS depressants, may increase
> the risk of respiratory depression, hypotension, profound sedation, syncope, and
> death. *If use of these CNS depressants in combination with Xyrem® is required, dose
> reduction or discontinuation of one or more CNS depressants (including Xyrem®)
> should be considered.*

*Id.* ¶ 98; *see* RJN Ex. 3 at 3. Notably, the CNS depressants listed do not include valproate.

Concurrent with the 2012 Label, FDA issued a Drug Safety Communication ("2012 Drug

Safety Communication") warning about the concomitant use of Xyrem® with another CNS

depressant. Dkt. 63 ¶¶ 96-97. The 2012 Drug Safety Communication details the 2012 Label

revisions, noting that it "recommend[s] that, when concomitant use of Xyrem® with a central

nervous system depressant is required, a reduction in dose or discontinuation of one or more

central nervous system depressants (including Xyrem®) should be considered." *See* RJN Ex. 4 at 2.

## II.    Jazz studied and sought to patent a method of safely coadministering Xyrem® with the CNS depressant valproate.

In 2012, Jazz conducted a scientific study to assess Xyrem®'s interactions with the CNS

depressant valproate (also known as divalproex sodium). *See* RJN Ex. 29 at 3. The study yielded

a surprising result: coadministration of Xyrem® with valproate increased patients' exposure to

---

[1] As explained in Jazz's RJN, this Court may consider materials incorporated by reference in the Amended
Complaint and materials subject to judicial notice in its review of Defendants' Motion.

GHB. *Id.*; *see also* RJN Ex. 11 at 1-2. In March 2013, Jazz filed provisional patent applications based on the results of the study. Dkt. 63 ¶ 50. Jazz then filed U.S. Patent Application No. 13/872,997 (the "'997 application") with the PTO on April 29, 2013, which claimed priority to the March 2013 application and sought to patent a method of co-administering Xyrem® with valproate and reducing the dose of Xyrem® by specified amounts. Dkt. 63 ¶ 50; RJN Ex. 5 at 39. The '997 application eventually issued as the '306 patent, which is the primary patent at issue in this case. Dkt. 63 ¶ 50; *see generally* RJN Ex. 17.

The '997 application was subjected to extensive examination. As originally presented, the application included claims broadly directed to methods of treating patients with "an adjusted dose amount of the GHB or salt thereof when the patient is receiving a concomitant administration of valproate." RJN Ex. 5 at 39. After reviewing relevant prior art identified by Jazz—including over 100 references, from patents to articles *see generally* RJN Ex. 6—and conducting a series of searches of the prior art herself, *see generally* RJN Ex. 16, the Examiner issued an initial rejection of the proposed claims, *see generally* RJN Ex. 7. In her view, it would have been obvious to a person with ordinary skill in the art ("POSA"), based on a combination of prior art references, that a dosing adjustment is required when treating patients with GHB and valproate concomitantly. RJN Ex. 7 at 2-6.

In response, Jazz urged that it would not have been obvious to combine the cited teachings, and even together they did not indicate how GHB and valproate would interact—particularly the unexpected way using valproate increases the *in vivo* effect of GHB, thus requiring a dose reduction when the compounds are administered together. RJN Ex. 8 at 7-10. Jazz's counsel then participated in two interviews with the Examiner, in which she indicated that a further amendment would bring the claims into condition for allowance to issue as a patent. *See* RJN Ex. 9 at 7-8. Jazz

made the requested amendments, specifying in all claims a *particular* dose reduction, *id.* at 2-6, after which the then-pending claims were determined to be non-obvious and allowable, *see generally* RJN Ex. 10.

Examination nonetheless continued: at Jazz's *request*, the Examiner reopened prosecution to consider additional references. *See generally* RJN Ex. 12. Jazz then further amended the claims to require (in all claims) at least a 5% dose reduction for GHB, consistent with the suggestion of the Examiner of that co-pending application. RJN Ex. 14 at 2. The Examiner then conducted still more prior art searches and concluded that the amended claims were patentable. *See generally* RJN Exs. 15-16. Those 34 claims subsequently issued in the '306 patent. *See generally* RJN Ex. 17. Every issued claim of the '306 patent requires (1) a dose reduction (rather than a dose reduction *or* discontinuation), (2) a dose reduction of 5% or more (rather than a reduction by an unspecified amount), and (3) that GHB be the CNS depressant reduced (rather than *either* GHB or the other CNS depressant, *e.g.*, valproate). RJN Ex. 17 at 26-27.

### III.     The PTAB rejected a series of post-issuance challenges to the validity of the '306 patent.

In 2016, three generic manufacturers challenged the '306 patent in *inter partes* review ("IPR") proceedings before the PTAB, asserting that certain challenged claims would have been obvious to a POSA. *See generally* RJN Exs. 19-20, 23. Those manufacturers were each represented by separate counsel and had every incentive to identify the best prior art they could, but none so much as mentioned adverse event reports or the 2012 Label. Two of the petitions were denied outright, *see generally* RJN Exs. 24, 28, and the third led to the institution of IPR on a subset of the challenged claims, RJN Ex. 26 at 20, after which the parties settled and the proceeding was terminated, *see generally* RJN Ex. 27. In each challenge, the PTAB found that the petitioner failed to meet its low burden of proof to demonstrate even a *reasonable likelihood*

that it would prevail in proving that the claimed invention would have been obvious. *See generally* RJN Exs. 24, 26, 28. Thus the '306 patent stands valid and nonobvious today after undergoing an extensive prosecution process and multiple challenges in IPR proceedings.

**IV.    In examinations of other patents in the '306 family, the Examiner considered the 2012 Label and the IPR materials and still allowed the patents.**

The Examiner who examined and allowed the '306 patent also examined and allowed other patents in the '306 family, including U.S. Patent Nos. 10,864,181 and 10,213,400. *See* Dkt. 63 ¶ 49; RJN Exs. 33-34. As the "References Cited" included in both of those patents make clear, the Examiner considered prior art in those examinations that she had not considered in examining the '997 application, including the 2012 Label and dozens of litigation-related documents (petitions for IPR, expert reports, invalidity contentions, and the like), many prepared by the sophisticated generic manufacturers with experienced counsel who wanted to invalidate Jazz's patents. *See* RJN Exs. 33 at 1-6, 34 at 1-7. Neither the generic manufacturers' arguments nor the 2012 Label stopped the Examiner from concluding that Jazz's claims were patentable.

**V.    Following issuance of the '306 patent, Jazz continued to work with FDA on patient safety issues related to Xyrem®.**

In 2014, Jazz worked with FDA to amend Xyrem®'s label to provide that, when using GHB and divalproex sodium, the GHB dose should be reduced by at least 20%. RJN Ex. 13 at Section 2.4. In 2016, in response to generic manufacturer attempts to circumvent that recommendation, Jazz submitted a Citizen Petition to FDA requesting that FDA "refuse to approve any sodium oxybate [generic drug application] that does not include in its proposed labeling the portions of the Xyrem® package insert related to divalproex" because that was important safety information. RJN Ex. 29 at 1. Par Pharmaceuticals Inc. ("Par") objected to the Citizen Petition, arguing it was "the result of a patent-driven effort," and that Jazz was "cite[ing]

safety issues in an effort to conceal its true anti-competitive motive." RJN Ex. 30 at 1. FDA

granted the Citizen Petition in January 2017, stating that it would not approve any generic

sodium oxybate application "that does not include in its labeling the portions [of the package

insert] related to the DDI with divalproex sodium." RJN Ex. 31 at 5. FDA explained:

> In the absence of the DDI information in the Xyrem® labeling subsections . . . a
> prescriber would not know that coadministering divalproex sodium with sodium
> oxybate would result in a net increase in overall exposure to sodium oxybate such
> that the initial dose of sodium oxybate dose should be reduced by at least 20 percent.

*Id.* at 4. In making this decision, FDA specifically determined that the language in the 2012

Label Relator relies on, *see* Dkt. 63 ¶¶ 98, did not provide sufficient information regarding

coadministration, *see* RJN Ex. 31 at 4-5 & n.10. In other words, FDA found that the CNS

coadministration warning language from the 2012 Label would not have taught a prescriber the

inventions claimed in the '306 patent.

## ARGUMENT

### I. Legal Standards

A complaint must be dismissed if it does not "state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[L]abels and conclusions,"

"formulaic recitation[s] of the elements of a cause of action," and "[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements" are insufficient.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a complaint, "courts must consider the

complaint in its entirety," as well as "documents incorporated into the complaint by reference,

and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights,*

*Ltd.,* 551 U.S. 308, 322-23 (2007). Courts accept a complaint's well-pled facts as true, but

disregard legal conclusions, including those "couched as [] factual allegation[s]." *See San*

*Geronimo Caribe Proj., Inc. v. Acevedo-Vila*, 687 F.3d 465, 471 (1st Cir. 2012).

Because FCA claims sound in fraud, they must be pled with particularity pursuant to Federal Rule of Civil Procedure 9(b). *See U.S. ex rel. Kelly v. Novartis Pharm. Corp.*, 827 F.3d 5, 13 (1st Cir. 2016). Where, as here, a relator alleges that a defendant caused a third party to submit a false claim to the government, "the First Circuit applies a somewhat 'more flexible' standard, allowing a relator to satisfy Rule 9(b) by providing 'factual or statistical evidence to strengthen the inference of fraud beyond possibility without necessarily providing details as to each false claim.'" *Id.* This "more flexible" standard, however, only alleviates a relator's burden to plead individual false claims; it does not obviate the need for a relator to plead the fraud itself with particularity. *Id.* Thus, "[c]onclusory allegations and references to 'plans and schemes' are not sufficient" to plead fraud. *Id.* Rather, a relator must plead the "who, what, when, where, and how of the alleged fraud." *Hagerty ex rel. U.S. v. Cyberonics, Inc.*, 844 F.3d 26, 31 (1st Cir. 2016).

Importantly here, "evidence of illegal conduct alone [is not] sufficient to state an FCA claim." *Kelly*, 827 F.3d at 14. Rather, the alleged illegal conduct must be connected to a "false or fraudulent claim for payment" or to a "false record or statement material to a false or fraudulent claim." *Id.* Allegations that only "give rise to . . . speculation as to whether the alleged scheme caused the filing of false claims with the government" must be dismissed. *Id.* at 15.

## II.    Relator Fails to Plead Essential Elements of His Claim.

Relator alleges that Jazz violated the FCA. To establish this violation, he must plead four elements: falsity, scienter, causation, and materiality. *See U.S. ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.*, 540 F. Supp. 3d 103, 117-18 (D. Mass. 2021). The falsity, causation, and materiality requirements must be pled with particularity. *See Kelly*, 827 F.3d at 13; *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004). Relator also must plead

"factual or statistical evidence to strengthen the inference" that false claims were submitted to the government. *Kelly*, 827 F.3d at 13. Relator fails to carry his burden on any of these elements.

### A.  Relator fails to adequately plead falsity.

Relator appears to allege that Jazz engaged in an underlying fraudulent scheme involving (1) inequitable conduct before the PTO, and (2) false statements to the PTAB that rendered claims for payment submitted to the government for Xyrem® false under two theories of liability: (1) fraudulent inducement and (2) false certification. Each of these issues are addressed in turn.

### 1.  Relator fails to adequately plead inequitable conduct.

Relator alleges that Jazz violated its duty of candor to the PTO by failing to disclose alleged prior art that would have rendered the '306 patent obvious and that, as a result, Jazz was able to obtain a patent that is "plainly invalid and unenforceable." Dkt. 63 ¶¶ 59-60, 111, 126. In other words, Relator alleges that Jazz engaged in inequitable conduct. *See Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1290 (Fed. Cir. 2012) ("To establish unenforceability based on inequitable conduct in the PTO, it must be shown that information material to patentability was withheld from the PTO . . . with the intent to deceive or mislead the patent examiner into granting the patent."). Jazz is aware of no case in the First Circuit in which inequitable conduct has been allowed to serve as the basis for an FCA violation. And, the only similar case to have survived the motion to dismiss stage was one in which the underlying patent claims were *invalidated* prior to the litigation. *U.S. ex rel. Silbersher v. Janssen Biotech, Inc.*, 576 F. Supp. 3d 212, 220 (D.N.J. 2021). This is not such a case—the '306 patent has never been invalidated despite being challenged in litigation and three IPR proceedings in which the challengers had every incentive to present their best arguments. And Relator has not pursued any claim before the PTO or the PTAB—the federal agencies allegedly misled by Jazz—to establish

9

invalidity or inequitable conduct. *See generally Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). Relator's theory that patent invalidity based on inequitable conduct may be litigated de novo within a FCA case is unprecedented and must fail.

Even if this Court believes that a patent may be collaterally attacked on an inequitable conduct theory through an FCA claim, Relator must sufficiently allege all of the elements of inequitable conduct. That is because, in any FCA case premised on a legal, as opposed to a factual, theory of falsity, a relator must plausibly allege element of the underlying fraudulent conduct. *Cf. United States v. Medtronic, Inc.*, 189 F. Supp. 3d 259, 268 n.3 (D. Mass. 2016).

To plead inequitable conduct, Relator must allege "underlying facts from which a court may reasonably infer that [(1)] a specific individual [(2)] knew of the withheld material information or of the falsity of the material misrepresentation, and [(3)] withheld or misrepresented this information with a specific intent to deceive the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328-29 (Fed. Cir. 2009). And, like with claims made under the FCA, these facts must be pled with particularity. *See id.* at 1327 ("[P]leading inequitable conduct in patent cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO."). Where, as here, a relator fails to plead the details of a fraudulent scheme with particularity, the case must be dismissed. *See U.S. ex rel. Allen v. Alere Home Monitoring, Inc.*, 355 F. Supp. 3d 18, 27-29 (D. Mass. 2019).

*First*, Relator has failed to "name the specific individual associated with the filing or prosecution of the application . . . who both knew of the material information and deliberately withheld or misrepresented it." *Exergen*, 575 F.3d at 1329. Regarding the alleged perpetrators of the fraud, Relator makes those allegations "[o]n information and belief," Dkt. 63 ¶¶ 154-59,

without "set[ting] forth the source of that information or the facts on which the belief was founded" as required by Rule 9(b), *Karvelas*, 360 F.3d at 234. To the extent Relator is alleging that Jazz as an organization was responsible for "conceal[ing] the existence of material facts that otherwise would have precluded Jazz from obtaining any new patents claiming the purportedly novel idea that Xyrem could safely be coadministered with other CNS depressants at reduced dosages," Dkt. 63 ¶ 111, that is not sufficient to support an inequitable conduct claim. *Exergen*, 575 F.3d at 1329 ("[T]he duty [of candor] applies only to individuals, not to organizations").

Relator's deficient allegations regarding the individuals involved also run afoul of the requirement that a "complaint must allege a plausible claim against *each* defendant." *Whitman & Co. v. Longview Partners (Guernsey) Ltd.*, 2015 WL 4467064, at *10 (D. Mass. July 20, 2015) (emphasis added). For example, Relator fails to identify the Defendant(s) by which each of the alleged perpetrators of the fraud was employed. *See* Dkt. 63 ¶¶ 154-56. Absent basic details concerning the role each Defendant played in the alleged fraudulent scheme, Jazz lacks sufficient notice of Relator's claims. *See GMO Tr. ex rel. GMO Emerging Country Debt Fund v. ICAP plc*, 2012 WL 5197545, at *8 (D. Mass. Oct. 18, 2012) (group pleading is impermissible when allegations are "so vague" that a defendant "can claim it lacks sufficient notice of the claim").

*Second*, Relator has failed to plead any facts regarding deceptive intent that "plausibly suggest any 'deliberate decision to withhold a known material reference.'" *Exergen*, 575 F.3d at 1330-31. Indeed, he does not allege any facts regarding *when* any alleged perpetrator learned of the alleged prior art, *who* actually decided not to disclose that prior art to the PTO, or *how* that decision was made. Absent such allegations, Relator has not sufficiently alleged the requisite "deliberate decision" required to plead deceptive intent. *Id.* at 1331.

*Third*, Relator has failed to plead how each piece of the alleged prior art that was

withheld would have been *material* to the Examiner's finding that the inventions claimed in the '306 patent were patentable. *See id.* at 1329-30 (to plead inequitable conduct a plaintiff must "allege 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims"). "Information is 'material' if the PTO would not have allowed a claim had it been aware of the undisclosed prior art when the claims at issue are given their broadest reasonable construction." *Lexington Luminance LLC v. Osram Sylvania Inc.*, 972 F. Supp. 2d 88, 92 (D. Mass. 2013). Here, Relator alleges the purported prior art withheld by Jazz establishes "these drugs were commonly being coadministered prior to September 2012" and therefore "it was obvious to adopt a lower-than-normal Xyrem dose in order to assure a patient's safety." *See, e.g.*, Dkt. 63 ¶ 105. But these same arguments were raised in the IPR proceedings and explicitly considered and rejected by the PTAB. *Compare* RJN Ex. 19 at 27[2] *with* RJN Ex. 24 at 13-24.[3] Relator's allegations are therefore insufficient to allege materiality.

Relator also fails to plead materiality within the inequitable conduct framework because he does not address whether the Examiner reviewed any of the prior art he alleges in her own independent examination of relevant materials. Patent examiners are required to conduct an independent and "thorough" examination of the available prior art. 37 C.F.R. § 1.104(a)(1); *see also* Manual of Patent Examining Procedure § 2103. Here, as noted above, the Examiner conducted dozens of searches to identify prior art relevant to the '306 patent, including searches for prior art discussing both valproate and GHB. With no allegation that the materials reviewed

---

[2] "[A] POSA would have found it obvious to try to reduce the dosage of GHB by **at least 5%**—and likely more—when a patient is concomitantly receiving valproate with a reasonable expectation of success in avoiding toxicity from GHB due to an interaction with valproate."

[3] "Petitioner, therefore, has not identified a sufficient basis on this record to conclude that any increased brain levels of endogenous GHB caused by valproate could have been predictably compensated for by a corresponding decrease of at least 5% in the amount of GHB orally administered to patients."

Case 1:21-cv-10891-PBS   Document 72   Filed 12/02/24   Page 21 of 40


by the Examiner were not "cumulative" of the materials Relator alleges, Relator has failed to plead materiality. *See Exergen*, 575 F.3d at 1329-30 (dismissing inequitable conduct claim because plaintiff failed to describe how the examiner "would have used [the omitted reference] in assessing patentability").

Rather than pleading facts to establish any of the elements of an inequitable conduct scheme, Relator rests on the conclusory allegation that "Jazz violated its duty of candor and good faith by withholding [the alleged] prior art" because "if a POSA had understood a dose reduction of GHB in any amount and for whatever reason, the claimed method would be rendered obvious." Dkt. 63 ¶¶ 56, 60; *see also Genentech, Inc. v. Sandoz Inc.*, 55 F.4th 1368, 1376 (Fed. Cir. 2022) ("Whether a claim is invalid as obvious is a question of law."). Such legal conclusions couched as factual allegations cannot be credited. *See U.S. ex rel. D'Agostino v. ev3, Inc.*, 153 F. Supp. 3d 519, 537 (D. Mass. 2015) (dismissing complaint for reliance on "legal conclusion[s]").

## 2. Relator fails to adequately plead that Jazz made false statements to the PTAB.

Relator alleges that "Jazz made affirmative, false statements to convince the PTAB to deny institution of IPRs challenging certain claims made in the '306 patent family"; that "the PTAB relied upon and adopted Jazz's false and misleading statements" in denying institution of the IPR proceedings; and that these statements "are independently sufficient to establish Jazz's liability under the False Claims Act." Dkt. 63 ¶¶ 114-15, 118. However, the statements that Relator alleges are misrepresentations, *id.* ¶ 116, are effectively opinions that Jazz expressed in briefing to the PTAB about what constitutes prior art. Opinions, however, only "qualify as a false statement for purposes of the FCA where the speaker knows facts which would preclude such an opinion," *U.S. ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 310 (1st Cir. 2010) (cleaned up). That means Relator must allege Jazz knew of facts precluding those statements that "could

reasonably [be] classif[ied] as true or false as opposed to legal argumentation and possibility." *Id.* (cleaned up). Yet all that he effectively alleges is that he disagrees with Jazz's determination of what qualifies as prior art, which falls into the camp of legal argumentation, not facts that can be classified as true or false. *See Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568 (Fed. Cir. 1987) ("Another key preliminary legal inquiry is—what is the prior art?").

### 3.    Relator fails to adequately plead a fraudulent inducement theory of falsity.

Relator alleges that Jazz's fraudulent conduct ultimately "taint[ed] claims for payment later submitted to the government." Dkt. 63 ¶¶ 126-27. This theory of fraudulent inducement fails because Relator does not adequately plead that theory nor does he plead a sufficient causal nexus to the submission of false claims to the government.

In *United States ex rel. Marcus v. Hess*, the Supreme Court established that claims submitted pursuant to a government contract obtained as a result of fraudulent statements or omissions are tainted by that initial fraud and rendered false. 317 U.S. 537, 543 (1943) (holding claims submitted pursuant to a contract "executed as the result of . . . fraudulent bidding" can be false under the FCA). Fraudulent inducement under the FCA is intentionally construed "narrowly" to prevent the theory from converting the FCA into a "general purpose anti-fraud statute," *U.S. ex rel. Provuncher v. Angioscore, Inc.*, 2012 WL 1514844, at *3 (D. Mass. May 1, 2012), and is therefore only actionable in "rare circumstances," *U.S. ex rel. Williams v. City of Brockton*, 2020 WL 887706, at *4 (D. Mass. Feb. 24, 2020). Stretching this theory to encompass Relator's allegations expands the theory far beyond this precedent.

Though the First Circuit has not yet had the opportunity to address the precise metes and bounds of this theory, other courts have found that it is limited to claims submitted *pursuant to* a fraudulently induced *contract* with the government. *See In re Plavix Mktg., Sales Prac. & Prods.*

*Liab. Litig. (No. II)*, 332 F. Supp. 3d 927, 951-52 n.12 (D.N.J. 2017) (collecting cases). At most, Relator has alleged that Jazz fraudulently induced a government entity to recognize a time-limited property right (the '306 patent). He has not alleged what is required—that Jazz fraudulently induced a government entity that pays claims to enter into a *contract* pursuant to which claims were ultimately submitted. Thus, this case does not fit the "rare circumstances" under which a fraudulent inducement theory can be pursued. *Williams*, 2020 WL 887706, at *4.

Moreover, Relator has not pled facts to establish that the fraudulent conduct was the "but for" cause of false claims being submitted to the government. *See, e.g.*, *U.S. ex rel. D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) (misrepresentation must "*actually* cause" the Government to make a payment "it otherwise would not have granted"). To be sure, Relator repeatedly asserts that "but-for" causation. *See* Dkt. 63 ¶ 125. But "parroting the language of a statutory cause of action, without providing some factual support, is not sufficient to state a claim." *Karvelas*, 360 F.3d at 240. And Relator does not allege any of the necessary factual predicates to sufficiently allege "but-for" causation. For example, as explained above, he does not allege how the purportedly omitted prior art would have caused the Examiner to reject the '997 application. This is critical because "[i]f the [PTO] would have approved [the '306 patent] notwithstanding the alleged fraudulent representations, then the connection between those representations to the [PTO] and a payment by CMS relying on [the PTO] approval disappears." *D'Agostino*, 845 F.3d at 8.

Relator also fails to plead "but-for" causation because the causal chain he alleges is far too attenuated. By Relator's telling, Jazz's alleged violation of its duty of candor to the PTO in 2014 and its alleged misrepresentations to the PTAB in 2016 caused the following chain of events: (1) the PTO issued the patent; (2) which Jazz listed in the Orange Book[4] and enforced;

---

[4] The Orange Book identifies drugs approved by FDA and the associated patents. Dkt. 63 ¶¶ 37-38.

(3) which was challenged in infringement actions; (4) which infringement actions were resolved through settlements extending Xyrem®'s exclusivity; (5) all which prevented generics from entering the market; (6) which allowed Jazz to charge higher prices for Xyrem®; (7) which, ultimately, made claims for reimbursement at that price false starting in 2019 and beyond. *See* Dkt. 63 ¶¶ 119-25. Courts have repeatedly dismissed FCA complaints like this premised on attenuated, multi-step causal chains.. *See U.S. ex rel. Promega Corp. v. Hoffman-La Roche Inc.*, No. 03-1447-A, Dkt. 221 at 5 (E.D. Va. Sept. 29, 2004); *see also U.S. ex rel. Siegel v. Novo Nordisk, Inc.*, 2024 WL 3582417, at *11 (W.D. Wash. July 30, 2024); *U.S. ex rel. Osinek v. Kaiser Permanente*, 2023 WL 4054914, at *14-15 (N.D. Cal. June 15, 2023).

### 4.  Relator fails to adequately plead his false certification theories of falsity.

Relator alleges that Jazz's conduct resulted in a series of express and implied false certifications that its prices were "fair and reasonable" and not "based on illegally-obtained and illegally maintained patent protection." Dkt. 63 ¶¶ 131-40.

Express false certification. "A claim is legally false under an express certification theory when the party *making the claim for payment* expressly represents compliance with a statute or regulation," "without actually complying with such statute or regulation." *U.S. ex rel. Mackillop v. Grand Canyon Educ., Inc.*, 626 F. Supp. 3d 418, 446 (D. Mass. 2022) (emphasis added). Here, Relator alleges that (1) "*via* U.S. Department of Health and Human Services Form 3542," Jazz expressly certified that "with respect to any listed patent, 'a claim of patent infringement could reasonably be asserted' against any person not licensed to sell the drug"; and (2) that representation was false because Jazz knew the '306 patent was "fraudulently obtained and maintained." Dkt. 63 ¶ 140. That theory fails because he alleges no express certification made in a claim for payment. *See Maturi v. McLaughlin Rsch. Corp.*, 413 F.3d 166, 171-72 & n.13 (1st Cir.

2005) (quoting 31 U.S.C. § 3729(c)). Form 3542 is a form submitted to the FDA in connection

with Orange Book submissions. *See generally* RJN Ex. 36. Form 3542 does not request or

demand payment from anyone. Thus, Form 3542 is not a claim for payment and Relator's claims

premised on an express false certification theory must be dismissed.

> Implied false certification. Implied false certification theories of liability under the FCA
are only viable under certain circumstances that Relator does not plead here. Pursuant to the

Supreme Court's decision in *Universal Health Services, Inc. v U.S. ex rel. Escobar*, a claim is

impliedly false "where two conditions are satisfied: first, the claim does not merely request

payment, but also makes specific representations about the goods or services provided; and

second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or

contractual requirements makes those representations misleading half-truths." 579 U.S. 176, 190

(1989). Both conditions must be met to establish falsity under an implied false certification

theory. *See U.S. ex rel. Collins v. Molina Healthcare, Inc.*, 2019 WL 11816475, at *7 (D. Mass.

July 17, 2019) ("[T]wo conditions *must* be satisfied for the implied certification theory to be a

basis of FCA liability." (emphasis added)); *see also U.S. ex rel. Rose v. Stephens Inst.*, 909 F.3d

1012, 1018 (9th Cir. 2018) (providing that both conditions must be met).

> Though not entirely clear, Relator appears to allege two specific representations made by
Jazz that rendered claims for payment impliedly false: (1) in submitting Xyrem® pricing

information to the General Service Administration ("GSA") in connection with its listing on the

Federal Supply Schedule ("FSS"), Jazz represented that the price was "fair and reasonable," Dkt.

63 ¶ 133; and (2) in submitting Xyrem® pricing information to the Centers for Medicare and

Medicaid Services ("CMS"), Jazz "implicitly" represented, pursuant to 42 U.S.C. § 1396r-

8(b)(3)(C)(ii) ("Medicaid Penalty Provision"), that "the average manufacturer price reported has not been unlawfully inflated through the exclusion of competitors," *id.* ¶ 136.

Relator's implied false certification theory fails *Escobar*'s first condition because none of the specific representations he identifies are included in claims for payment to the government. *Escobar*, 579 U.S. at 190 (for a claim to be impliedly false it cannot "merely request payment, but [must] also make[] specific representations about the goods or services provided."); *see also Martino-Fleming*, 540 F. Supp. 3d at 117.

Moreover, the Medicaid Penalty Provision does not set forth any specific representation made by manufacturers about their products in claims for payment; rather it authorizes the imposition of penalties on manufacturers for certain conduct. *See* 42 U.S.C. § 1396r-8(b)(3)(C)(ii). Relator's implied false certification theory fails *Escobar*'s first condition for this reason too. *See U.S. ex rel. Stonebrook v. Merck KGaA*, 2024 WL 1142702, at *8 (D. Mass. Mar. 15, 2024) (dismissing a relator's complaint for failure to plead a "specific representation about the goods and services provided").

Relator's implied false certification theory also fails *Escobar*'s second condition that the representation be rendered a misleading half-truth by a defendant's fraudulent conduct. This issue is addressed with each representation in turn below.

*FSS "Fair and Reasonable" Representation*. Relator's FSS theory is premised on a misunderstanding of how "fair and reasonable" pricing negotiations work. The Veterans Health Care Act ("VHCA") provides that manufacturers of "covered drugs," such as Xyrem®, "shall enter into a master agreement" with the VA. 38 U.S.C. § 8126(a). The master agreement requires

manufacturers to make covered drugs available for procurement on the FSS *Id.* § 8126(a)(2). Accordingly, GSA plays no role in negotiating Xyrem®'s price on the FSS.

When negotiating a drug's FSS price with the VA, manufacturers must submit the prices that various commercial customers pay for the drug. *See generally* RJN Ex. 38. When it submits those prices, the manufacturer must certify that they are "current, accurate, and complete." *See generally* RJN Ex. 39. In other words, the VA evaluates the price to be charged for the drug by reference to its market price. Once the FSS price is set, certain government agencies may purchase the drug for the price on the FSS that is available to the agency. *See* 48 C.F.R. § 8.401 *et seq.* Unlike the VA, Medicare and Medicaid do not use the FSS pricing. *See* RJN Ex. 35 at 8, Table 1 (showing prices paid by Medicare and Medicaid for drugs are not set by the FSS).

When the VA certifies a price as "fair and reasonable," it represents that the manufacturer followed the statutory and regulatory requirements outlined above. Relator offers no explanation as to how Jazz's alleged conduct impacted those requirements such that it could have rendered that representation a misleading "half-truth." *Escobar*, 579 U.S. at 190. Relator does not plead, for example, that Jazz submitted commercial prices that were not "current, accurate, and complete," nor does he point to any other deficiency in the FSS negotiation process. Rather, he asserts in conclusory fashion that Jazz "misleadingly omitted the critical fact that [its] pricing was the product of an unlawfully extended patent monopoly" and that "[t]hat omission goes directly to whether the prices the government paid for Xyrem® were fair and reasonable." Dkt. 63 ¶ 138. That conclusory allegation does not engage with the "fair and reasonable" pricing framework, and thus cannot withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678.

<u>*Medicaid Penalty Provision Representation*</u>. Even if the Medicaid Penalty Provision did amount to a representation about product pricing in a claim for payment, Relator offers no

explanation as to how that representation about product pricing (whatever it is) was rendered a misleading half-truth by Jazz's conduct. All he offers is the conclusory assertion that "[w]hen providing the AMP to CMS, Defendants *implicitly* certify that the average manufacturer price reported has not been unlawfully inflated through the exclusion of competitors." Dkt. 63 ¶ 136 (emphasis added). Without any authority supporting that interpretation, however, this allegation is also not sufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678.

### B.  Relator fails to adequately plead materiality.

Even assuming Relator has sufficiently pled falsity, to establish an FCA violation he must also plead with particularity that the falsity was material to the government's decision to pay a claim for payment. *Escobar*, 579 U.S. at 193. This conclusory allegation is insufficient as a matter of law. *See id.* at 194. Moreover, even though the government investigated his claims and, per Relator, views "overcharging the government through anticompetitive conduct to be [a] material and serious violation," Dkt. 63 ¶ 150, Relator concedes that the government "paid and continues to pay . . . claims," *id.* ¶ 166. "The fact that CMS has not denied reimbursement for [Xyrem®] in the wake of [Relator's] allegations casts serious doubt on the materiality of the fraudulent representations that [Relator] alleges." *D'Agostino*, 845 F.3d at 7.

### C.  Relator fails to adequately plead scienter.

Relator must also plead scienter and, although scienter may be alleged generally under Rule 9(b), a relator "must still lay out enough facts from which [scienter] might reasonably be inferred." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012). Relator fails to meet this requirement. As discussed above, he alleges that persons "with knowledge of the withheld prior art include" Jazz's CEO, the inventor of the patent, Jazz's Deputy General Counsel, unnamed "patent counsel," and Jazz's alleged agent Express Scripts, Dkt. 63 ¶¶ 154-55,

but he does not provide any details of their factual knowledge except as to Jazz's Deputy General Counsel and Express Scripts, *id.* ¶¶ 155-57. And even as to Mr. Honerkamp and Express Scripts, Relator only rehashes his allegations regarding what he believes is prior art. *Id.* ¶¶ 154-58. Absent those details, it cannot be reasonably inferred that Jazz "knowingly cause[d] the submission of a false claim." *Guilfoile v. Shields*, 913 F.3d 178, 187 (1st Cir. 2019).

### D.  Relator fails to adequately allege the submission of false claims.

Finally, even if Relator has sufficiently pled all the foregoing elements of an FCA violation, he must still also plead "factual or statistical evidence to strengthen the inference . . . beyond possibility" that false claims were actually submitted. *Kelly*, 827 F.3d at 13; *U.S. ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 58 (1st Cir. 2017). That is because "evidence of an actual false claim is 'the *sine qua non* of a[n] [FCA] violation.'" *Karvelas*, 360 F.3d at 225. The only facts that Relator alleges regarding claim submission are: (1) "[b]ut-for Defendants' fraudulent actions, many generic competitors should and would have been able to enter the market by January 2021, and possibly as early as December 2019," Dkt. 63 ¶ 125; (2) "competition would have lowered prices for sodium oxybate by 85% or more, and lower priced generics would have filled 90% of Xyrem® prescriptions," *id.* ¶ 147; and (3) Jazz received hundreds of millions of dollars from Medicare and Medicaid in 2020 and 2021, *id.* ¶ 9.

Nowhere in the Amended Complaint does Relator allege any facts regarding the submission of claims for payment of Xyrem® to government healthcare programs that should have been claims for lower-cost generics. Instead, he only alleges that Medicare and Medicaid paid claims and offers his speculation that "90% of Xyrem® prescriptions" would have been filled with generic alternatives. Dkt. 63 ¶ 147. But the First Circuit has rejected the notion that mere speculation about the percentage of claims that would have been different absent the

alleged fraud can be sufficient "to demonstrate the existence of false claims in an FCA case."
*Booker*, 847 F.3d at 58; *see also Lawton ex rel. U.S. v. Takeda Pharm. Co.*, 842 F.3d 125, 132
(1st Cir. 2016). Moreover, other than Medicare and Medicaid, Relator does not sufficiently
allege that claims were submitted to, much less paid by, any of the other government health care
programs he claims are at issue in this case. *See* Dkt. 63 ¶ 18 (listing the government health care
programs on behalf of which Relator seeks damages). And even as to Medicaid, he has not
identified which states' Medicaid programs paid claims for Xyrem®. Finally, at minimum,
Relator does not allege the submission of false claims prior to December 2019, and therefore any
claims pre-dating that time must be dismissed.

###    III.    Relator's Claims are Precluded by the Public Disclosure Bar.

Alternatively, assuming Relator's allegations are true, they must be dismissed under the
FCA's public disclosure bar. The public disclosure bar requires a court to dismiss a *qui tam*
action if (1) there has already been a "public disclosure" of "substantially the same allegations or
transactions as alleged in the action"; and (2) the relator is not an "original source" of that
disclosure. 31 U.S.C. § 3730(e)(4). To qualify as a public disclosure, the disclosure must have
been made through one of the statutorily prescribed channels: "(i) in a Federal criminal, civil, or
administrative hearing in which the Government or its agent is a party, (ii) in a congressional,
Government Accountability Office, or other Federal report, hearing, audit, or investigation, or
(iii) from the news media." *Id.* The FCA "contains no requirement that a public disclosure use
magic words or specifically label disclosed conduct as fraudulent," and "[a] relator's ability to
recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the
fact that the material elements of the violation already have been publicly disclosed." *U.S. ex rel.
Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 209 (1st Cir. 2016).

This Court has adopted a "helpful, straightforward, and widely accepted framework for determining whether a public disclosure of the allegations or transactions has occurred." *In re Pharm. Indus. Average Wholesale Price Litig.*, 538 F. Supp. 2d 367, 383 (D. Mass. 2008).

> [I]f X+Y=Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed. Under the framework, X stands for the allegedly false set of facts set forth in the claim at issue, and Y is a proxy for the allegedly true set of facts. Thus when X [the false set of facts] *and* Y [the true set of facts] surface publicly, or when Z is broadcast . . . there is little need for *qui tam* actions and the claim will be barred.

*Id.* (internal quotation marks omitted).

If Relator is correct that the '306 patent claims are invalid because the alleged prior art rendered them obvious, then the public disclosure bar bars his FCA claims.[5] Following the "X + Y = Z" formula, taking Relator's allegations as true for purposes of this Motion, one or more public disclosures through channels (ii) and (iii) disclosed: (1) the allegedly false set of facts—Jazz's failure to disclose and misrepresentation of alleged prior art to the PTO and PTAB in connection with their review of the '306 patent claims; (2) the allegedly true set of facts—that the alleged prior art rendered obvious coadministration of Xyrem® with valproate and a reduction in the dose of Xyrem®; and (3) the allegation that fraud that was committed—that the '306 patent claims were obvious and invalid.

The allegedly false set of facts was disclosed in Jazz's submissions to the PTO and PTAB. Regarding the false set of facts, Relator alleges: (1) Jazz "took steps to conceal and misrepresent, material prior art that rendered obvious . . . Jazz's claimed invention both during the original prosecution of the '306 patent family, and during several petitions to the PTAB to institute IPR proceedings"; and (2) "[t]he material prior art . . . includes . . . adverse events

---

[5] For the convenience of this Court, Appendix A compares Relator's allegations with the relevant public disclosures.

reports that Jazz received; numerous instances of real world safe and effective coadministration at reduced doses; a 2006 article published by Jazz; [the 2012 Label]; and [the 2012 Drug Safety Communication]." Dkt. 63 ¶ 22. But any alleged failure by Jazz to disclose prior art would have been evident based on a review of the materials considered by the Examiner during the initial '306 patent examination, *see generally* RJN Ex. 17 at 1-3, which qualifies as a channel (ii) disclosure, *see United States v. Allergan, Inc.*, 46 F.4th 991, 998 (9th Cir. 2022) ("[W]e conclude that an *ex parte* patent prosecution is an 'other Federal . . . hearing' under prong (ii)"). And, the statements made by Jazz to the PTAB were disclosed during the IPR proceedings, *see generally* RJN Exs. 21, 22, 25, which as explained further below, also qualify as a channel (ii) disclosure.

Per Relator's own pleading, the allegedly true set of facts was publicly disclosed in various FDA documents. For example, Relator invokes "30 documented instances" in the FDA Adverse Events Reporting System that purportedly demonstrate "the prior co-administration of GHB and Valproate between 2003 and 2012 in a safe and effective manner." Dkt. 63 ¶¶ 66, 68. He also cites the 2012 Label and 2012 Drug Safety Communication as materials demonstrating that "Xyrem and CNS depressants . . . could be taken together." *Id.* ¶ 100. These FDA documents are all "Federal reports" under channel (ii). *See U.S. ex rel. D'Agostino*, 153 F. Supp. 3d at 531-32.

The allegedly true set of facts was also publicly disclosed in a scientific article, which qualifies as a public disclosure under channel (iii). *See U.S. ex rel. Hagerty v. Cyberonics*, *Inc.*, 95 F. Supp. 3d 240, 256 (D. Mass. 2015) ("[N]ews articles . . . can properly be considered when evaluating the FCA's public-disclosure bar because they are . . . susceptible to judicial notice."), *aff'd*, 844 F.3d 26 (1st Cir. 2016). Specifically, Relator alleges that "Jazz itself in a scientific article published in 2006 and authored by its employee . . . explicitly taught that GHB-DH

[Xyrem®] is inhibited by various antiepileptic drugs . . . [which] induce increased GHB concentration by inhibiting GHB metabolism." Dkt. 63 ¶ 106; *see generally* RJN Ex. 2.

Similarly, the alleged fraud was disclosed in at least two online articles, which as noted above, qualify as channel (iii) disclosures. *Hagerty*, 95 F. Supp. 3d at 256. For example, a *Law360* article covering a '306 patent infringement claim that Jazz made against Roxane Laboratories Inc. noted that Roxane argued the invention "isn't patentable" because "[d]octors routinely determine if a patient is taking other medications, and if so, recommend dosage adjustments. The '306 patent claims are thus nothing more than an attempt to claim the naturally occurring relationship between GHB and valproate in vivo." RJN Ex. 8 at 1. And a 2018 edition of *Mealey's Litigation Report* discussing Par's litigation against Jazz noted that Par was attempting to "show that the '306 patent … [is] invalid based on prior art" and subpoenaed Express Scripts for "prescription records for and information regarding patients taking Xyrem® concomitantly with a form of valproate." RJN Ex. 32 at 1-2. Relator makes the exact same claims as Roxane and Par—that prescribing information from doctors and Express Scripts rendered the '306 patent claims obvious. *See* Dkt. 63 ¶¶ 59, 155.

The alleged fraud was also disclosed in Par's response to Jazz's 2016 Citizen Petition to FDA. As discussed above, in response to that Citizen Petition, Par told FDA that it was "the result of a patent-driven effort" and that Jazz was "cit[ing] safety issues in an effort to conceal its true anti-competitive motive." RJN Ex. 30 at 1. Relator's allegations mirror Par's objections. *See* Dkt. 63 ¶ 129 ("[T]he entire point of Defendants' fraud was to extend the patent monopoly on Xyrem®, so that they could continue to charge inflated prices to all payors").

Finally, the alleged fraud was also disclosed in the three IPR proceedings addressing the '306 patent. In those proceedings, each petitioner alleged the '306 patent claims would have been

obvious to a POSA. RJN Exs. 24 at 11 ("Petitioner argues that the skilled artisan 'would have found it obvious to try to reduce the dosage of GHB by at least 5%—and likely more—when a patient is concomitantly receiving valproate with a reasonable expectation of success in avoiding toxicity from GHB due to an interaction with valproate.'"), 26 at 10 (similar), 28 at 10 (similar). Relator's allegations are no different. *See* Dkt. 63 ¶ 105 ("[I]t was obvious to adopt a lower-than-normal Xyrem dose in order to assure a patient's safety . . . .").

IPR proceedings qualify as channel (ii) public disclosures.[6] In an IPR proceeding, the PTO "act[s] as the United States in its role as a superior sovereign to reconsider a prior administrative grant." *Saint Regis Mohawk Tribe v. Mylan Pharm. Inc.*, 896 F.3d 1322, 1329 (Fed. Cir. 2018). As such, the PTO receives and investigates the pertinent facts related to its initial grant of the patent. Due to the government's involvement, patent holders otherwise entitled to sovereign immunity in private litigation do not have that same privilege in an IPR proceeding. *See Regents of Univ. of Minn. v. LSI Corp.*, 926 F.3d 1327, 1339 (Fed. Cir. 2019). In addition, the PTO must report facts disclosed in an IPR proceeding on the PTAB's online, public IPR docket. *See* 35 U.S.C. § 316(a)(1). Because the PTO conducts an inquisitorial proceeding in the United States' sovereign capacity to aid its administration of patent-related laws and policy, the government possesses, and is charged with notice of, facts relevant to that proceeding. Accordingly, an IPR proceeding qualifies as a channel (ii) disclosure because it is a federal proceeding that results in a "report," often includes a "hearing," and is readily classified as an "investigation." *See* 31 U.S.C. § 3730(e)(4)(A)(ii).

---

[6] In *U.S. ex rel. Silbersher v. Valeant Pharm. International, Inc.*, 89 F.4th 1154, 1166 (9th Cir. 2024), *cert. denied*, 2024 WL 4426551 (U.S. Oct. 7, 2024) and *U.S. ex rel. Silbersher v. Janssen Biotech, Inc.*, 576 F. Supp. 3d 212, 226 (D.N.J. 2021), the courts determined that IPR proceedings do not qualify as channel (ii) disclosures. Those non-binding decisions are wrong for the reasons set forth here.

Given these public disclosures, Relator can only escape the bar if he is an "original source" of his allegations. An original source is someone who: (1) "prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based"; or (2) "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing" the *qui tam* lawsuit. 31 U.S.C. § 3730(4)(B).

As to the first statutory definition, Relator has not pled that his voluntary disclosures to the government pre-date the foregoing public disclosures. *Compare* Dkt. 63 ¶ 23 ("Relator voluntarily provided the information to the federal government and the Plaintiff States over a month before filing this action on May 27, 2021") *with* RJN, Exs. 1-4, 11, 13, 18-30, 32 (all disclosures were made prior to 2019). And, as to the second statutory definition, besides a conclusory assertion that his "independent research and investigation has generated information that is independent of, and materially adds to, any publicly-disclosed allegations and transactions," Dkt. 63 ¶ 19, Relator has pled no other facts supporting his original-source status and therefore cannot qualify as such.

The FCA's public disclosure bar constitutes an "effort to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Graham Cnty. Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 294-95 (2010). Relator's allegations, which were repeatedly publicly disclosed, decidedly fall into the latter category.

IV.    **Relator's State Law Claims Fail Because They Are Derivative of His Federal FCA Claims.**

This Court should also dismiss each of Relator's derivative state law FCA claims. All but one of the state laws cited by Relator is modeled on the federal FCA and courts interpreting state FCAs often look to the federal FCA for guidance. *New York v. Amgen Inc.*, 652 F.3d 103, 109

27

(1st Cir. 2011). For all the reasons set forth above that Relator's claims fail under the federal FCA, they also fail under the state FCAs. Relator's claim under California's Insurance Fraud Prevention Act ("IFPA") also fails for at least two reasons. First, the IFPA applies only to private insurers, not public insurers. *See* Cal. Ins. Code §§ 1871 et seq. Relator has not identified a single private insurer who paid for Xyrem® Second, the IFPA does not recognize false certification as a theory of liability, so false claims premised on this theory are not viable. *See State ex rel. Wilson v. Bristol Myers Squibb, Inc.*, 2013 WL 5373514, at *7 (Cal. Super. Ct. Sept. 23, 2013).

###### V.    Relator's Claims Must Be Dismissed Because the FCA *Qui Tam* Provisions are Unconstitutional.

Relator's federal claims must also be dismissed because his initiation of this case pursuant to the FCA's *qui tam* provisions violates the Appointments Clause of Article II of the Constitution. *Qui tam* relators exercise civil enforcement authority on behalf of the United States. *U.S. ex rel. Zafirov v. Fla. Med. Assocs.*, 2024 WL 4349242, at *6 (M.D. Fla. Sep. 30, 2024). And "the FCA prescribes a relator's statutory duties, powers, and emoluments." *Id.* Because *qui tam* relators "exercise significant authority pursuant to the laws of the United States" and "occupy a continuing position established by law," they are "Officers of the United States" who must be appointed consistent with the Appointments Clause. *Id.* *6-15. That clause requires Officers of the United States to be nominated by the President and confirmed by the Senate if they are "principal officers"; for "inferior officers," Congress may "by law" vest their appointment "in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* at *5 (citing U.S. Const. art. II, § 2, cl. 2). Because Relator was not chosen by any of the methods prescribed by the Appointments Clause, his effort to exercise federal authority by enforcing federal law in this case is unconstitutional and must be dismissed. *Id.* at *19-20.

## VI.    This Court Lacks Personal Jurisdiction Over the Irish Entities.

Relator asserts that both Jazz Pharmaceuticals Inc. and the Irish Entities violated the FCA. Relator "bears the burden of persuading the court that jurisdiction exists." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009). But Relator fails to establish that the Irish Entities are subject to either this Court's general or specific personal jurisdiction, so his claims as to the Irish Entities must be dismissed pursuant to Rule 12(b)(2).

### A.  This Court Lacks General Jurisdiction Over the Irish Entities.

The Supreme Court has repeatedly held that a corporation is ordinarily subject to general jurisdiction in only two places: (1) "the corporation's place of incorporation," and (2) "its principal place of business." *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017). That test is not met here—both of the Irish Entities are incorporated in Ireland and maintain their principal place of business in Dublin, not in Massachusetts. *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014). Nor does Relator allege that this is the sort of "exceptional case" in which their general business operations in Massachusetts are nonetheless "so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 139 n.19. Beyond Jazz Pharmaceuticals PLC's status as the parent company of Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited's ownership of the patents at issue, the Amended Complaint does not point to *any* business operations conducted by the Irish Entities in Massachusetts. Dkt. 63 ¶ 20. Thus, this Court lacks general jurisdiction over the Irish Entities.

### E.  This Court Lacks Specific Jurisdiction Over the Irish Entities.

To establish specific jurisdiction, Relator must demonstrate: (1) his claims directly arise from or relate to the Irish Entities' activities in Massachusetts; (2) the Irish Entities purposely availed themselves of the privilege of conducting activities in Massachusetts; and (3) the

exercise of specific jurisdiction in Massachusetts is reasonable under the circumstances. *See Chen v. U.S. Sports Acad., Inc.*, 956 F.3d 45, 59 (1st Cir. 2020).

Relator does not meet any of these requirements. The only connection he alleges between Massachusetts and Jazz Pharmaceuticals PLC is that it is the "parent company to the other defendants." Dkt. 63 ¶ 20. But "[t]he mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary." *CXENSE Inc. v. Maroniene*, 2017 WL 3131987, at *5 (D. Mass. 2017) (quoting *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980)). Similarly, the only connection the Amended Complaint makes between Massachusetts and Jazz Pharmaceuticals Ireland Limited is that it is "the owner of the patents at issue." Dkt. 63 ¶ 20. But ownership of patents alone is insufficient to establish minimum contacts. *See, e.g., Venmill Indus., Inc. v. ELM, Inc.*, 100 F. Supp. 3d 59, 72-73 (D. Mass. 2015). Relator does not allege any other ties between Massachusetts and the Irish Entities because he cannot. His claims do not arise from the Irish Entities' activities in the state, the Irish Entities have not purposefully availed themselves of the privilege of conducting business there, and there are no circumstances that would render the exercise of specific jurisdiction in Massachusetts reasonable. Thus, this Court lacks specific jurisdiction over the Irish Entities.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Irish Entities for lack of personal jurisdiction under Rule 12(b)(2) and dismiss Relator's Amended Complaint with prejudice for failure to state a claim under Rules 12(b)(6) and 9(b).


 Dated: December 2, 2024                    Respectfully submitted,

/s/ *Jack W. Pirozzolo*
Jack W. Pirozzolo (Mass. Bar No. 564879)
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
Telephone: (617) 223-0300
Fax: (617) 223-0301
jpirozzolo@sidley.com

Jaime L.M. Jones (*pro hac vice pending*)
Matthew Bergs (*pro hac vice pending*)
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
Telephone: (312) 853-7000
Fax: (312) 853-7036
jaime.jones@sidley.com
mbergs@sidley.com

Kwaku A. Akowuah (*pro hac vice pending*)
Brenna Jenny (*pro hac vice pending*)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000
Fax: (202) 736-8711
kakowuah@sidley.com
bjenny@sidley.com

*Attorneys for Jazz Pharmaceuticals PLC, Jazz*
*Pharmaceuticals, Inc. and Jazz*
*Pharmaceuticals Ireland Limited*

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2024, the foregoing document was filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ *Jack W. Pirozzolo*
Jack W. Pirozzolo