**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA; STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, AND WASHINGTON; THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA; THE DISTRICT OF COLUMBIA; GUAM, PUERTO RICO, and THE U.S. VIRGIN ISLANDS, <br><br> *ex rel.* LEONARDO S. SORGI, <br><br>         Plaintiffs, <br><br>   v. <br><br> JAZZ PHARMACEUTICALS PLC, JAZZ PHARMACEUTICALS, INC., and JAZZ PHARMACEUTICALS IRELAND LIMITED, <br><br>         Defendants. | Civil Action No. 1:21-cv-10891-PBS <br><br> Judge Patti B. Saris <br><br> **Leave to file overlength brief granted on Nov. 25, 2024 (ECF No. 69)** |

**PLAINTIFF-RELATOR LEONARDO S. SORGI'S OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   LEGAL STANDARDS .......................................................................................3

III.  THE COMPLAINT PLEADS ALL ELEMENTS OF FALSE CLAIMS ACT
      LIABILITY .........................................................................................................4

      A.    The Complaint Pleads Falsity ...............................................................5

            1.    Jazz's Deception of the Patent Office .......................................5

            2.    False Statements and Material Omissions to the PTAB .............9

            3.    The Complaint Pleads Fraudulent Inducement ........................11

            4.    The Complaint Pleads Express and Implied Certification..........12

      B.    The Complaint Pleads Materiality .......................................................14

      C.    The Complaint Pleads Scienter ...........................................................17

      D.    The Complaint Includes Reliable Indicia that False Claims Were Presented............18

IV.   THE PUBLIC DISCLOSURE BAR DOES NOT COMPEL DISMISSAL ........................20

      A.    The Public Disclosure Bar Does Not Apply ........................................21

            1.    The Public Sources Do Not Disclose Substantially the Same
                  Allegations or Transactions as the Complaint................................21

            2.    The Asserted Public Disclosures Did Not Occur in Qualifying
                  Channels ........................................................................................25

      B.    Even if the Public Disclosure Bar Applies, Relator Is an Original Source...............27

V.    THE STATE LAW CLAIMS SURVIVE ..........................................................28

VI.   THE FCA'S QUI TAM PROVISIONS ARE CONSTITUTIONAL .....................................28

VII.  THE COURT HAS PERSONAL JURISDICTION OVER THE FOREIGN
      DEFENDANTS...............................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................................4, 9

*Cook County v. United States ex rel. Chandler*,
   538 U.S. 119 (2003)............................................................................................................11

*Gose v. Native Am. Serv. Corp.*,
   109 F.4th 1297 (11th Cir. 2024) ......................................................................................19

*Guilfoile v. Shields*,
   913 F.3d 178 (1st Cir. 2019)............................................................................................14

*Hertz Corp. v. Enter. Rent-A-Car Co.*,
   557 F. Supp. 2d 185 (D. Mass. 2008) ..............................................................................8

*In re Baycol Prods. Litig.*,
   732 F.3d 869 (8th Cir. 2013) ..........................................................................................19

*In re Loestrin 24 Fe Antitrust Litig.*,
   261 F. Supp. 3d 307 (D.R.I. 2017) ...................................................................................8

*Leveski v. ITT Educ. Servs., Inc.*,
   719 F.3d 818 (7th Cir. 2013) ..........................................................................................21

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)...........................................................................................................10

*Par Pharm., Inc. v. Express Scripts Specialty Distribution Servs., Inc.*,
   No. 4:17-mc-510 RLW (E.D. Mo. Jan. 2, 2018) ...........................................................24

*Riley v. St. Luke's Episcopal Hosp.*,
   252 F.3d 749 (5th Cir. 2001) ..........................................................................................28

*SAS Institute Inc. v. Iancu*,
   138 S. Ct. 1348 (2018)......................................................................................................26

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
   563 U.S. 401 (2011)......................................................................................................20, 22

*Stone v. Rockwell Int'l Corp.*,
   282 F.3d 787 (10th Cir. 2002) ........................................................................................28

*Sturgeon v. Pharmerica Corp.*,
   438 F. Supp. 3d 246 (E.D. Pa. 2020) .........................................................................21, 22

*United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*,
   960 F.2d 1080 (1st Cir. 1992)..........................................................................................29

*United States ex rel. Adams v. Chattanooga Hamilton Cty. Hosp. Auth.*,
  2024 WL 4784372 (E.D. Tenn. Nov. 7, 2024) ...................................................................29

*United States ex rel. Allen v. Alere Home Monitoring, Inc.*,
  334 F. Supp. 3d 349 (D. Mass. 2018) ..............................................................................5

*United States ex rel. Banigan v. PharMerica, Inc.*,
  950 F.3d 134 (1st Cir. 2020) ...........................................................................................25

*United States ex rel. Barrett v. Allergan, Inc.*,
  2019 WL 4675756 (C.D. Cal. Sept. 24, 2019) ................................................................22

*United States ex rel. Bawduniak v. Biogen Idec, Inc.*,
  2018 WL 1996829 (D. Mass. Apr. 27, 2018) ..................................................................19

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
  501 F.3d 493 (6th Cir. 2007) .............................................................................................7

*United States ex rel. Borzilleri v. Bayer Healthcare Pharms., Inc.*,
  24 F.4th 32 (1st Cir. 2022) .................................................................................................9

*United States ex rel. Campie v. Gilead Sciences, Inc.*,
  862 F.3d 890 (9th Cir. 2017) ...............................................................................9, 11, 17

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
  842 F.3d 103 (1st Cir. 2016) ...............................................................................14, 16, 17

*United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh*,
  728 F. App'x 101 (3d Cir. 2018) .....................................................................................28

*United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*,
  680 F.3d 933 (7th Cir. 2012) ...........................................................................................21

*United States ex rel. Heath v. AT&T, Inc.*,
  791 F.3d 112 (D.C. Cir. 2015) ...........................................................................................7

*United States ex rel. Heath v. Wisconsin Bell, Inc.*,
  92 F.4th 654 (7th Cir. 2024) ............................................................................................17

*United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*,
  874 F.3d 905 (6th Cir. 2017) ...........................................................................................22

*United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*,
  2019 WL 3282619 (C.D. Cal. July 16, 2019) ................................................................27

*United States ex rel. Kelly v. Boeing Co.*,
  9 F.3d 743 (9th Cir. 1993). ..............................................................................................29

*United States ex rel. Kelly v. Novartis Pharm. Corp.*,
  827 F.3d 5 (1st Cir. 2016) ..................................................................................................4

*United States ex rel. Loughren v. Unum Grp.*,
    613 F.3d 300 (1st Cir. 2010) ........................................................................... 10

*United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.*,
    540 F. Supp. 3d 103 (D. Mass. 2021) ............................................................... 4

*United States ex rel. Mateski v. Raytheon Co.*,
    816 F.3d 565 (9th Cir. 2016) ........................................................................... 21

*United States ex rel. Roby v. Boeing Co.*,
    184 F.R.D. 107 (S.D. Ohio 1998) ..................................................................... 7

*United States ex rel. Schutte v. SuperValu Inc.*,
    598 U.S. 739 (2023) ........................................................................................ 17

*United States ex rel. Silbersher v. Allergan Inc.*,
    506 F. Supp. 3d 772 (N.D. Cal. 2020) ........................................... 4, 14, 16, 20

*United States ex rel. Silbersher v. Janssen Biotech, Inc.*,
    576 F. Supp. 3d 212 (D.N.J. 2021) ......................................................... passim

*United States ex rel. Silbersher v. Valeant Pharms. Int'l, Inc.*,
    89 F.4th 1154 (9th Cir. 2024) ................................................................. passim

*United States ex rel. Silbersher v. Valeant Pharms. Int'l, Inc.*,
    No. 20-16256, 2023 WL 4946736 (9th Cir. Aug. 3, 2023) ........................... 30

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
    14 F.3d 645 (D.C. Cir. 1994) ......................................................................... 22

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
    41 F.3d 1032 (6th Cir. 1994) ......................................................................... 29

*United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, LLC*,
    34 F.4th 29 (D.C. Cir. 2022) .......................................................................... 14

*United States ex rel. Winslow v. PepsiCo, Inc.*,
    2007 WL 1584197 (S.D.N.Y. May 31, 2007) ................................................ 7

*United States v. Allergan, Inc.*,
    46 F.4th 991 (9th Cir. 2022) .......................................................................... 27

*United States v. Care Alternatives*,
    952 F.3d 89 (3d Cir. 2020) ............................................................................. 11

*United States v. Krizek*,
    111 F.3d 934 (D.C. Cir. 1997) ....................................................................... 18

*United States v. Neifert-White Co.*,
    390 U.S. 228 (1968) .......................................................................................... 8

*United States v. Strock,*
  982 F.3d 51 (2d Cir. 2020) ............................................................. 14

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
  579 U.S. 176 (2016) ...................................................... 8, 13, 14, 17

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,*
  382 U.S. 172 (1965) ........................................................................ 8

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.,*
  953 F.3d 1108 (9th Cir. 2020) ...................................................... 10

## Statutes and Rules

31 U.S.C. § 3729 ................................................................. 4, 11, 13, 17

31 U.S.C. § 3730 ..................................................................... 21, 25, 27

31 U.S.C. § 3732 ................................................................................. 29

35 U.S.C. § 102 ................................................................................... 3

35 U.S.C. § 311 ................................................................................... 8

Cal. Gov't Code § 12652 .................................................................. 28

Tex. Hum. Res. Code § 36.002 ........................................................ 28

## Other Authorities

145 Cong. Rec. E1546-01 ................................................................. 20

M.P.E.P. § 2010 ................................................................................. 8

S. Rep. No. 110-507 ......................................................................... 20

## I.    Introduction

Jazz Pharmaceuticals maintained a monopoly on its billion-dollar narcolepsy drug Xyrem through a calculated scheme of patent fraud that forced government healthcare programs to pay over $400 million annually for medication that should have faced generic competition years ago. The pricing of Xyrem tells the story: what began as a $40 bottle of medication in the 1980s now costs Medicare beneficiaries over $16,395 per monthly prescription, generating annual revenues of $1.6 billion at the scheme's peak. ¶¶ 7–8 & n.1. This unconscionable price inflation stems directly from Jazz's fraudulent manipulation of the patent system to maintain market exclusivity after its legitimate patent protection expired.

Jazz fraudulently extended the patent monopoly protecting Xyrem by patenting the co-administration of Xyrem at reduced doses with valproate, another CNS depressant. But Jazz concealed from the Patent Office extensive real-world evidence that medical practitioners were already doing exactly that. The Complaint identifies at least 30 documented instances before March 2013 (the priority date of the fraudulent patents) where doctors safely co-administered Xyrem and valproate, including specific examples where the Xyrem dose was reduced by more than the thresholds Jazz later claimed as its invention. ¶¶ 65–68. These real-world examples of prior use were known to Jazz through its receipt and active investigation of FDA adverse event reports, European regulatory filings, and Jazz's own central pharmacy records. ¶¶ 154–58. And because these prior art reflected *actual* use, they were significantly more probative of the claimed invention's obviousness than the prior art Jazz submitted to the Patent Office, which dealt with the expected results of *hypothetical* coadministration. Had the Patent Office known this information, it would not have issued the relevant patents. Jazz not only failed to disclose this critical prior art, it affirmatively misrepresented the state of medical practice by arguing that practitioners would not have known even to consider co-administering these medications (in the manner they actually did) due to safety concerns. ¶¶ 111, 126.

1

Jazz's fraud did not stop with patent prosecution. When generic manufacturers challenged the validity of these patents in 2016, Jazz made affirmative misrepresentations to the Patent Trial and Appeal Board (PTAB), falsely claiming there was no prior evidence of co-administration while concealing adverse event reports documenting the extensive record of such use. These misrepresentations were brazen and specific: Jazz told the PTAB that the material prior art did not contain "a single patient with a sleep disorder even receiving co-administered GHB and valproate." ¶ 116. In reality, Jazz's own records documented numerous instances of safe co-administration, and the FDA had already issued a Safety Communication specifically instructing physicians to consider dose reduction when co-administering Xyrem with other CNS depressants. ¶¶ 98–100. The PTAB, relying on Jazz's false statements and misleading omissions, declined to institute IPR proceedings that would have invalidated the patents. ¶¶ 114–15.

The impact of this fraudulent scheme continues today, as Jazz leverages these patents to block generic competition that would have dramatically reduced costs to government healthcare programs. But for Jazz's fraud, generic manufacturers would have entered the market no later than January 2021, and possibly as early as December 2019. ¶ 125. Instead, Jazz has used its fraudulently obtained patents to force settlements that delay full generic competition until 2026. ¶¶ 119–24. The practical effect is severe: Medicare Part D's step therapy requirements force the government to pay for expensive brand-name Xyrem prescriptions that would have been filled with dramatically cheaper generics absent Jazz's fraud, while studies show that generic entry typically reduces prices by 85% and captures 90% of prescriptions. ¶¶ 125, 147.

Jazz's responds with its own version of the facts. To hear Jazz describe it, the fraudulent '306 patent family[1] is rock solid, resting on an unexpected study result and surviving multiple challenges by generic manufacturers. But Jazz does not deny it withheld from the Patent Office

---

[1] Named after the first obtained patent in the patent family, U.S. Patent No. 8,772,306 ("the '306 patent").

and PTAB the key prior art identified in the Complaint, which showed that physicians were actually practicing the purportedly novel inventions claimed in the '306 patent family long before Jazz applied for the patents. Prior uses of a patented method are themselves prior art. *See* 35 U.S.C. § 102(a) (pre-AIA based on the patents' claimed priority dates in March 2013) ("A person shall be entitled to a patent unless (a) the patent was known ***or used by others*** in this country . . . before the invention thereof by the applicant for a patent.") (emphasis added). And such prior uses are much stronger than the prior art disclosed in the patent prosecution and *inter partes* review proceedings (IPRs) before the Patent Trial and Appeal Board (PTAB), because the references in those proceedings only relied upon scientific explanations for what would have been hypothetically obvious to a doctor. Actual prior uses by doctors do not require speculation or expert opinion on what a person of skill in the art might have hypothetically found obvious in hindsight. This is why Jazz is wrong that Relator's allegations rehash or are cumulative of arguments rejected by the PTAB (Mem. at 12), because the PTAB was never apprised of these prior uses. Jazz essentially concedes this point by admitting that none of the generic manufacturers (and certainly not Jazz) "so much as mentioned adverse event reports or the 2012 Label" in the course of challenging the patents. Mem. at 5.

Ultimately, Jazz's story shows why its motion should fail. First, it shows that Jazz has factual disagreements about whether its patents extending the Xyrem monopoly were obtained and defended fraudulently. But whether Jazz dealt honestly with the government is a factual dispute, which is for later. Second, Jazz's story shows that Relator's allegations have not been made before—undermining Jazz's public disclosure argument, as well as its suggestion that Relator's arguments have already been evaluated and rejected by the Patent Office or PTAB.

## II.    Legal Standards

When evaluating a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in

plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While FCA claims must satisfy Rule 9(b)'s particularity requirements, the First Circuit applies a "more flexible" standard where the defendant allegedly caused third parties to submit false claims to the government. *United States ex rel. Kelly v. Novartis Pharm. Corp.*, 827 F.3d 5, 13 (1st Cir. 2016). Under this standard, a relator may satisfy Rule 9(b) by providing "factual or statistical evidence to strengthen the inference of fraud beyond possibility" without necessarily pleading details about each false claim. *Id*. The relaxed standard is particularly appropriate here, where Jazz's patent fraud caused the submission of false claims by numerous healthcare providers across multiple government programs over several years.

### III.    The Complaint Pleads All Elements of False Claims Act Liability

The False Claims Act is a statutory cause of action with its own standards for falsity, scienter, and materiality. See 31 U.S.C. § 3729; *see also United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.*, 540 F. Supp. 3d 103, 117–18 (D. Mass. 2021) (describing elements). Relator's Complaint satisfies each element through detailed factual allegations.

Jazz's motion erroneously argues that the Complaint alleges "inequitable conduct"—a judge-made affirmative defense to patent infringement based on fraud during patent prosecution. Mem. at 9–13. Inequitable conduct incorporates elevated standards for materiality and scienter not applicable in FCA actions, and it cannot displace the statutory cause of action. *See United States ex rel. Silbersher v. Janssen Biotech, Inc.*, 576 F. Supp. 3d 212, 230 (D.N.J. 2021) (explaining that inequitable conduct is "judicially-crafted and designed for different statutory contexts than the FCA," and it cannot "displace … the FCA's plain text"); *United States ex rel. Silbersher v. Allergan Inc.*, 506 F. Supp. 3d 772, 820 (N.D. Cal. 2020) (considering the FCA's statutory elements, and not evaluating them under the inequitable conduct standard, in an analogous case), *rev'd on other grounds* 46 F.4th 991 (9th Cir. 2022). The different standards make sense because the FCA protects the government—and by extension taxpayers—from fraud,

and is broadly crafted to protect the public fisc. But what matters most is that the FCA is a statute with a text, which courts must apply as written. Thus, Relator need not prove inequitable conduct to prove his case. He only needs to establish the statutory elements of FCA liability.

### A. The Complaint Pleads Falsity

As this Court has recognized, the First Circuit "take[s] a broad view of what may constitute a false or fraudulent statement." *United States ex rel. Allen v. Alere Home Monitoring, Inc.*, 334 F. Supp. 3d 349, 354 (D. Mass. 2018) (quoting *United States ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72, 85 (1st Cir. 2012)). The Complaint establishes falsity through multiple independently sufficient theories. First, Jazz committed fraud on the Patent Office by deliberately withholding material prior art that would have prevented issuance of the '306 patent family—thus obtaining property (the patents) by fraud. Second, Jazz made affirmatively false statements to the PTAB to prevent invalidation of these fraudulently obtained patents. Third, these fraudulent acts rendered subsequent claims to government healthcare programs false under both fraudulent inducement and false certification theories.

### 1. Jazz's Deception of the Patent Office

During prosecution of the '306 patent application in 2013, Jazz affirmatively misrepresented the state of medical practice to overcome the Examiner's initial rejection. When presented with prior art teaching administration of GHB with other agents, Jazz's patent counsel told the Examiner that prior art "does not teach or suggest that valproate could be combined with GHB, or what might be the effects of the two if combined." ¶ 52. This is the exact opposite of what Jazz knew to be true from documented clinical experience. ¶¶ 65–95.

At the time Jazz made these representations to the Patent Office, it possessed extensive documentation of doctors in the real world safely co-administering Xyrem and valproate with dose reductions. The Complaint identifies at least 30 documented cases before March 2013 where doctors successfully co-administered Xyrem and valproate—all reported to Jazz through

FDA's adverse event reporting system. ¶¶ 65–68. These reports included specific examples directly contradicting Jazz's statements to the Patent Office: For example, Case Report 7895321 showed effective treatment from 2011 with a 10% reduction in Xyrem dosage during co-administration with valproate. Moreover, even the original 5g dose was reduced 17% below the minimum recommended dose of 6g, and the revised 4.5g dose was reduced 25% below the minimum. As another example, Case Report 8566159 documented successful treatment of a patient receiving a 2000mg dose of valproate, while receiving a reduced 5g Xyrem dose. At 5g, the Xyrem dose was 17% below the normal, recommended minimum dose. ¶¶ 80; 83; 102 n.16.

Jazz's knowledge of prior co-administration went beyond individual case reports to include formal FDA guidance and Jazz's own revised product labeling. In December 2012— months before Jazz filed its patent application—the FDA issued a Safety Communication based on its own review of adverse event reports detailing co-administration of Xyrem and CNS depressants. The FDA specifically instructed physicians to consider dose reduction when co-administering Xyrem with CNS depressants like valproate. ¶¶ 98–100. The FDA required Jazz to amend its product label to state that when Xyrem is used with CNS depressants, "dose reduction or discontinuation of one or more CNS depressants (including Xyrem) should be considered." ¶ 98. Jazz not only knew about these changes—it worked directly with FDA to implement them.

Jazz's in-house patent counsel and executives, who had access to evidence of this prior use, withheld it from the Patent Office while arguing the opposite. ¶ 154. The Complaint specifically alleges that Deputy General Counsel Honerkamp and other Jazz employees, including CEO Cozadd and the inventor Dr. Eller, were aware of the FDA Adverse Event Reporting System (FAERS) case reports and other documentation of real-world co-administration. ¶¶ 154–55. As the Complaint explains, the FDA requires pharmaceutical manufacturers like Jazz to investigate adverse event reports related to their products. ¶ 90. Moreover, the FAERS reports were sent directly to Jazz, as evidenced by notations stating the

date Jazz Pharmaceuticals received each report. ¶ 88. Jazz's knowledge of these reports can be

reasonably inferred at the pleadings stage. Despite possessing this information, Jazz's counsel

and executives did not provide it to the Patent Office and instead made inconsistent statements.

Contrary to Jazz's contentions, these allegations are easily particularized enough to

satisfy the requirements of Rule 9(b). For example, Jazz faults the Complaint for failing to

identify specific employees involved in the misrepresentation. Apart from the fact that the

Complaint does this, ¶¶ 154–56, Rule 9(b) does not require it. *See, e.g.*, *United States ex rel.

Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 506 (6th Cir. 2007) (rejecting the argument that

"parties must plead the identity of the specific individual employees within the defendant

corporation who submitted false claims to the government"); *United States ex rel. Heath v.

AT&T, Inc.*, 791 F.3d 112, 124–25 (D.C. Cir. 2015) (holding that complaint satisfied Rule 9(b)

by naming the responsible entity, without naming specific employees); *United States  ex rel.

Winslow v. PepsiCo, Inc.*, 2007 WL 1584197, at *8 (S.D.N.Y. May 31, 2007) ("It is not fatal to

the complaint that Relator does not specify who exactly made the certification on behalf of the

company. . . ."); *United States ex rel. Roby v. Boeing Co.*, 184 F.R.D. 107, 111 (S.D. Ohio 1998)

(holding that it was sufficient to identify the corporate party; identification of specific employees

was not necessary). Jazz also accuses the Complaint of failing to differentiate between the

corporate defendants. But the Complaint does that, too, identifying numerous case reports from

FAERS that show the date the report was received by Jazz Pharmaceuticals, Inc. (¶ 89), which is

the exclusive licensee of the '306 patent (RJN Ex. 24 at 1), and the entity to which that patent

was originally assigned (*see e.g.*, RJN Ex. 17 at 1). Other patents from the family were originally

assigned to Jazz Pharmaceuticals Ireland Ltd. (*see e.g.*, RJN 33 at 1), and the Complaint

identifies the company as a party defending the patents in the IPRs. ¶¶ 111 n.21; 116; 118. And

the parent entity, Jazz Pharmaceuticals plc, along with its co-defendants, acted individually and

in concert to secure government payments for illegally inflated prices for sodium oxybate. ¶ 139.

Jazz also makes much of the fact that the '306 patent family has not yet been invalidated—and implies that declaring patents invalid or fraudulent is a function reserved to the Patent Office and the PTAB. Mem. at 9–10. That is clearly wrong. In patent infringement litigation, for example, any district court can deem a patent invalid or unenforceable, even if the administrative agencies have not. In addition, unlike other federal agencies, the Patent Office does not police fraud on the agency, *see* M.P.E.P. § 2010, and fraud cannot be raised during an IPR proceeding, which is limited to invalidity arguments based on prior art patents and printed publications only, 35 U.S.C. § 311(b). Outside of traditional patent infringement cases, courts have the authority to decide fraud-based claims that depend on a patent's validity without a prior finding of invalidity. For example, federal courts commonly decide antitrust actions alleging competitive injury from fraudulent patents under *Walker Process Equip., Inc. v. Food Mach. & Chemical Corporation*, 382 U.S. 172 (1965), that have not previously been invalidated, including live patents. *See, e.g., In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 338–47 (D.R.I. 2017); *Hertz Corp. v. Enter. Rent-A-Car Co.*, 557 F. Supp. 2d 185, 193–95 (D. Mass. 2008). More broadly, Jazz's argument misunderstands the FCA's purpose and this Court's role. The FCA is designed to "reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). Assessing the truth or falsity of a defendant's statements is an essential part of adjudicating FCA claims. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 186–87 (2016). Nothing in the FCA requires—or even permits—punting that question of fact to another tribunal.

Courts also regularly assess the truth or falsity of statements made to government agencies in FCA cases without requiring prior administrative adjudication of those statements, and Jazz offers no persuasive reason why statements to the Patent Office should be treated differently. For example, in *United States ex rel. Campie v. Gilead Sciences, Inc.*, the Ninth

8

Circuit held that relators properly stated an FCA claim by alleging defendant misrepresented its compliance with FDA regulations, even though the FDA had not conclusively determined that violations had occurred. 862 F.3d 890, 906–07 (9th Cir. 2017). Similarly, the First Circuit recently held that a relator could proceed on a claim that defendant made false statements to the EPA to reduce a penalty without any finding of falsehood by the EPA itself. *See United States ex rel. Borzilleri v. Bayer Healthcare Pharms., Inc.*, 24 F.4th 32, 41–42 (1st Cir. 2022).

Even if the Court were to accept Jazz's premise that patent invalidity is required (it is not), the Complaint's detailed allegations of fraud would be sufficient at the pleading stage to support an inference that the patents would be found invalid if properly challenged. (*E.g.*, ¶¶ 66–68, 96–98). The alleged misrepresentations go to the heart of patentability and thus permit a plausible inference that the patents would not have issued if Jazz had been forthright. While Relator bears no burden to *prove* invalidity at this stage, the Complaint's allegations amply "raise a reasonable expectation that discovery will reveal evidence" to support the claims. *Twombly*, 550 U.S. at 556. If Jazz believes its patents could withstand scrutiny, it will have ample opportunity to make that showing on a full record. But given the gravity and specificity of the Complaint's allegations, Jazz's fact-intensive invalidity defense is no basis for dismissal.

### 2. False Statements and Material Omissions to the PTAB

A critical part of Jazz's overall scheme involved making affirmative misrepresentations and material omissions to the PTAB when generic manufacturers tried to institute IPRs of the '306 patent. After several generic competitors filed IPR petitions challenging the validity of the '306 patent based on prior art, Jazz doubled down on its deceptive scheme. Rather than correct earlier failures, it filed opposition briefs containing false statements about the state of the art and concealed material prior art to prevent the PTAB from instituting review proceedings that would have exposed the '306 patent as invalid. ¶¶ 114–16. These misrepresentations and material

omissions provide an independent basis for FCA liability because they, too, allowed the '306 patent to stand—and thus caused the presentment of false claims.

Jazz attempts to characterize its PTAB submissions as opinions about what constitutes prior art (Mem. at 13–14), but that is wrong—Jazz never argued in any of the three IPRs that the prior art cited by the generics did not qualify as prior art. *See generally,* RJN Exs. 21, 22 and 25. For instance, during the Par IPR, Jazz stated that "Cagnin [one of the prior art references cited by Par] is the only reference Par cites, *and the only reference Jazz is aware of*, that describes a side effect in a patient receiving both GHB and valproate." ¶ 117(d) (emphasis added). That is not an opinion about whether Cagnin qualifies as prior art under the Patent Statute, but an affirmative misrepresentation that Jazz is purportedly unaware of prior art other than Cagnin disclosing doctors prescribing GHB and valproate. As detailed in the Complaint, Jazz's statements to the PTAB were false based on Jazz's own records, including the collective teachings of numerous adverse event reports (¶¶ 66–68, 89–90, 94), Express Scripts data (¶ 155), and the 2012 FDA Safety Communication and label revision (¶¶ 96–100).

Even if Jazz's PTAB statements and material omissions could be characterized as opinions rather than factual assertions, they would still be actionable. The First Circuit has held that statements of opinion constitute false claims where "the speaker knows facts which would preclude such an opinion." *United States ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 310 (1st Cir. 2010). More broadly, "the expression of an opinion may carry with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 191 (2015). Heeding this guidance, courts have frequently allowed FCA cases asserting false opinions to proceed past the pleading stage. *See, e.g.*, *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1117 (9th Cir. 2020)

(explaining that the FCA does not "carve out an exception for clinical judgments and opinions"); *United States v. Care Alts.*, 952 F.3d 89, 98 (3d Cir. 2020) (similar).

### 3. The Complaint Pleads Fraudulent Inducement

Jazz's fraud on the Patent Office and the PTAB directly led to inflated claims being submitted to government healthcare programs. Through its fraudulent patent applications, Orange Book listings, and PTAB submissions, Jazz obtained and maintained patent protection that it then used to prevent generic competition and maintain monopoly pricing for Xyrem. ¶¶ 124–27. This scheme caused government healthcare programs to pay vastly inflated prices for Xyrem prescriptions that, but for Jazz's fraud, would have been filled with much cheaper generic alternatives. ¶¶ 147–50. "[C]ompetition would have lowered prices for sodium oxybate by 85% or more, and lower priced generics would have filled 90% of Xyrem prescriptions." ¶ 147. Each inflated claim submitted to government programs was thus tainted by Jazz's underlying fraud.

Jazz's argument that fraudulent inducement is limited to government contracts contradicts precedent recognizing broader FCA liability. First, the FCA by its plain text applies to "any request or demand, *whether under a contract or otherwise*, for money *or property*." 31 U.S.C. § 3729(b)(2)(A) (emphasis added). A patent application is obviously such a request—and so falls within the scope of the statute even more clearly than a fraudulent attempt to obtain a contract (which is undisputedly covered). Moreover, while fraudulent inducement often arises in the contract context, courts have recognized the theory applies whenever fraud leads to government payments. *See Campie*, 862 F.3d at 902–03 (holding fraudulent inducement theory viable when false statements to FDA caused government payments down the line); *see also Janssen*, 576 F. Supp. 3d at 228–29 (recognizing fraudulent inducement theory based on patent fraud). This follows from the Supreme Court's recognition that the FCA seeks "to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quotation marks omitted).

11

Jazz argues that its conduct in 2014 is too remote from claims submitted in 2019 and beyond. Mem. at 15–16. But the Complaint details how Jazz's fraudulent patent scheme operated as intended: Jazz knowingly withheld material prior art from the Patent Office to obtain invalid patents (¶¶ 66–68, 96–100), listed those patents in the Orange Book (¶ 119), asserted them against potential generic competitors (¶¶ 119–23), and withheld them from the PTAB (¶¶ 112–18), thereby maintaining monopoly pricing that directly caused inflated claims to be submitted to government healthcare programs (¶¶ 124–27). This is not an attenuated chain but rather the precise sequence of events Jazz designed to maintain its monopoly pricing.

Jazz's own conduct demonstrates that its patent fraud was intended to, and did cause the submission of, inflated claims to the government. Jazz used its fraudulently obtained patents to block all nine generic manufacturers who attempted to enter the market between 2014 and 2017. ¶¶ 119–23. The intended and actual result was exactly what Jazz sought: the continued submission of claims to government programs at grossly inflated prices that would have been "85% or more" lower if Jazz's fraud had not prevented generic competition. ¶ 147. The Complaint thus establishes far more than a "but-for" causal connection—it shows that inflated government payments were the intended and achieved purpose of Jazz's fraudulent scheme.

### 4.   The Complaint Pleads Express and Implied Certification

Jazz made actionable express false certifications when it repeatedly certified to the government that its patents could "reasonably be asserted" against generic competitors. As alleged in the Complaint, Jazz submitted Form 3542 to HHS representing that "a claim of patent infringement could reasonably be asserted" for its patents. ¶ 140. These certifications were false because Jazz knew the patents were fraudulently obtained by withholding material prior art showing extensive real-world coadministration of GHB and valproate. ¶¶ 66–68, 96–100. No reasonable patent infringement claim could be premised on patents that Jazz knew were invalid and unenforceable due to its fraud before the Patent Office. ¶¶ 59–60, 111, 126. Yet Jazz made

these express certifications precisely so it could list the patents in the Orange Book and trigger automatic 30-month stays preventing generic competition. ¶¶ 119–23. These stays prevented generic manufacturers from introducing lower-priced alternatives that would have reduced prices by "85% or more" and captured "90% of Xyrem prescriptions." ¶ 147.

Jazz argues that Form 3542 cannot support FCA liability because it doesn't request payment. Mem. at 17. But this misses the point—the false certifications directly caused the submission or presentment of inflated payment claims to government healthcare programs. 31 U.S.C. § 3729(a)(1)(A). They also constituted false records or statements that were material to such inflated payment claims. 31 U.S.C. § 3729(a)(1)(B).

Jazz also made implied false certifications when it represented its monopolistic prices as "fair and reasonable" while concealing that those prices resulted from fraudulently obtained patents. To receive payment under various government healthcare programs, Jazz was required to certify that its Federal Supply Schedule (FSS) prices were "fair and reasonable" and that its Average Manufacturer Price submissions were accurate. ¶¶ 133, 136. These price representations became misleading half-truths under *Escobar* when Jazz failed to disclose that its pricing power stemmed from patents it knew were fraudulently obtained. ¶¶ 138–39. As the Supreme Court explained in *Escobar*, representations can be "misleading half-truths" when the defendant's failure to disclose noncompliance with material requirements "makes those representations misleading." 579 U.S. at 190. That is precisely what occurred here: Jazz represented its prices as fair while deliberately concealing the fraudulent conduct that enabled it to charge those prices.

The Complaint satisfies both conditions for implied certification liability under *Escobar*. First, Jazz made specific representations about Xyrem's pricing through its FSS certifications that it knew were intended to ensure fair and reasonable pricing. ¶¶ 133, 136. Second, Jazz failed to disclose its patent fraud in a way that made these price representations misleading half-truths. ¶¶ 138–39. Jazz claims these allegations are merely "conclusory" (Mem. at 19), but the

Complaint details exactly how Jazz's misconduct rendered its price representations misleading (¶¶ 66–68, 96–100, 114–18). Just like the half-truths in *Escobar*, Jazz's selective disclosures about its pricing while concealing the underlying fraud rendered its certifications actionably false under the FCA. *See Janssen,* 576 F. Supp. 3d at 229 (defendants' patent fraud rendered their subsequent pricing representations to the government related to "fair and reasonable" pricing "misleading half-truths") (*citing Escobar,* 579 U.S. at 193); *Allergan*, 506 F. Supp. 3d at 822–26 (same).

### B. The Complaint Pleads Materiality

In analyzing materiality under the FCA, the First Circuit asks whether the misrepresentation has "a natural tendency to influence or was capable of influencing the [government]'s decision. . . ." *Guilfoile v. Shields*, 913 F.3d 178, 187 (1st Cir. 2019) (quoting *Unum Grp.*, 613 F.3d at 307); *see also United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110 (1st Cir. 2016). ("Materiality is more likely to be found where the information at issue goes to the very essence of the bargain.") Another way to think of materiality is as potential causation, measured when a false statement is made. *See, e.g.*, *United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29, 37 (D.C. Cir. 2022). Of course, when a false statement *actually* causes the government to pay more, or the defendant to receive more, then materiality is established *a fortiori*. In cases arising from fraudulent inducement, courts hold that materiality can be established upstream, where the fraud occurs—or downstream, where payments occur. *See United States v. Strock*, 982 F.3d 51, 62 (2d Cir. 2020). If a plaintiff shows that the defendant's misstatements had a likely effect on either decision, the element is satisfied.

Jazz's fraud satisfies this element at both junctures. First, Jazz's misrepresentations and concealment of critical prior art were material to the Patent Office's decision to grant the '306 patent family and the PTAB's decisions not to institute IPR proceedings. The Patent Office

14

allowed the '306 patent specifically because it believed—based on Jazz's deceptive omissions—that the prior art taught away from combining GHB and valproate. ¶¶ 53–54, 92. Similarly, the PTAB denied institution of IPR proceedings in direct reliance on Jazz's false statements that "no drug product labeling even contemplated co-administering GHB and valproate" and that Jazz was unaware of any instances of side effects in patients receiving both drugs—when Jazz knew of, but concealed, numerous documented cases of coadministration. ¶¶ 116–18. In other words, the Complaint alleges—with reference to the government's own statements—that Jazz's lies and misleading omissions actually caused the government to issue and then uphold the '306 patent family. Such allegations of causation easily clear the bar for materiality. Jazz argues that the 2012 label was disclosed during prosecution of some later patents in the '306 patent family, but those patents were nonetheless allowed. This is irrelevant, however, because the gravamen of the fraud in this case is the withholding of the adverse event reports—which were never disclosed—and the case can proceed on those alone. Viewed in conjunction with the adverse reports, the teaching of the 2012 label becomes much more significant.[2]

Second, these fraudulently obtained patents were material to government payment decisions because they prevented generic competition that would have dramatically reduced the

---

[2] Jazz withheld the 2012 label during prosecution of the three patents that it actually asserted against generic competitors that first filed ANDAs to launch generic alternatives, including the '306 patent and two subsequent patents in the family. ¶ 49, n.7. While Jazz eventually disclosed the 2012 Xyrem label during prosecution of later patents in the family, it did so only after the first three patents had issued and many generic applications were on file. ¶ 110, n.20. Jazz filed terminal disclaimers with respect to all four of the later patents. ¶ 109, n.19. In doing so, Jazz essentially conceded that these later patents were obvious variations of the '306 patent, and the Patent Office essentially would have relied on the prior examination of the '306 patent to authorize the subsequent patents. And as the Complaint explains, Jazz misleadingly provided the Patent Office with the 2005 label, but deceptively described it based on its download date of "May 3, 2013," misleadingly implying that it was actually a copy of the 2012 label, which further confused the Patent Office. ¶ 98, n.15. Finally, Jazz has never disclosed either the FDA's 2012 Safety Communication or the extensive evidence of real-world co-administration that predated its alleged invention. ¶ 100. All of this prior art, particularly in light of actual, prior use of the claimed invention reflected in the adverse reports that Jazz concealed, were material to patentability, and if they had been properly disclosed, would have prevented the issuance of the patents at issue.

cost to federal healthcare programs. ¶¶ 119–125. Indeed, as explained *supra*, Jazz's conduct was not merely material to this overcharging—it *caused* it.

Courts have found materiality adequately alleged in indistinguishable cases where fraudulent patent schemes blocked generic competition and inflated drug prices. *See Janssen*, 576 F. Supp. 3d at 229–30 (holding that complaint pleaded materiality because "Defendants' misrepresentations to the PTO and other government agencies had a natural tendency or capacity to influence government decisions to … pay inflated prices") ; *Allergan*, 506 F. Supp. 3d at 827 ("Because price goes to the 'essence of the bargain' between the government and drug manufacturers, the Court finds that Relator has adequately alleged that Defendants' fraud was material for the purposes of his FCA claims."). These holdings align with the requirements of many government health care plans to use lower cost generics when available. *See*, *e.g.*, ¶ 31. Consistent government enforcement actions targeting fraudulent patent extensions and other anticompetitive acts further show materiality. ¶¶ 148–50.

Jazz's extraordinary success in blocking generic competition through its fraudulent patents demonstrates the materiality of its scheme to government payment decisions. The Complaint alleges that generic competition would have "lowered prices for sodium oxybate by 85% or more, and lower priced generics would have filled 90% of Xyrem prescriptions." ¶ 147. The financial impact on government healthcare programs is staggering—instead of paying over $16,395 per Medicare prescription (more than $144,000 per patient annually), the government would have paid just a fraction of these amounts for generic alternatives. ¶¶ 8, 10. In 2020 alone, Jazz received over $430 million from Medicare and Medicaid for Xyrem prescriptions that could have been filled with generics but for Jazz's fraud. ¶ 9.

Jazz's argument that continued government payments defeat materiality fails under *Escobar* because the Complaint alleges the government was unaware of Jazz's fraud. ¶ 141. Indeed, Jazz's careful concealment of its fraudulent conduct is central to the entire scheme.

¶¶ 66–68, 116–117, 123. And mere knowledge of allegations—as opposed to knowledge of actual violations—is insufficient. *See Escobar*, 842 F.3d at 112 ("mere awareness of allegations . . . is different from knowledge of actual noncompliance"); *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 92 F.4th 654, 665 (7th Cir. 2024) ("[t]he government's knowledge of a pending lawsuit making allegations simply does not indicate actual knowledge of actual violations"). Under these circumstances, the government's payment of claims while unaware of Jazz's fraud cannot defeat materiality. *See Escobar*, 579 U.S. at 195; *Campie*, 862 F.3d at 906–07; *Wisconsin Bell*, 92 F.4th at 665.

### C.  The Complaint Pleads Scienter

The FCA applies to those who act "knowingly," defined as acting with actual knowledge, in deliberate ignorance, or in reckless disregard of the truth or falsity of information. 31 U.S.C. § 3729(b)(1)(A). This standard "largely tracks the traditional common-law scienter requirement for claims of fraud," and focuses "primarily on what [defendants] thought and believed" at the time the false statement or claim was submitted. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750–51 (2023). Under that rule, if a statement proves to be false, the defendant has scienter unless the defendant had an honest belief in the statement's truth—meaning a firm, sincere belief formed after inquiry that is appropriate under the circumstances or implied by the statement. *See* Restatement (Second) of Torts § 526 cmts. e, f. Scienter is also a factual question; a defendant cannot defeat this element merely by showing that its behavior may have been honest or reasonable. *See Schutte*, 598 U.S. at 752 (citing Restatement (Second) of Torts § 526).

The Complaint specifically identifies multiple Jazz executives and employees who knew about and deliberately withheld material prior art from the Patent Office. While scienter may be alleged generally under Rule 9(b), the Complaint here goes well beyond general allegations by naming specific individuals—including Jazz's CEO, the named inventor, and Jazz's Deputy General Counsel—and detailing their knowledge of the withheld information. *See* ¶¶ 154–59.

17

For instance, Jazz's senior executives had direct knowledge of the invalidating prior art through their roles overseeing Xyrem's development and patent prosecution. CEO Bruce Cozadd, as the company's highest-ranking officer, was aware of the FDA mandated changes to the 2012 label and the issuance of the 2012 Safety Memorandum based on its review of adverse event reports showing co-administration. ¶ 154. Dr. Marc Eller, the sole named inventor on the '306 patent family, knew of these prior uses given his central role in Xyrem's development and the requirement that inventors disclose all material prior art to the Patent Office. ¶¶ 50, 154. Deputy General Counsel Philip Honerkamp had detailed knowledge of prior co-administration through his oversight of the Jazz Pharmaceuticals, Inc. sleep division and overall responsibilities as deputy general counsel. ¶¶ 155–57.

Jazz's knowledge of prior co-administration is further established through its relationship with Express Scripts, Jazz's designated central pharmacy for Xyrem distribution. Under Jazz's own Risk Management Program, Express Scripts was required to discuss with each patient "any other medications you are taking" and especially those "that can cause drowsiness" before dispensing Xyrem. ¶ 155. Express Scripts—and therefore Jazz—knew of numerous instances where doctors safely prescribed reduced doses of Xyrem with valproate before the '306 patent application was filed. *Id*. As Jazz's authorized agent for dispensing Xyrem, Express Scripts' knowledge of widespread co-administration with valproate is imputed to Jazz. *Id*.; *see United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (finding scienter adequately alleged based on knowledge of defendant's billing agent).

### D.  The Complaint Includes Reliable Indicia that False Claims Were Presented

The Complaint alleges that the applications for the '306 patent family were false claims because they were requests for property presented to government agents. ¶ 126. Those applications are identified by patent and application number. ¶¶ 49–50. The omitted documents

(*e.g.*, adverse event reports, and the 2012 label) are also identified in detail. ¶¶ 57–111. No further information is required to satisfy Rule 9(b) vis-à-vis these false claims.

The detailed analysis of the false patent applications also suffices to establish that false claims were later presented. Courts considering fraudulent inducement cases have recognized that in such cases, the "circumstances constituting fraud" refer to the upstream fraud that causes the downstream harm to the government. *See Gose v. Native Am. Serv. Corp.*, 109 F.4th 1297, 1318 (11th Cir. 2024) ("When a relator alleges liability under a fraudulent inducement theory, … [s]pecifying individual bids or claims—which themselves may not contain false information— adds little, if any, particularity concerning 'the circumstances constituting fraud.'"); *In re Baycol Prods. Litig.*, 732 F.3d 869, 876 (8th Cir. 2013) (holding that the particularity requirement focuses on the upstream fraud in fraudulent inducement cases).

To the extent more is required, the Complaint also provides detailed statistical evidence of false claims submitted to Medicare and Medicaid. Government data shows that in 2020 alone, Jazz received at least $287,143,624 from Medicare and $143,164,931 from Medicaid for Xyrem prescriptions. ¶ 9. The Complaint further alleges that a single month's prescription typically costs over $15,000, with Medicare Part D spending an average of $16,395 per prescription in 2022 (amounting to over $144,000 per Medicare patient annually). ¶¶ 6–7. Courts have found similar statistical evidence of government payments sufficient at the pleading stage. *See United States ex rel. Bawduniak v. Biogen Idec, Inc.*, 2018 WL 1996829, at *3 (D. Mass. Apr. 27, 2018) (finding aggregate data about Medicare payments sufficient to support FCA claims).

Moreover, every Xyrem prescription paid for by government healthcare programs that would have been filled with a generic absent Jazz's fraud constitutes a false claim. Many government programs require patients to use generic alternatives when available. ¶ 130. Jazz's fraudulent patents forced government payors to cover costlier brand-name prescriptions that

would otherwise have been filled with generics. Courts have recognized that this misconduct can give rise to FCA liability. *See Allergan*, 506 F. Supp. 3d at 827.

## IV.    The Public Disclosure Bar Does Not Compel Dismissal

The FCA's public disclosure bar seeks "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 413 (2011) (quotation marks and emphasis omitted). That balance favors enforcement. "In creating both the public disclosure bar and the original source exception," Congress's intent was "to only bar truly 'parasitic' lawsuits, such as those brought by individuals who did nothing more than copy a criminal indictment filed by the Government." S. Rep. No. 110–507, at 22 (2008). The statute's drafters made it clear they wanted relators "who use[] their education, training, experience, or talent to uncover a fraudulent scheme from publicly available documents" to be able to proceed—especially "where a relator must piece together facts exposing a fraud from separate documents." 145 Cong. Rec. E1546-01 (daily ed. July 14, 1999), 1999 WL 495861, at *E1547 (letter from Sen. Charles Grassley & Rep. Howard Berman).

The public disclosure bar does not compel dismissal because, prior to this action, no public source revealed that Jazz had fraudulently obtained the '306 Patents and used them to overcharge government health care programs for Xyrem. Instead, scattered disclosures revealed information that was facially innocuous. It was only Relator's analysis and expertise that allowed him to recognize and allege the violations in the Amended Complaint. Recent decisions in analogous cases have rejected Defendants' public disclosure arguments. *See United States ex rel. Silbersher v. Valeant Pharms. Int'l, Inc.*, 89 F.4th 1154, 1166 (9th Cir. 2024), *cert. denied sub nom. Valeant Pharms. v. Silbersher*, No. 23-1093, 2024 WL 4426551 (U.S. Oct. 7, 2024) (public sources, including patent prosecution files and news articles, did not disclose substantially the same patent fraud as relator's complaint); *Janssen,* 576 F. Supp. 3d at 226–27 (finding no public

disclosure in similar case). This Court should do the same—both because the public disclosure

bar does not apply and because Relator qualifies as an original source.

### A. The Public Disclosure Bar Does Not Apply

#### 1. The Public Sources Do Not Disclose Substantially the Same Allegations or Transactions as the Complaint

For the public disclosure bar to apply, the qualifying public sources must publicly

disclose "substantially the same allegations or transactions as alleged in the action." 31 U.S.C.

§ 3730(e)(4)(A). Relator's allegations are that Jazz: (1) knowingly withheld important prior art

(the adverse event reports and 2012 label) while prosecuting the '306 Patent, and continued

withholding the adverse event reports while prosecuting the remainder of the patents in the '306

patent family; (2) listed these patents in the Orange Book and then asserted them in bad faith to

delay generic competition; (3) continued to deny the existence of invalidating prior art to stave

off the IPRs; (4) excluded at least nine generic competitors who would have introduced less

expensive generics into the market by January 2021 or earlier but for the Jazz's assertion of

specific patents against them whose claims were obtained by fraud; and (5) overcharged the

government for Xyrem by exploiting unlawful monopoly prices and market share.

Jazz does not argue that these allegations have been publicly disclosed. Instead, it argues

that the public disclosures reveal the fraudulent "transactions." As Jazz explains, this inquiry

applies the so-called X+Y=Z test, so that if both a true state of affairs (X) and the assertedly false

state (Y) are publicly disclosed, such that the public could reasonably infer that fraud occurred

(Z), fraudulent transactions are disclosed. Courts have cautioned against conducting this inquiry

"at too high a level of generality." *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 264

(E.D. Pa. 2020); *see also United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 577 (9th

Cir. 2016), *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 831 (7th Cir. 2013); *United States ex*

*rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 935 (7th Cir. 2012); *United States ex rel.*

*Barrett v. Allergan, Inc.*, 2019 WL 4675756, at *5 (C.D. Cal. Sept. 24, 2019). Instead, courts must "take a careful look at the details of each alleged fraud." *Sturgeon*, 438 F. Supp. 3d at 264.

This careful approach aligns with the purpose of the public disclosure bar, which is to "strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Schindler Elevator Corp*., 563 U.S. at 413. As the court that coined the X+Y=Z test explained, "[m]any potentially valuable *qui tam* suits would be aborted prematurely by a reading … that barred suits when the only publicly disclosed information was itself innocuous." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994). Thus, for the test to be satisfied, X and Y must both be actually disclosed. If the public disclosures merely reveal facts from which X or Y could be inferred, that is not a sufficient disclosure. Moreover, "the public disclosure bar is not implicated—even if one or more of a claim's essential elements are in the public domain—unless the exposed elements, taken together, provide adequate notice that there has been a fraudulent transaction." *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 918–19 (6th Cir. 2017).

Under this rule, Jazz's motion fails. The Ninth Circuit's recent *Valeant* decision is on point. There, the relator alleged that a pharmaceutical company intentionally withheld scientific studies when seeking to extend the patent monopoly covering an ulcerative colitis drug, thus committing a fraud analogous to the one here. *See Valeant*, 89 F.4th at 1167. The relator bolstered his argument by pointing to other patent prosecution dockets where the defendant took positions inconsistent with the ones it took to pursue the fraudulently obtained patent. *See id.* at 1167–68. The defendants argued that the public disclosure bar foreclosed the claim because the substance of the claim could be discerned by examining the various patent prosecution dockets and scientific studies, which would reveal that the studies were not disclosed during patent prosecution, and that the defendants made contradictory statements. *See id.*

The Ninth Circuit rejected the argument, holding that although "the scattered qualifying public disclosures may each contain a piece of the puzzle, … when pieced together, they fail to present the full picture of fraud." *Valeant*, 89 F. 4th at 1168. Thus, the court explained that the fact that two disparate patent prosecution dockets contained conflicting representations was not enough to publicly disclose the conflict: it was the plaintiff's identification of the conflict that was the "critical fact necessary for scienter"—and such identification was not revealed in either patent prosecution, or any other disclosure. *Id*. Similarly, the defendants pointed to a Law360 article stating that two claims in one of the relevant patents were obvious—but the court determined that this article did "not disclose—or even imply—that Valeant knowingly withheld information when applying for" the patent. *Id*. Fairly read, *Valeant* stands for the proposition that when scattered public disclosures contain only innocuous facts (or omit facts, the import of which is not obvious), without any suggestion of impropriety—and the relator is the one who pieces together the fraud, the public disclosure bar does not apply.

This case is *a fortiori* from *Valeant*. Jazz admits that, prior to this case, generic manufacturers who "had every incentive to identify the best prior art they could" did not "so much as mention[] adverse event reports or the 2012 Label." Mem. at 5. In other words, Relator is the only person who has ever surfaced the specific fraud alleged here, *i.e.*, the knowing withholding of those specific documents during the prosecution of the '306 patent. And he is the only one who has explained why that specific prior art fatally contradicts Jazz's representations to the Patent Office, and the basis for allowance of the patent. Relator is also the only person to allege part of the scheme included fraud during the IPR proceedings. Prior to this case, nobody asserted that Jazz defended the validity of its patents by obscuring prior art it knew about. And nobody has alleged that Jazz used these patents unlawfully to overcharge the government.

Jazz's argument to the contrary is an unjustifiably broad interpretation of public disclosure. It is like saying that if somebody looked at a haystack (the patent prosecution docket),

they would notice that some needles (the adverse event reports) were missing. This is an absurd interpretation of the statute, because the silent withholding of information is the *opposite* of a public disclosure. Moreover, the mere absence of adverse events reports would not reasonably lead to the inference of fraud without more. For example, relevant adverse event reports that belie the patent applicant's statements to the Patent Office may not exist. And someone reviewing the adverse event report database would have no reason to think any of those documents were relevant to any patent, because the reports do not identify or discuss any patents.

Jazz also argues that three articles disclose various relevant facts. Mem. at 24–25. They do not. The Pardi article articulates a scientific basis for safely combining GHB and valproate, but it does not say that this combination was *actually occurring* in the real world via a reduced dose of Xyrem. Pardi also says nothing about fraud or the '306 patent family. In fact, Pardi pre-dates the first '306 patent family application by 6 years. The *Law360* article Jazz cites is also too vague: it merely reports on a generic's challenge claiming the '306 patent was invalid. The Court in *Valeant* rejected an indistinguishable argument: even though a *Law360* article discussed the patent's invalidity, "the *Law360* article does not disclose—nor even imply—that Valeant knowingly withheld information when applying for the '688 Patent." 89 F.4th at 1168. Similarly, Jazz's citation to *Mealy's Litigation Report* does not disclose any facts suggesting that Jazz withheld material prior art during examination of the '306 patent or misrepresented facts during the IPRs. It merely says that Par had subpoenaed prescribing information from Express Scripts— but it says nothing more, and any investigation would have led to a dead end because Par's motion to compel compliance with the subpoena was denied. *See Par Pharm., Inc. v. Express Scripts Specialty Distribution Servs., Inc.*, No. 4:17-mc-510 RLW (E.D. Mo. Jan. 2, 2018). The article also does not explain the potential relevance of this information.

Next, Jazz argues that Par's response to Jazz's Citizen Petition disclosed the claimed fraud. (Mem. at 25) But Par's objections were aimed at the Citizen Petition itself, not at the

underlying patents. Relator's Complaint does not assert that the Citizen Petition violated the FCA, and so obviously Par's objections are not "substantially the same" as Relator's allegations.

Finally, Jazz argues that the alleged fraud was disclosed in the IPRs. Again, this is wrong. Although the IPRs challenged the validity of the '306 patent, none relied on the evidence of real-world coadministration Relator asserts here—let alone that Jazz had withheld that information.

## 2. The Asserted Public Disclosures Did Not Occur in Qualifying Channels

The foregoing establishes why, even if the Court considers all of Jazz's asserted public disclosures, the public disclosure bar does not apply. But Jazz's argument is weaker still because some of the asserted public disclosures do not count. The statute applies only to disclosures occurring in three channels: (i) "a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party"; (ii) "a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; or (iii) "the news media." 31 U.S.C. § 3730(e)(4)(A). Several asserted public disclosures—in IPRs, in patent prosecution dockets, in the Citizen Petition proceedings, and the Pardi article—fall outside these channels.

The three statutory channels each do different work. The first channel addresses every criminal, civil, and administrative hearing. In this context, the word "'hearing' is synonymous with 'proceeding.'" *United States ex rel. Banigan v. PharMerica, Inc.*, 950 F.3d 134, 138 n.2 (1st Cir. 2020). For hearings covered by this channel, the public disclosure bar applies *only* if "the Government or its agent is a party." 31 U.S.C. § 3730(e)(4)(A)(i). Proceedings where the government acts solely as an adjudicator do not trigger the public disclosure bar.

IPRs are "administrative hearings" before an administrative tribunal (the PTAB) and are therefore addressed by the first channel. Accordingly, the statute only applies to them if the government or its agent is a party to the IPR under channel (i). The government was not a party to the IPRs here, and so they do not fall within the scope of the public disclosure bar. The two

courts that have considered this question have so held, and the Supreme Court denied certiorari. *See Valeant*, 89 F.4th at 1166; *Janssen*, 576 F. Supp. 3d at 225.

Jazz argues that IPRs are investigations, reports, or hearings under channel (ii) because IPRs supposedly are "inquisitorial" proceedings, akin to a congressional inquiry. Mem. 26. Defendants' premise is foreclosed by Supreme Court precedent holding that in creating IPRs, "Congress opted for a party-directed, adversarial process," as opposed to an "agency-led, inquisitorial process." *SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018). Moreover, channel (ii) cannot be read to encompass materials incidental to a "hearing" covered by channel (i), because doing so would render channel (i) a nullity. For example, the PACER system (a government website) produces a "docket report" for every civil case between private parties, with links to all the filed materials, so it is clearly governed under channel (i)—but it would make no sense to hold that this "docket report" is also Federal "report" under channel (ii), because such a holding would eviscerate the government-party limitation in channel (i). Indeed, the Ninth Circuit has rejected Defendants' argument, holding that such an interpretation "would render the government-as-a-party requirement in channel (i) a nullity." *Valeant*, 89 F.4th at 1166. The District of New Jersey reached the same conclusion, explaining that Jazz's argument that IPRs are governed under channel (ii) would "negate evident Congressional intent." *Janssen*, 576 F. Supp. 3d at 225. Thus, Relator's allegations of wrongdoing based on the non-public IPR misrepresentations alone defeat the public disclosure bar raised by Jazz.

For similar reasons, Jazz is wrong to argue that Par's response to its Citizen Petition is a qualifying public disclosure. The Citizen Petition proceedings fall within the broad definition of an administrative hearing, and are therefore addressed by channel (i). Like the PTAB in an IPR, the FDA merely acted as an adjudicator—not a party. And Jazz's petition also had adversarial characteristics: It filed the petition specifically to block Par from obtaining approval of a drug label; Par responded as Jazz's adversary; and the FDA adjudicated the dispute. This only further

confirms that this proceeding is covered by channel (i) and does not trigger the public disclosure bar because the government was not a party.

The same is true of patent prosecution dockets. Patent prosecution is an *ex parte* administrative hearing. Because the government was not a party to the prosecutions for the '306 family, statements on those dockets do not trigger the public disclosure bar. The better-reasoned decision on this point agrees with Relator. *Compare Janssen*, 576 F. Supp. 3d at 225–26 (explaining why it is more faithful to the plain meaning of the statutory text to hold that patent prosecutions are covered only by channel (i)), *with United States v. Allergan, Inc.*, 46 F.4th 991, 997–98 (9th Cir. 2022) (acknowledging that "a patent prosecution is an administrative hearing," but developing an atextual distinction between adversarial and information-gathering proceedings to hold that patent prosecutions fall within channel (ii)).[3]

Jazz also points to the Pardi article, which they contend is "the news media." The phrase "the news media" is undefined, and so takes its ordinary meaning. This means professionals who focus on reporting current events to the public. *See United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, 2019 WL 3282619, at *13 (C.D. Cal. July 16, 2019), *rev'd on other grounds*, No. 19-56367, ECF 67-1 (9th Cir. Mar. 31, 2021). Nobody in ordinary parlance thinks of niche scientific articles as "the news media."

### B. Even if the Public Disclosure Bar Applies, Relator Is an Original Source

Even if the public disclosure bar applies, Relator is an "original source" with "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," and voluntarily provided related "information to the Government" before filing this action. *See* 31 U.S.C. § 3730(e)(4)(B); ¶ 23. Relator alone alleged that, before Jazz filed for the '306 patent

---

[3] The statute does not distinguish between adversarial and inquisitorial proceedings. It puts all criminal, civil, and administrative hearings in channel (i), period. Indeed, the previous version of the statute (before 2010) included "administrative hearings" in channels (i) and (ii). Congress specifically deleted the word "administrative" from (ii) while leaving it in (i), sending a clear signal about how to treat these hearings.

family, doctors were co-administering GHB and valproate, and that was material to the patentability of the '306 patent family. Relator was also the first to allege another key part of the fraud involving Jazz's misrepresentations during the IPRs. More broadly, Relator had to piece together the fraud from many different complex, technical sources—a task that required independent knowledge that materially added to the public disclosures. In any event, the question whether a relator's knowledge "materially adds to" the publicly disclosed allegations or transactions is a fact issue that should not be resolved on a Rule 12 motion. *Cf. United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh*, 728 F. App'x 101, 104–05 (3d Cir. 2018).

## V.    The State Law Claims Survive

If the Court sustains the federal claims, Jazz has offered no reason to dismiss any state claim. On the other hand, Jazz summarily contends that if the federal law claims fail, the State ones should, too. Mem. at 27–28. That is incorrect. State FCAs sometimes differ from their federal counterpart. For example, state public disclosure bars typically are triggered by disclosures in state government sources—not federal ones. *See, e.g.*, Cal. Gov't Code § 12652(d)(3). And other statutes have different elements. For example, Texas has requested that Relator inform the Court that the Texas Health Care Program Fraud Prevention Act is broader than the FCA, including because it does not require the submission of false claims, *see* Tex. Hum. Res. Code § 36.002(2). Accordingly, if the Court deems the federal claims inadequate, the prudent course would be to decline to exercise jurisdiction over the state law claims and dismiss them without prejudice.

## VI.    The FCA's Qui Tam Provisions Are Constitutional

Jazz's one-paragraph throwaway challenge to the constitutionality of the FCA's qui tam provisions (Mem. at 28) is meritless. Such challenges have been uniformly rejected by the courts of appeals. *See, e.g.*, *Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804–07 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757 (5th Cir. 2001) (en banc); *United States ex rel.*

28

*Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *Kelly.*, 9 F.3d at 759. Virtually every district court has reached the same decision. As these courts recognize, the long history of qui tam statutes—none of which have ever required relators to be appointed pursuant to the Appointments Clause—forecloses this argument as a matter of originalist principle. Relators also do not qualify as officers under modern Appointments Clause precedents because they do not occupy any government position, let alone a continuing one—nor exercise any governmental power. If anything, relators' powers are narrower than those of other private litigants because the government has unique supervisory powers over their actions. The only contrary decision—currently under appeal—is an "outlier" that relies "chiefly on selections of dissents, concurrences, and law review articles" while "whistl[ing] past precedent." *United States ex rel. Adams v. Chattanooga Hamilton Cty. Hosp. Auth.*, 2024 WL 4784372, at *2–3 (E.D. Tenn. Nov. 7, 2024). This Court should join the overwhelming majority of courts.

## VII.    The Court Has Personal Jurisdiction Over the Foreign Defendants

The FCA provides for jurisdiction in any district in which any defendant transacts business, or performed any act proscribed by the statute. 31 U.S.C. § 3732(a). Under Federal Rule of Civil Procedure 4(k)(2) the Irish entities may be sued in any district if jurisdiction is consistent with the Constitution. The inquiry for a federal cause of action is based on a defendant's nationwide contacts—not only contacts with the district. See, e.g., *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992).

The Irish defendants are subject to specific personal jurisdiction. Jazz Pharmaceuticals Ireland Ltd. is not only the owner of the fraudulent patents, but has asserted those patents alongside its domestic affiliate against generic companies in the United States (¶¶ 20, 122)—and responded to the IPRs against those patents (¶ 112, 116, 118), thus committing acts alleged to violate the False Claims Act. The assertion of the patents constitutes purposeful availment of the laws of the United States, as does profiting from the unlawful patent monopoly.

Jazz Pharmaceuticals plc is publicly traded on the NASDAQ. In addition to the allegations in the Complaint, the Court can take judicial notice that the parent company's SEC filings state that it "owns" the Xyrem patents, and that the company was litigating several IPRs relating to them. *See* 2015 Form 10-K, at 4–6. Moreover, the Jazz Pharmaceutical Medical Information portal directed at U.S. doctors prescribing Xyrem (and copyrighted by Jazz Pharmaceuticals, Inc.) confirms that Jazz Pharmaceuticals plc "owns" the Website, and the referenced products belong to the Irish parent.[4]

Thus, both Irish entities exercise ownership and control over the relevant patents and were involved in actively litigating the IPRs concerning them. In a case presenting substantially indistinguishable circumstances, the Ninth Circuit held that for foreign entities that own or seek to enforce fraudulent pharmaceutical patents to benefit from the sales of the drug to the government, the Court may exercise jurisdiction to determine FCA claims that the patents were fraudulently obtained to exclude competitors. *See United States ex rel. Silbersher v. Valeant Pharms. Int'l, Inc.,* No. 20-16256, 2023 WL 4946736, at *2 (9th Cir. Aug. 3, 2023). This Court should hold likewise.

## CONCLUSION

Defendants' motion to dismiss the Amended Complaint should be denied.

---

[4] The 2015 Form 10-K and Medical Information portal are Exhibits A and B to Relator's Response to Defendants' Request for Judicial Notice.

Dated: January 15, 2025

/s/ Ana Muñoz
By: Ana Isabel Muñoz
(Mass. Bar No. 569233)

**ZALKIND DUNCAN & BERNSTEIN LLP**
65A Atlantic Avenue
Boston, MA 02110
Telephone: (617) 742-6020
AMunoz@ZalkindLaw.com

**HERRERA KENNEDY LLP**
Nicomedes Sy Herrera
(*admitted pro hac vice*)
Shawn M. Kennedy
(*admitted pro hac vice*)
Bret D. Hembd (*admitted pro hac vice*)
Laura E. Seidl (*admitted pro hac vice*)
1300 Clay Street, Suite 600
Oakland, California 94612
Telephone: (510) 422-4700
NHerrera@HerreraKennedy.com
SKennedy@HerreraKennedy.com
BHembd@HerreraKennedy.com
LSeidl@HerreraKennedy.com

**SPARACINO PLLC**
Tejinder Singh
(*admitted pro hac vice*)
1920 L Street, NW, Suite 835
Washington, DC 20036
Telephone: (202) 629-3530
Tejinder.Singh@Sparacinopllc.com

**POLLOCK COHEN LLP**
Adam Pollock (*admitted pro hac vice*)
111 Broadway, Suite 1804
New York, NY 10006
Telephone: (212) 337-5361
Adam@PollockCohen.com


*Attorneys for Plaintiff-Relator*
*Leonardo S. Sorgi*

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2025 a true copy of the above document was served upon the attorney of record for each party by the ECF system.

/s/Ana Muñoz
Ana Muñoz