### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

```
_____
                               )
UNITED STATES OF AMERICA, et al., )
ex rel. LEONARDO S. SORGI,      )
                               )
              Plaintiffs,       )
                               )
v.                              )        Civil Action
                               )        No. 21-cv-10891-PBS
JAZZ PHARMACEUTICALS PLC, JAZZ  )
PHARMACEUTICALS, INC., and JAZZ )
PHARMACEUTICALS IRELAND LIMITED, )
                               )
              Defendants.       )
_____)
```

### MEMORANDUM AND ORDER

September 23, 2025

Saris, J.

### INTRODUCTION

In this <u>qui tam</u> action,[1] Plaintiff-Relator Leonardo S. Sorgi ("Relator") alleges that Defendants Jazz Pharmaceuticals plc, Jazz Pharmaceuticals, Inc., and Jazz Pharmaceuticals Ireland Limited (collectively, "Jazz" or "Defendants") fraudulently obtained patents to unlawfully maintain a monopoly over Xyrem, a central nervous system ("CNS") depressant. According to Relator, this

---

[1] The amended complaint was brought on behalf of the United States, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Guam, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Puerto Rico, Rhode Island, Tenneessee, Texas, Vermont, Virginia, the Virgin Islands, and Washington. <u>See</u> Dkt. 63.

scheme excluded lower-cost generic competitors and caused Medicare and Medicaid to reimburse Xyrem prescriptions at inflated prices in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A) & (B). Jazz moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that Relator cannot state a plausible claim on which relief can be granted for six independent reasons, including that Relator's allegations were previously disclosed and are barred under the FCA's public disclosure bar.[2] After a hearing, the Court **ALLOWS** Jazz's motion to dismiss (Dkt. 71).

## BACKGROUND

Because this FCA claim is predicated on a still-valid patent, a brief description of the patent process is necessary. The Court begins there and then describes the facts alleged in Relator's complaint (Dkt. 63), which the Court accepts as true at this stage. See Artuso v. Vertex Pharms., Inc., 637 F.3d 1, 5 (1st Cir. 2011).

---

[2] Jazz also argues that Relator's complaint should be dismissed, either in full or in part, because: (i) Relator failed to plead with particularity a scheme by Jazz to defraud the government, including the who, what, when, where, and how of the alleged fraud; (ii) Relator failed to plead all the elements of an FCA violation; (iii) Relator's state-law claims mirror the federal FCA claim and fail for the same reasons; (iv) the FCA's qui tam provisions are unconstitutional; and (v) this Court lacks personal jurisdiction over Jazz Pharmaceuticals PLC and Jazz Pharmaceuticals Ireland Limited.

## I.    <u>Patent Prosecution and Inter Partes Review</u>

A person may apply and be entitled to a patent for an invention that is novel and non-obvious to a person having ordinary skill in the art. <u>See</u> 35 U.S.C. §§ 102-103. To apply for a patent, an applicant must submit a specification and claims to the United States Patent and Trademark Office ("PTO") in a process known as patent prosecution. Patent prosecution is an ex parte process completed without the participation of third parties. Without an adversary to challenge the applicant during patent prosecution, the applicant must abide by a duty of "candor, good faith, and honesty." <u>Molins PLC v. Textron, Inc.</u>, 48 F.3d 1172, 1178 (Fed. Cir. 1995). He must disclose to the PTO "all information known to [him] to be material to patentability." 37 C.F.R. § 1.56(a). Once the PTO decides that the invention satisfies the statutory requirements, a patent is issued that grants the owner the exclusive right to "make[], use[], offer[] to sell, or sell[]" the invention for a period of time. 35 U.S.C. § 271(a).

After issuance, patents remain subject to challenge. One mechanism is inter partes review ("IPR"). "IPR is a trial-like, adversarial" proceeding conducted by the Patent Trial and Appeal Board ("PTAB"), an adjudicative body within the PTO. <u>United States ex rel. Silbersher v. Valeant Pharms. Int'l, Inc.</u>, 89 F.4th 1154, 1160-61, 1165 (9th Cir.), <u>cert. denied</u>, 145 S. Ct. 140 (2024). IPR permits third parties to challenge patents on the grounds of lack

of novelty or obviousness based on prior art patents and publications. See 35 U.S.C. §§ 102-03, 311(b). A challenger may not use IPR proceedings to allege that a patent was obtained through intentional misconduct or fraud. See id. § 311(b).

## II.  **Facts Underpinning the Present Litigation**

### A.  **The Parties**

Relator is a patent attorney who focuses on investigating pharmaceutical patents. He has never worked for Jazz. Jazz Pharmaceuticals plc, an Irish public limited company with principal executive offices located in Dublin, Ireland, is the parent company of the other two Defendants. Jazz Pharmaceuticals, Inc., a Delaware corporation with a principal place of business in Palo Alto, California, is the American distributor of Xyrem. Jazz Pharmaceuticals Ireland Limited, an Irish corporation with a principal place of business in Dublin, Ireland, is the owner of the patents at issue in this case. Jazz manufactures, sells, and distributes Xyrem, a CNS depressant used to treat narcolepsy and cataplexy. Jazz has profited immensely from Xyrem, earning over $1.6 billion per year at its peak.

### B.  **Prosecution of the '306 Patent Family**

While its patent on Xyrem's active ingredient -- sodium oxybate, the sodium salt of gamma-hydroxybutyrate ("GHB") -- has long since expired, Jazz has continued to profit from Xyrem by obtaining patents on different applications of the medication.

Currently, all of Jazz's patents on Xyrem cover the coadministration of Xyrem with other CNS depressants, such as the medication valproate. U.S. Patent No. 8,772,306 ("the '306 patent"), which was the first patent to issue, covers a method of "orally administering . . . at least [a] 5% decrease in an effective dosage amount of the GHB or salt thereof when the patient is receiving a concomitant administration of valproate." Dkt. 63 ¶ 55 (second alteration in original). In other words, the '306 patent covers any dose reduction of Xyrem between 5% and 99% when Xyrem and valproate are coadministered. The patents covering the coadministration of Xyrem with other CNS depressants are collectively referred to as "the '306 patent family."[3]

The '306 patent issued from U.S. Patent Application No. 13/872,997 ("the '997 application"), which Jazz filed on April 29, 2013. On September 13, 2013, the PTO issued a Non-Final Office Action rejecting the claims pending under the '997 application, explaining that prior art taught coadministration of GHB and other medications to treat sleep disorders. In response, Jazz argued that the prior art "d[id] not teach or suggest that valproate could be combined with GHB, or what might be the effects of the two if combined." Id. ¶ 52. Jazz insisted that the safety and efficacy of

---

[3] The other patents in the '306 patent family are U.S. Patent Nos. 9,050,302, 9,486,426, 10,213,400, 10,864,181, 11,253,494, and 11,986,446.

coadministering valproate and a reduced dose of Xyrem "could not have been predicted prior to the disclosure of the ['997 application]." Id. Based on these representations, the PTO issued a Notice of Allowance approving the '306 patent on December 13, 2013. The Notice stated that, while prior art "teaches away from the claimed invention in that [it] teach[es] that [valproate] can create a therapeutic problem [when used with] GHB," Jazz's "argument [that the two medications can be safely coadministered] is found persuasive." Id. (third alteration in original).

### C.    FDA Adverse Event Reporting System

The U.S. Food and Drug Administration ("FDA") collects data on adverse events that occur in the provision of medical treatment via Form 3500, also known as the FDA Adverse Event Reporting System ("FAERS"). Between 2003 and September 2012, interested parties could access FAERS data through quarterly reports, downloadable electronic files, or physical copies. On September 10, 2012, the FDA created a searchable online database containing information documented in the FAERS reports. The FAERS reports are indexed and searchable by drug name, year, and reaction type, and each report contains the date that Jazz received it.

Prior to the PTO approving the '997 application and granting the '306 patent, the FAERS database contained reports of over thirty instances of medical practitioners safely and effectively coadministering GHB and valproate.

**D.    2012 FDA Safety Communication and Revised Xyrem Label**

On December 17, 2012, prior to the submission of the '997 application, the FDA released a Safety Communication instructing physicians to reduce the normal dose of Xyrem when coadministering it with other CNS depressants like valproate. The FDA published this communication after reviewing adverse event reports involving the coadministration of Xyrem with other CNS depressants. The Communication stated, "The Xyrem drug label . . . is being revised as follows: . . . when concomitant use of Xyrem with a central nervous system depressant is required, a reduction in dose or discontinuation of one or more central nervous system depressants (including Xyrem) should be considered." Id. ¶ 97 (alterations in original).

Upon receiving this instruction, Jazz revised its Xyrem label to reflect the FDA's guidance. This updated label cautioned users against "[t]he concurrent use of Xyrem with other CNS depressants," stating that concurrent use "may increase the risk of" certain adverse health effects. Id. ¶ 98. The label also advised that "[i]f use of . . . CNS depressants in combination with Xyrem is required, dose reduction or discontinuation of one or more CNS depressants (including Xyrem) should be considered." Id. (emphasis omitted).

**E.    Attempts by Generic Manufacturers to Institute IPR**

On at least three occasions, manufacturers of generic pharmaceutical drugs petitioned the PTAB to institute IPR

7

proceedings and invalidate the '306 patent. In every case, however, Jazz successfully defended the '306 patent against the petitioners' claims that prior art rendered the patent's teachings obvious. When Par Pharmaceuticals, Inc. challenged the '306 patent in 2016, for instance, Jazz represented that "no drug product labeling even contemplated co-administering GHB and valproate, much less for the claimed sleep disorders, until Jazz invented a safe and effective way to do so," and that "[t]here is no disclosure, teaching, or suggestion in the prior art to use reduced GHB doses to avoid a potential negative GHB-valproate interaction." Id. ¶ 116(b), (e) (emphasis omitted). During these proceedings, Jazz did not disclose to the PTAB the teaching of the 2012 revised Xyrem label or the FDA's 2012 Safety Communication.

### F.    Jazz Lists the '306 Patent in the Orange Book

Under the Food, Drug, and Cosmetic Act, pharmaceutical companies must file a New Drug Application ("NDA") before selling a new medication. An NDA must include information concerning the safety and efficacy of the drug in question and identify any patents that could reasonably be asserted against manufacturers of generic versions of the approved brand. After the NDA is approved, the patents are listed in an official FDA database of "Approved Drug Products with Therapeutic Equivalence Evaluations," also known as the "Orange Book." When a pharmaceutical company lists a

patent in the Orange Book, it represents that the patent is valid and enforceable.

Generic manufacturers interested in selling a generic version of a brand name drug need only file an Abbreviated New Drug Application ("ANDA"). When filing an ANDA, the manufacturer must certify that either (i) no patent for the brand name drug has been filed with the FDA; (ii) the patent for the brand name drug has expired; (iii) the patent for the brand name drug will expire on a particular date and the generic company does not seek to market its generic version before that date; or iv) the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product. When a generic manufacturer certifies that the brand drug's patent is invalid or will not be infringed, it must promptly provide notice to the brand manufacturer. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notice, the FDA will not grant final approval of the ANDA until the earlier of (a) the passage of thirty months from the notification date or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic's ANDA.

After obtaining the patents in the '306 family, Jazz had the patents listed in the Orange Book. Between 2014 and 2017, nine generic manufacturers submitted ANDAs with the FDA looking to

produce and sell generic versions of Xyrem. In response, Jazz initiated patent infringement suits against each manufacturer asserting one or more patents from the '306 patent family against the prospective generics. Ultimately, Jazz reached settlement agreements in each case that prevented all the generic manufacturers from entering the market until 2026.

### G. Payment by Government Healthcare Programs

To market Xyrem to federal agencies and qualify for reimbursement under certain government programs, Jazz listed Xyrem's price on the Federal Supply Schedule ("FSS"), a program run by the General Services Administration ("GSA"). As part of GSA's assessment of Xyrem's pricing, Jazz justified its pricing, proposed a mechanism for future price adjustments, and offered proof that its FSS price was "fair and reasonable." Id. ¶ 133. Jazz could only have listed Xyrem's price on the FSS if it signed, among other documents, a Pharmaceutical Price Agreement, for which Jazz must have, in turn, provided the non-federal average manufacturer price ("AMP") of Xyrem for the prior year. Like all drug manufactures, Jazz was required to update its AMP information to the Centers for Medicare and Medicaid Services ("CMS") every calendar quarter for reimbursement purposes.

CMS payments and reimbursements have proven to be major sources of Xyrem sales revenue. In 2020, Jazz received at least $287,143,624 from Medicare and $143,164,931 from Medicaid. The

next year, Jazz received at least $208,290,136 from Medicare and at least $130,160,575 from Medicaid. In 2022, Medicare Part D spent over $16,395 per Xyrem prescription (over $144,000 per patient per year).

## III. **Procedural Background**

Relator filed this action against Jazz in May 2021. Three years later, the United States declined to intervene pursuant to 31 U.S.C. § 3730(b)(4)(B). In June 2024, certain state and territory plaintiffs declined to intervene as well.[4] Relator amended his complaint on September 3, 2024. Jazz now moves to dismiss the amended complaint's federal and state-law claims.

### **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and

---

[4] Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Puerto Rico, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington declined to intervene. California declined to intervene with respect to the California False Claims Act claim; it did not take a position with respect to the claim brought under the California Insurance Code.

conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (cleaned up). This standard requires a court to "separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Kando v. R.I. State Bd. of Elections, 880 F.3d 53, 58 (1st Cir. 2018) (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). The court must then determine whether the factual allegations permit it "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Germanowski v. Harris, 854 F.3d 68, 72 (1st Cir. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

Federal Rule of Civil Procedure 9(b) applies to claims under the FCA. See Lawton ex rel. United States v. Takeda Pharm. Co., 842 F.3d 125, 130 (1st Cir. 2016). Under Rule 9(b), allegations of fraud are subject to a heightened pleading standard. To survive a motion to dismiss, a complaint alleging fraud must "state with particularity the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Although courts generally only consider material presented in the complaint at the motion-to-dismiss stage, see Douglas v. Hirshon, 63 F.4th 49, 57 (1st Cir. 2023), courts may also "consider (a) 'implications from documents' attached to or fairly

12

'incorporated into the complaint,' (b) 'facts' susceptible to 'judicial notice,' and (c) 'concessions' in [the] plaintiff's 'response to the motion to dismiss,'" Lyman v. Baker, 954 F.3d 351, 360 (1st Cir. 2020) (alteration in original) (quoting Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55-56 (1st Cir. 2012)). In particular, news articles can be considered when assessing the FCA's public-disclosure bar. See United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 207-08 (1st Cir. 2016).

## DISCUSSION

### I.    Federal FCA Standard

The complaint relies on two provisions of the FCA that target distinct types of false claims. First, relying on the presentment theory, the complaint alleges that Jazz "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Under this theory, fraud "has two components: the defendant must submit or cause the submission of a claim for payment to the government, and the claim for payment must itself be false or fraudulent." Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26, 31 (1st Cir. 2016). Second, under a false statements theory, the complaint alleges that Jazz "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim" to the federal government. 31 U.S.C. § 3729(a)(1)(B).

As the First Circuit has explained, "[e]vidence of an actual false claim is the sine qua non of [an FCA] violation." Guilfoile v. Shields, 913 F.3d 178, 188 (1st Cir. 2019) (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 225 (1st Cir. 2004)). The plaintiff must also show that the defendant either "present[ed]" or "cause[d] to be presented" the false claim, 31 U.S.C. § 3729(a)(1)(A), or made or used a false statement "material to a false or fraudulent claim," id. § 3729(a)(1)(B). Under both provisions, the falsity must be material to the government's decision to pay. See Guilfoile, 913 F.3d at 187 & n.7.

Next, "[t]he FCA includes a scienter requirement that the false claim be submitted 'knowingly.'" Id. (quoting 31 U.S.C. § 3729(a)(1), (b)(1)). The FCA defines "knowingly" to mean that the defendant "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). "[P]roof of specific intent to defraud," however, is not required. Id. § 3729(b)(1)(B).

## II. **Availability of FCA Cause of Action**

The core of Relator's theory is that Jazz deliberately withheld material prior art from the PTO during prosecution of the '306 patent family and then continued to conceal or misrepresent that art in subsequent proceedings before the PTAB. According to

14

Relator, this alleged misconduct rendered later claims for payment to federal and state healthcare programs false under the FCA.

Jazz characterizes Relator's theory as "alleg[ing] that Jazz engaged in inequitable conduct" rendering the patent unenforceable. Dkt. 72 at 17. Noting the absence of caselaw supporting the use of "inequitable conduct . . . as the basis for an FCA violation," Jazz argues that "Relator's theory that patent invalidity based on inequitable conduct may be litigated de novo within a FCA case is unprecedented and must fail." Id. at 17-18. This argument, however, mischaracterizes Relator's claim, which in fact "involves a different statute[] [and] subject matter" than the inequitable conduct framework. United States ex rel. Silbersher v. Janssen Biotech, Inc., 576 F. Supp. 3d 212, 230 (D.N.J. 2021); see id. (noting that the doctrine of inequitable conduct under patent law is "designed for [a] different statutory context[] than the FCA").

Jazz's argument also fails to recognize that in an analogous context, the Supreme Court has held that the enforcement of a patent procured by knowing and willful fraud on the PTO could violate antitrust law if a plaintiff can meet all the elements necessary to prove a Sherman Act monopoly charge. See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174 (1965); see also In re Loestrin 24 FE Antitrust Litig., 261 F. Supp. 3d 307, 338-39 (D.R.I. 2017); Hertz Corp. v. Enter. Rent-A-

15

Car Co., 557 F. Supp. 2d 185, 193–95 (D. Mass. 2008); cf. Xitronix Corp. v. KLA-Tencor Corp., 757 F. App'x 1008, 1010 (Fed. Cir. 2019) (per curiam) ("Walker Process fraud and inequitable conduct are fraternal twins, such that conclusions as to Walker Process fraud would likely resolve questions as to the enforceability of the patent."). "The heightened standard of materiality in a Walker Process case requires that the patent would not have issued but for the patent examiner's justifiable reliance on the patentee's misrepresentation or omission." United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp., 902 F.3d 1, 9 (1st Cir. 2018) (quoting Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1347 (Fed. Cir. 2007)).

Relying on the Walker Process caselaw, Relator argues that the allegations in the complaint of misrepresentation and omissions to the PTO to procure a patent state a viable FCA claim. The caselaw involving similar lawsuits is sparse. See, e.g., Valeant, 89 F.4th at 1158-62; United States ex rel. Silbersher v. Allergan, Inc., 46 F.4th 991, 993-96 (9th Cir. 2022); Janssen, 576 F. Supp. at 217-21. Jazz's contention that Relator cannot maintain this manner of action under the FCA is not fully developed, and the parties have cited no caselaw in which a court invalidated a patent based on a patentee's fraud in an FCA case. In any event, the Court need not resolve the issue -- or the questions of whether Relator has plausibly alleged the statutory elements of an FCA

violation, whether the FCA's <u>qui tam</u> provisions are unconstitutional, and whether the Court lacks personal jurisdiction over two of the three Defendants -- because the Court concludes that the public disclosure bar forecloses Relator's FCA claim, as explained below.

## III. <u>FCA Public Disclosure Bar</u>

To deter opportunistic suits based on publicly available information, the FCA includes a public disclosure bar that prohibits relators from bringing <u>qui tam</u> actions based on potential fraud that the government has already had an opportunity to address. The bar is designed to prevent "perverse incentives for opportunists to seek compensation based on fraud already apparent from information in the public domain" and applies where "the government has received fair notice" of the alleged fraud "prior to the suit." <u>Winkelman</u>, 827 F.3d at 206, 208.

The statute provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed --
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> >
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> >
> > (iii) from the news media . . . .

31 U.S.C. § 3730(e)(4)(A). The First Circuit applies this provision via a three-part inquiry: (1) whether there has been a public disclosure of fraud; (2) whether the "disclosure occurred through one of the statutorily prescribed methods"; and (3) whether the relator's allegations "are substantially the same as the publicly disclosed allegations or transactions." Winkelman, 827 F.3d at 208; see United States ex rel. Poteet v. Bahler Med., Inc., 619 F.3d 104, 109 (1st Cir. 2010). All three conditions must be satisfied for the bar to apply. See Poteet, 619 F.3d at 109. If they are, the action may still proceed only if the relator qualifies as an "original source." Id. at 109-10 (quoting United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 53-54 (1st Cir. 2009)). The Court addresses each of the three prongs in turn before turning to the original source exception.

### A.    Public Disclosure

An allegation or transaction is publicly disclosed "when the essential elements exposing the particular transaction as fraudulent find their way into the public domain." Winkelman, 827 F.3d at 208 (quoting Ondis, 587 F.3d at 54). This can occur "either through 'a direct allegation of fraud' or through the revelation of 'both a misrepresented state of facts and a true state of facts so that the listener or reader may infer fraud.'" Id. (quoting Poteet, 619 F.3d at 110).

The direct allegation of fraud here is that Jazz "fraudulently procured a series of patents [on Xyrem] by withholding material prior art, which -- if properly disclosed to the [PTO] -- would have precluded the issuance of such patents." Dkt. 63 ¶ 11. The allegedly misrepresented state of facts is that Jazz's invention was not obvious; the allegedly true state of facts is that the invention was obvious. See Valeant, 89 F.4th at 1168. Jazz argues that these facts were publicly disclosed before Relator filed suit, including through proceedings before the PTO and PTAB, adverse event reports in the FDA's FAERS database, the 2012 revised Xyrem label and FDA Safety Communication, and two online articles discussing litigation over the '306 patent.[5]

Here, the allegedly false state of facts includes Jazz's representations to the PTO and PTAB that it was unaware of real-world coadministration of Xyrem and valproate. In particular, Relator alleges that during the prosecution of the '306 patent, Jazz argued to the PTO that the "effects of coadministration of GHB and valproate were unpredictable" before Jazz's invention. Dkt. 63 ¶ 52. Similar representations were made during IPR proceedings, including that "no drug product labeling even contemplated co-administering GHB and valproate" until Jazz's purported invention and that a person of ordinary skill "would do

---

[5] Though Jazz includes other disclosures, the Court does not rely on them in reaching its conclusions.

exactly what the Xyrem 2005 Label instructs, and avoid co-administration entirely." Id. ¶ 116(b)-(c) (emphasis omitted). And throughout its defense of the '306 patent family, Jazz "repeatedly argued that prior to [the] alleged invention, no medical doctor would (1) have even considered coadministering Xyrem and valproate, or (2) prescribed Xyrem at below the minimally indicated dose of 4.5g." Id. ¶ 57.

The allegedly true state of facts was publicly disclosed in a range of sources. According to the complaint, "[t]he FAERS database contains over 30 documented instances" of prior coadministration of GHB and valproate in clinical practice, as well as prescriptions for Xyrem initiated at doses below 4.5g. Id. ¶¶ 68, 72. Jazz also points to two news articles reporting on related patent litigation. One article from 2015 notes that a competitor argued the '306 patent was invalid because "[d]octors routinely determine if a patient is taking other medications, and if so, recommend dosage adjustments." Dkt. 73-18 at 2. The second article from 2018 reports that another competitor sought to show invalidity based on prior art and issued subpoenas for data on prior coadministration. Dkt. 73-32 at 2. Finally, the 2012 revised Xyrem label and the FDA's 2012 Safety Communication materials reflected that "Xyrem and CNS depressants . . . could be taken together." Dkt. 63 ¶ 100.

Together, these sources disclose both the allegedly misrepresented and the allegedly true facts. That is sufficient to trigger the public disclosure bar. See Ondis, 587 F.3d at 54 ("The two states of facts may come from different sources, as long as the disclosures together lead to a plausible inference of fraud.").

## B.    Statutorily Specified Sources

To qualify as a public disclosure under the FCA, the disclosure must originate from one of three statutorily prescribed channels: "(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media." 31 U.S.C. § 3730(e)(4)(A). Relator contends that neither IPR proceedings nor patent prosecution dockets fall within these channels.[6]

The Court agrees that IPR proceedings do not qualify as public disclosures under § 3730(e)(4)(A). An IPR allows third parties to challenge the validity of issued patents before the PTAB, which

---

[6] Relator does not dispute that the FAERS adverse event reports, the 2012 revised Xyrem label, the FDA Safety Communication, and the two online articles fall within the statutorily prescribed channels. Relator does challenge Jazz's reliance on a scientific article and a citizen petition, arguing that neither qualifies as a disclosure through one of the enumerated channels. Because the Court does not rely on these materials in reaching its conclusion, it need not resolve whether they fall within the scope of § 3730(e)(4)(A).

acts as the adjudicator. See 35 U.S.C. §§ 6(b)(4), 316(c). Put differently, an IPR proceeding "is a trial-like, adversarial hearing conducted before the PTAB between a patent owner and patent challenger." Valeant, 89 F.4th at 1165.

Jazz argues that because an IPR proceeding is "inquisitorial," often involves a "hearing," and "results in a 'report,'" it qualifies as a § 3730(e)(4)(A)(ii) disclosure. Dkt. 72 at 34. But this interpretation would effectively collapse subsection (i) -- which requires the government to be a party in adversarial proceedings -- into subsection (ii) since nearly any federal hearing with an adjudicator could then qualify under (ii), regardless of whether the government appears as a party. As the Ninth Circuit has reasoned, that reading would render § 3730(e)(4)(A)(i) "a nullity." Valeant, 89 F.4th at 1166; accord Janssen, 576 F. Supp. 3d at 225-26. The Court finds this logic persuasive and concludes that IPR proceedings do not satisfy the statutory criteria for public disclosure.

In contrast, ex parte patent prosecutions do fall within § 3730(e)(4)(A)(ii) as "other Federal . . . hearing[s]." Unlike IPRs, ex parte prosecutions are not adversarial. The process is investigative and administrative: the applicant submits materials to the PTO, which reviews them and either allows or rejects the application. See Allergan, 46 F.4th at 997-99. As the Ninth Circuit has explained, this nonadversarial character aligns ex parte

patent prosecutions with other investigative federal proceedings contemplated under subsection (ii). See id. Accordingly, the Court finds that ex parte patent prosecution dockets qualify as public disclosures under § 3730(e)(4)(A).

### C.  Substantial Similarity

To preclude a claim under the public disclosure bar, Jazz must show that Relator's complaint presents "substantially the same allegations or transactions" as those publicly disclosed in the statutorily recognized sources. 31 U.S.C. § 3730(e)(4)(A). In assessing whether two sets of allegations are "substantially the same," courts "bear in mind the core purpose of the FCA: to encourage suits by individuals with valuable knowledge of fraud unknown to the government." Winkelman, 827 F.3d at 210. Consequently, a public disclosure need not "define[] or label[] [the conduct] as fraudulent" so long as it "put[s] the government on notice of potential fraud." United States ex rel. Langer v. Zimmer Biomet Holdings, Inc., 743 F. Supp. 3d 282, 295 (D. Mass. 2024) (finding a news article disclosed "the crux" of relator's complaint by laying out the basic facts relevant to relator's claim). "[A]dd[ing] some color to the allegation[s]" is not sufficient to evade the public disclosure bar, Poteet, 619 F.3d at 115, "especially where the complaint targets the same potentially fraudulent conduct disclosed in the public sources," Langer, 743 F. Supp. 3d at 296.

23

Relator contends that the public disclosures Jazz identifies fall short of revealing substantially the same allegations because they contain "only innocuous facts (or omit facts, the import of which is not obvious), without any suggestion of impropriety." Dkt. 84 at 29. For support, Relator analogizes to Valeant, where the Ninth Circuit rejected a public disclosure defense. See 89 F.4th at 1169. There, the relator alleged that the defendant fraudulently obtained two patents by withholding scientific studies showing that the invention was obvious. See id. at 1158, 1167. The court held that the prior disclosures, including the withheld studies, statements from parallel patent proceedings, and articles questioning patent validity, failed to allege a combination of facts sufficient to permit a reasonable inference of fraud. See id. at 1168. Only the complaint, the court explained, added the "critical fact necessary for scienter," namely, that the defendant knowingly withheld the materials during patent prosecution. Id. Relator argues the same is true here, insisting he is "the only person who has ever surfaced the specific fraud alleged here, i.e., the knowing withholding of th[e] specific documents [alleged to have been withheld] during the prosecution of the '306 patent." Dkt. 84 at 29.

Relator's argument is unavailing. The First Circuit has held that a public disclosure of fraud can occur if disclosures reveal "both a misrepresented state of facts and a true state of facts so

24

that the listener or reader may infer fraud." <u>Winkelman</u>, 827 F.3d at 208 (quoting <u>Poteet</u>, 619 F.3d at 110). The crux of Relator's argument was publicly disclosed prior to the filing of his complaint. The allegedly false set of facts consists of Jazz's representations during prosecution of the '306 patent that no one had previously contemplated or safely implemented coadministration of GHB and valproate. The allegedly true set of facts includes publicly available information showing over thirty instances of such coadministration in the FAERS, the FDA's 2012 Drug Safety Communication instructing doctors to reduce the dose of Xyrem when administered with CNS depressants, and the Xyrem label recommending dose reduction. Taken together, these disclosures provided the government with enough information to infer that Jazz knowingly or recklessly omitted or misrepresented prior art evidence -- evidence that Jazz itself reported to the FDA -- in order to obtain the '306 patent.

The news articles further support this conclusion. One Law360 article reported that a competitor had "accused Jazz of attempting to 'evergreen' its drugs by seeking extra patents on different aspects of medications." Dkt. 73-18 at 2. Another article from 2018 reported that a different competitor suspected that Express Scripts, the exclusive filler of Xyrem prescriptions, possessed records confirming that patients had taken Xyrem concomitantly with a form of valproate as early as 2002. <u>See</u> Dkt. 73-32 at 2.

These accounts, taken together with Jazz's statements to the PTO, the FAERS records, the FDA's 2012 Safety Communication materials, and the 2012 revised Xyrem label, gave the government ample notice of the potential fraud Relator alleges.

Because the complaint merely "add[s] some color" to previously disclosed facts but "ultimately targets the same fraudulent scheme," the public disclosure bar is triggered. Poteet, 619 F.3d at 115. The combination of allegedly misrepresented and allegedly true facts had already placed the government on constructive notice of the same fraudulent conduct Relator now alleges. Accordingly, the Court finds that Relator's complaint presents substantially the same allegations as those previously disclosed.

### D. Original Source

Having found that the allegations in Relator's complaint are substantially the same as those publicly disclosed through statutorily recognized sources prior to this action, Relator's claims are barred unless he qualifies as an original source. See Ondis, 587 F.3d at 58. An original source is an individual who:

> (1) prior to a public disclosure under [31 U.S.C. § 3730(e)(4)(A)], has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B).

Jazz argues that Relator is not an original source because (i) he did not voluntarily disclose the relevant information to the government before the same allegations were publicly disclosed, and (ii) his allegations are neither independent of nor materially additive to those prior disclosures. Relator does not contend that he made a pre-disclosure submission to the government, so the Court limits its inquiry to whether he possessed "knowledge that is independent of and materially adds to the publicly disclosed allegations." Id.

The "independent of and materially adds" requirement is a demanding one. "Expertise that enables a relator to understand the significance of publicly disclosed information, without more, is insufficient." Ondis, 587 F.3d at 59-60. To materially add to the public record, a relator must offer information that is "significant, essential, or [capable of] influenc[ing] a person's decision-making." Zimmer Biomet, 743 F. Supp. 3d at 297. Merely "[o]ffering specific examples of . . . conduct does not" materially add "where the underlying conduct already has been publicly disclosed." Winkelman, 827 F.3d at 212. Courts routinely resolve whether a relator meets this standard at the motion to dismiss stage. See id. at 203, 213.

Relator argues that, even if substantially similar information was publicly disclosed before his complaint, he

nonetheless qualifies as an original source because only he synthesized those scattered disclosures into a coherent allegation of fraud. He emphasizes the technical complexity of the disclosures and the specialized knowledge required to understand their significance. This argument falls short. A relator cannot manufacture independence merely by identifying fraud in already-public materials using industry expertise. See Ondis, 587 F.3d at 59-60. Unlike in Zimmer Biomet, where the relator drew on ten years of firsthand experience at the defendant company to supply internal presentations, documents, and conversations, see 743 F. Supp. 3d at 296-97, Relator here has no personal or insider knowledge of Jazz's patent prosecution conduct. He did not work at the company, participate in the patent filings, or witness any fraudulent behavior. Nor does he supply any non-public evidence. His allegations rely entirely on information in the public domain. That Relator was the first to label this conduct "fraudulent" does not satisfy the original source exception. See Winkelman, 827 F.3d at 212 (rejecting relator's attempt to recast disclosed conduct as fraudulent without adding material, new information). Accordingly, the public disclosure bar applies, and Relator's FCA claim must be dismissed.

## IV.    **State-Law Claims**

Having dismissed the FCA claim, the Court declines to exercise supplemental jurisdiction over Relator's state-law claims. See 28

U.S.C. § 1367(c)(3); United States ex rel. Kelly v. Novartis Pharms. Corp., 827 F.3d 5, 15-16 (1st Cir. 2016) (directing dismissal without prejudice of claims under state false claims statutes following dismissal of FCA claim). Relator does not request otherwise. Accordingly, the state-law claims are dismissed without prejudice. See Kelly, 827 F.3d at 16; cf. Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass., 66 F.4th 307, 329 n.23 (1st Cir. 2023) (affirming declination of supplemental jurisdiction where plaintiff-appellant did not request otherwise).

### ORDER

For the reasons stated above, Jazz's motion to dismiss (Dkt. 71) is **ALLOWED**.


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge